**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

KERRY NIETZ, on behalf of himself and all others similarly situated,

Plaintiff,

v.

LPL FINANCIAL LLC,

Defendant.

Case No. '26CV3383 JES DEB

**CLASS ACTION COMPLAINT**

Demand for Jury Trial

# TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1

PARTIES ........ 2

JURISDICTION AND VENUE ........ 3

FACTUAL ALLEGATIONS ........ 3

A. Overview ........ 3

B. LPL Provided Advisory Services With Respect to the Phoenix Products ........ 6

C. LPL Was Aware of Phoenix's Deteriorating Financial Condition ........ 11

D. PHL Variable Insurance Co. and its Rehabilitation ........ 17

E. LPL Had a Conflict of Interest ........ 22

F. LPL Entered Several Consent Orders Regarding Its Advisers' Sale of Products ........ 24

G. Plaintiff Kerry Nietz's Experience ........ 25

CLASS ALLEGATIONS ........ 27

COUNT I ........ 30

COUNT II ........ 33

COUNT III ........ 37

COUNT IV ........ 39

COUNT V ........ 40

PRAYER FOR RELIEF ........ 43

JURY TRIAL DEMANDED ........ 44

Plaintiff Kerry Nietz ("Plaintiff") brings this action on behalf of himself, and all others similarly situated, against LPL Financial LLC ("LPL" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel, based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action on behalf of all persons in the United States who acquired rights under life insurance policies or annuity contracts issued by what was formerly known as The Phoenix Companies, Inc., now known as PHL Variable Insurance Company in Rehabilitation ("Phoenix" or "PHL"), and sold by Defendant LPL or purchased through LPL investment advisors.

2. Defendant LPL, as an investment advisor, occupied and assumed a unique position of trust and confidence with Plaintiffs and Class Members regarding the brokering, sale, and servicing of the Phoenix Products (as defined herein), which were knowingly used by Plaintiff and others similarly situated for retirement planning, estate planning, risk management planning, personal wealth planning, and/or investment planning.

3. Defendant abused its position of trust and confidence. For more than a decade, Defendant concealed real and imminent threats facing Plaintiff's and Class Members' insurance policies and annuity contracts and their associated benefits (the "Phoenix Products"). At all times after 2009, Defendant knew the financial risk facing Phoenix and chose to keep silent so it could hide its breaches of trust and failure to disclose while quietly pocketing and improperly retaining millions of dollars in upfront and trailer commissions, to the detriment of Plaintiff and Class Members. By the time Plaintiff and Class Members became aware of their financial injury, it was too late.

4. In 2023, the market value of Plaintiff's variable annuity contract (the "Nietz Variable Annuity") exceeded one million dollars, and it was well past the

surrender period—meaning that Plaintiff could have withdrawn the full market value of the Nietz Variable Annuity in cash. Today, PHL Variable Insurance Company is in rehabilitation, and Plaintiff and Class Members are unable to receive the full benefits due under their policies and contracts. Neither can they exchange, surrender, or withdraw the cash value of their Phoenix Products. For example, had Mr. Nietz been made aware of the material risk facing the Nietz Variable Annuity, he could have withdrawn the cash value in full or performed a 1035 exchange for a suitable alternative annuity with a solvent and better capitalized insurer.

5. Plaintiff's former LPL investment advisor has conceded that Plaintiff's financial injury was "years in the making." The same, former advisor acknowledged it is a "fair question" why Plaintiff's then-current LPL advisor never informed Plaintiff about the risk facing the Nietz Variable Annuity, given that financial advisor "was receiving a trail commission" during the time that Phoenix was rapidly deteriorating and in unsound condition.

6. Accordingly, Plaintiff brings claims against Defendant for professional negligence, breach of fiduciary duty, fraudulent concealment, unjust enrichment, and violation of Washington's Consumer Protection Act.

## PARTIES

7. Plaintiff Kerry Nietz is a resident and citizen of the State of Ohio and is domiciled in Wood County, Ohio. Mr. Nietz is the Primary Annuitant of the Flexible Premium Variable Accumulation Deferred Annuity sold under a Prospectus that was filed with the Securities and Exchange Commission under a product originally known as Phoenix Investor's Edge in 1999. Upon information and belief, Phoenix Investor's Edge is now known as The Big Edge Choice ("Big Edge Choice").

8. Based on estate planning recommendations that Mr. Nietz received from LPL, the Big Edge Choice was at all times relevant to this dispute owned by a Washington domiciled trust known as the Kerry L Nietz trust 1997 dated May 15, 1997 (the "Nietz Trust").

9. Defendant LPL Financial is a Limited Liability Company organized under the laws of California with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act ("CAFA"), because there are more than 100 Class members, at least one member of the Class is a citizen of a different state than Defendant, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs.

11. The Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

### A. Overview

13. Linsco/Private Ledger ("LPL") "is registered with the U.S. Securities and Exchange Commission as a broker-dealer and an investment adviser."[1] LPL has "a network of financial professionals ... who offer brokerage and investment advisory services."[2]

14. Investment advisers provide ongoing investment advice, continuously managing their customers' investment accounts.

15. LPL abandoned its fiduciary duties as an investment advisor to Plaintiff and Class Members. For over a decade, LPL profited from Plaintiff and Class Members' risky Phoenix insurance and annuity products, despite clear and mounting

[1] *LPL Financial LLC (LPL) Relationship Summary* (Mar. 31, 2026), available at https://brokercheck.finra.org/firm/summary/6413.

[2] *Id.*

warning signs of Phoenix's deteriorating financial condition. LPL's gain—millions of dollars of trail compensation—came directly at the expense of Plaintiff and Class Members, who now face devastating financial harm as a result.

16. LPL has been Plaintiff's investment advisor, and the Nietz Trust's investment advisor, since 1997. LPL acted as an investment advisor and fiduciary with respect to Mr. Nietz and the Nietz Trust throughout the time that Big Edge Choice was first acquired by the Nietz Trust in 1999, through May 20, 2024 when PHL Variable was placed into Rehabilitation by the Connecticut Insurance Department, and to the present day.

17. Beginning no later than 2009, LPL acquired particularized knowledge of financial risks associated with PHL and the Phoenix Products, and LPL was acutely aware of PHL's deteriorating financial condition that began with significant downgrades by rating agencies. These rating agencies included, for example, Moody's, Standard & Poor, and A.M. Best Company, and the downgrades materially affected PHL's financial results and reduced its ability to borrow.

18. Immediately following the ratings downgrades, both State Farm and National Life Group suspended sales of Phoenix annuities and life insurance policies. Prior to the suspension of sales of the Phoenix Products, State Farm and National Life accounted for more than 82% of Phoenix's annuity sales and State Farm alone accounted for 27% of Phoenix's life insurance premiums.

19. The impact of the loss of annuity and life insurance sales was severe, and the events of 2009 were confirmed in Phoenix's own SEC filings and observable by any broker-dealer or investment advisor risk or compliance department.

20. At some point following the 2009 events noted above, LPL removed Phoenix from its recommended products platform and ceased selling the Phoenix Products.

21. While Phoenix's financial condition continued to severely deteriorate after 2009, LPL never informed Mr. Nietz that his retirement security was at risk and

subject to disruption in the event of regulatory action by the Connecticut Insurance Department.

22. In fact, LPL never did a review of PHL for Mr. Nietz, never assessed whether or not Mr. Nietz's investment remained suitable for Mr. Nietz's retirement- and estate-planning objectives, and never recommended a surrender or even a partial withdrawal—even though by 2009 there was a 0% surrender charge associated with the Nietz Variable Annuity.

23. Even when Standard & Poor subsequently downgraded PHL five notches to junk status in 2019 (CCC+ from BB, citing a $100 million decline in capital adequacy), LPL remained radio silent.

24. When PHL announced in statutory annual statements that it "stopped marketing and selling new business" as of November 2019,[3] and therefore was therefore entering run-off, LPL remained silent and did not inform Plaintiff and Class Members.

25. By actively and continuously concealing PHL's deteriorating financial condition from 2009 through May 20, 2024, LPL prevented Mr. Nietz and others similarly situated from protecting their retirement security.

26. To add insult to injury, LPL continues to collect trailer commissions based on the notional value of the Big Edge Choice Variable Annuity, even though Mr. Nietz has not been able to withdraw anything from his investment due to the Moratorium Order that has remained in place since May 20, 2024.

///

///

[3] PHL Variable Insurance Company, Management's Discussion and Analysis of the Statutory Financial Condition and Results of Operations As of and for the Year Ended Dec. 31, 2019, at 1; PHL Variable Insurance Company Statutory Financial Statements and Supplemental Schedules Dec. 31, 2019 and 2018, Notes to Statutory Financial Statements, at 6 ("In November 2019, PHL stopped marketing and selling new business.").

### B. LPL Provided Advisory Services With Respect to the Phoenix Products

27. "LPL's advisory services are made available to clients" like Plaintiff and Class Members "primarily through individuals associated with LPL as investment adviser representatives ('IARs')."[4]

28. As relevant here, LPL and its investment advisors provided ongoing advisory services to Plaintiff and Class Members in connection with the "Phoenix Products.

29. LPL states that, as part of its "Investment Advisory Services," it will "typically monitor accounts, and specific investments within accounts, ***on an ongoing basis*** to align with your investment goals."[5] And in its Firm Brochure, LPL says: "LPL, through its IARs, provides ***personal financial planning*** and consulting services ***tailored to the individual needs*** of the client."[6]

30. LPL advised Plaintiff and Class Members with respect to retirement planning, estate planning, risk management planning, personal wealth planning, and/or investment planning.

31. In the course of providing such planning, consulting, and advisory services, LPL advised Plaintiff and Class Members regarding the Phoenix Products.

32. LPL presented the Phoenix Products to Plaintiff and Class Members as tailored, "customized," wealth management products that were best suited for Plaintiff

---

[4] LPL FIRM BROCHURE A58 (Mar. 31, 2026), at 2, available at https://adviserinfo.sec.gov/firm/brochure/6413.

[5] LPL FINANCIAL LLC (LPL) RELATIONSHIP SUMMARY (Eff. Mar. 31, 2026), at 1, available at https://www.lpl.com/content/dam/edam/format/disclosure/relationship-summary/ap-gwp-r.pdf (emphasis added).

[6] LPL FIRM BROCHURE A58 (Mar. 31, 2026), at 3, available at https://adviserinfo.sec.gov/firm/brochure/6413 (emphasis added).

and Class Members' needs.[7]

33. LPL's "Wealth Management Products" include but are not limited to "Annuities" and "Comprehensive Insurance Solutions[.]" LPL's annuity and insurance wealth management products are detailed on the LPL website (which website is designed to provide information on LPL product offerings) as follows:[8]

> **Annuities**
>
> Combine your experience with access to a wide array of annuity products that can help your clients preserve and manage their assets. You'll also gain access to robust research tools and platforms so you can analyze products, compare options, and make informed recommendations that fit your clients' long-term goals.
>
> - Deferred income annuities (DIA)
> - Fee-Based annuity solutions
> - Fixed annuities
> - Fixed index annuities
> - Registered index-linked annuities
> - Single premium immediate annuities (SPIA)
> - Variable annuities
>
> **Comprehensive Insurance Solutions**
>
> Help your clients protect what matters most. With LPL's in-house insurance agency, you can access a wide selection of name-brand carriers and life insurance products to fit each client's unique protection and legacy goals.
>
> Available options include:
>
> Term life

---

[7] *See, e.g.*, LPL FINANCIAL, WEALTH MANAGEMENT PRODUCTS, available at https://www.lpl.com/join-lpl/managing-your-business/products-platforms/products.html ("At LPL Financial, we help advisors build tailored portfolios, access a wide range of nonproprietary products, and craft solutions that are customized to fit their clients' lives and goals.") (last accessed May 27, 2026).

[8] *See generally id.*

Whole life
Universal life

34. At all relevant times, LPL knew that the Phoenix Products (i.e. Phoenix annuities[9] and life insurance) were sold to LPL customers to protect families from the early demise of a primary wage earner and to provide estate planning and wealth management strategies for their customers. LPL knew that Plaintiff and Class Members purchased and retained these products to ensure that Plaintiff and Class Members could protect their families and maintain their lifestyle in their retirement years.

35. According to the LPL website:

> Having enough retirement income is a top concern for many Americans nearing or in retirement. Even though they may have saved consistently throughout the working years, they may be concerned that their retirement plans will succeed. A successful retirement plan provides the ability to maintain your lifestyle for the duration of your life.[10]

36. LPL reiterates just how important the Phoenix annuity products were for Plaintiff's and Class Members' retirement, risk management, personal wealth, and/or investment planning, for example, when it says: "For those seeking income and safety, annuities may be an asset class they may want to consider."[11]

37. LPL knew that its clients, including Plaintiff and Class Members, "count on" their LPL advisors. LPL knew that its advisers held a significant position of trust among clients like Plaintiff and Class Members:

[9] INNOVATE FINANCIAL BY LPL FINANCIAL, RETIREMENT ANNUITIES EXPLAINED: WHAT THEY ARE AND HOW THEY WORK, https://if.lpl.com/blog/retirement-annuities-explained-what-they-are-and-how-they-work ("Annuities help retirees address a specific retirement planning risk- Longevity Risk. Longevity Risk is the risk that a retiree outlives their financial assets.").

[10] *Id.*

[11] *Id.*

> *Investors count on financial advisors* for guidance they can trust. At LPL Financial, we help advisors build tailored portfolios, access a wide range of nonproprietary products, and craft solutions that are customized to fit their clients' lives and goals.[12]

38. LPL used its position of trust and confidence to sell and advise Plaintiff and Class Members on the Phoenix Products. LPL marketed and sold the Phoenix life and annuity products through thousands of its investment advisors "in branch offices throughout the United States"[13] pursuant to a written marketing agreement with Phoenix, after LPL "entered into an agreement to acquire the retail broker-dealer operations of The Phoenix Companies Inc."[14] Phoenix described this agreement with LPL as part of an "industry trend" that "led to ***advisor groups becoming a distinct class of distributors***."[15] According to Todd Robinson, chairman and CEO of LPL: "We believe LPL offers these advisors an excellent platform to grow their business[] …. In addition, this move will strengthen [LPL's] ability to leverage Phoenix's life, annuity and asset management products and expertise to ***enhance our high-net-worth***

---

[12] LPL FINANCIAL, WEALTH MANAGEMENT PRODUCTS, available at https://www.lpl.com/join-lpl/managing-your-business/products-platforms/products.html (emphasis added).

[13] https://www.sec.gov/Archives/edgar/data/1129633/000094937704000150/pnx_66152-ex1.htm; *see also* https://www.sec.gov/Archives/edgar/data/1129633/000094937704000490/pnx68085_10q.htm.

[14] FINANCIAL ADVISOR, LPL TO ACQUIRE PHOENIX BROKER-DEALERS (Apr. 20, 2004), https://www.fa-mag.com/news/article-2049.html (last accessed May 16, 2026); *see also* PHOENIX ACTION UNLEASHES BACKLASH, HARTFORD COURANT (July 30, 2004) (updated Sep. 3, 2021), available at https://www.courant.com/2004/07/30/phoenix-action-unleashes-backlash/.

[15] https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm (emphasis added); https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/form10k2006.pdf

***services***."[16]

39. This agreement was profitable for both Phoenix and LPL. "During 2005, [Phoenix] realized a gain of $1.5 million related to contingent consideration based on gross distribution concessions earned by LPL during the first year following the sale."[17] And in the span of one year following its advisors moving to LPL, Phoenix made $24.9 million *more* than it had the previous year, or, $58.7 million total. This is shown by the delta between the Second Quarter 2004 "Life and Annuity Segment Income" ($33.8 million) and Second Quarter 2005 "Life and Annuity Segment Income" ($58.7 million):[18]

**SUMMARY OF SEGMENT RESULTS**

**Life and Annuity**

| **Summary (millions)** | **Second Quarter 2005** | **Second Quarter 2004** | **Change** |
|---|---|---|---|
| Life Insurance Income (pre-tax) | $68.3 | $29.2 | $39.1 |
| Annuity Income (Loss) (pre-tax) | (9.6) | 4.6 | (14.2) |
| Life and Annuity Segment Income (pre-tax) | $58.7 | $33.8 | $24.9 |
| Life Insurance Sales (Annualized + Single Premium) | $34.4 | $36.5 | $(2.1) |
| Annuity Deposits | 80.4 | 137.9 | (57.5) |
| Annuity Net Deposits | $(155.1) | $(30.0) | $(125.1) |

- Life and Annuity segment income reflects year-over-year improvements in investment and mortality margins, continued strong persistency and the benefit of expense reductions, particularly those related to the second quarter 2004 sale of Phoenix's affiliated retail distribution to Linsco/Private Ledger (LPL).
- Life Insurance income included a $34.3 million pre-tax DAC benefit related primarily to the recognition of favorable mortality experience.

---

[16] FINANCIAL ADVISOR, LPL TO ACQUIRE PHOENIX BROKER-DEALERS (Apr. 20, 2004), https://www.fa-mag.com/news/article-2049.html (last accessed May 16, 2026) (emphasis added).

[17] https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm; https://www.sec.gov/Archives/edgar/data/1129633/000094937705000849/pnx_74468-10q.htm

[18] https://www.sec.gov/Archives/edgar/data/1129633/000094937705000674/pnx72838_8-k.htm

### C. LPL Was Aware of Phoenix's Deteriorating Financial Condition

40. As Plaintiff's former LPL advisor noted, PHL Variable's rehabilitation-turned liquidation was "years in the making"—PHL Variable did not deteriorate overnight. It certainly did not come as a surprise to LPL and its investment advisors. LPL knew that PHL Variable was in failing financial condition for over a decade.

41. LPL stuck its head in the sand as to the material risk facing Phoenix/PHL Variable, and actively concealed the material risk facing Plaintiff and Class Members who purchased the Phoenix Products.

42. In a 2009 Form 10-Q, Phoenix said: "We have recently been downgraded and had our outlook revised adversely."[19] Phoenix went on to explain:

> - On September 8, 2009, Moody's Investor Services downgraded our financial strength rating of Baa2 to Ba1 and lowered our senior debt rating from Ba2 to B1. They maintained their negative outlook on all ratings.
>
> - On August 6, 2009, Standard & Poor's downgraded our financial strength rating of BBB- to BB and lowered our senior debt rating from B+ to B-. They maintained their negative outlook on all ratings.
>
> - On March 10, 2009, A.M. Best Company, Inc. downgraded our financial strength rating to B++ from A and downgraded our senior debt rating to bb+ from bbb and maintained its negative outlook.
>
> These **downgrades have materially and adversely affected new sales, persistency, our relationships with distributors and our financial results, and have reduced our ability to borrow**. Further declines in ratings would likely also materially and adversely affect our sales, persistency, our relationships with distributors and our financial results.[20]

---

[19] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

[20] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf (emphasis added).

43. For reasonable individuals like Plaintiff and Class Members who are not familiar with and generally do not subscribe to rating agency reports, this information is not readily available, and it is difficult to decipher.

44. However, LPL, as (1) both a sophisticated advisor and broker-dealer and (2) a Phoenix insider, who had thousands of formerly-Phoenix investment advisors, knew this downgrading was highly significant and would likely impact Plaintiff's and Class Members' Phoenix policies and/or annuity contracts. Phoenix's financial strength rating being downgraded from Baa2 to Ba1 changed PHL's rating from that of "***Investment***-Grade" to merely "***Speculative***-Grade."[21]

45. As a result of this initial downgrade, ***LPL removed Phoenix annuities and life insurance products from LPL's list of recommended products.***

46. There were dates—in addition to the 2009 downgrades—when LPL knew, or, by the exercise of reasonable diligence should have known, of facts or circumstances which would put a reasonable investment advisor on notice that the Phoenix insurance and annuity products presented an unreasonable and material risk to its customers.

47. For example, in August 2012, Phoenix executed a 1-for-20 reverse stock split.[22] Reverse stock splits "are often done by … financially struggling companies. … [D]oing a reverse stock split can be a red flag to investors" and "investors are often right to proceed with caution."[23]

48. In 2012, Phoenix reported that it had "***identified a material weakness*** in our internal controls over financial reporting during" 2010. This should have been a

---

[21] *See, e.g.*, Moody's Ratings System (May 2006), available at https://www.moodys.com/uploadpage/2005700000433096.pdf (emphasis added).

[22] *See* https://www.sec.gov/Archives/edgar/data/1129633/000135448814003889/pnx_ex991.htm

[23] Carpenter Wellington PLLC, *Reverse Stock Splits as a Strategy of Struggling Companies* (Dec. 7, 2025), available at https://carpenterwellington.com/post/reverse-stock-splits-as-a-strategy-of-struggling-companies/.

major red flag to LPL because, as Phoenix explains in the same 10-K, "[e]ffective ***internal controls are necessary*** for [Phoenix] to provide timely and reliable financial reports and ***effectively prevent fraud***. …. If [Phoenix] fail[s] to maintain adequate internal controls our financial statements may not accurately reflect our financial condition, which could cause [Phoenix] investors to lose confidence in our reported financial information and ***have an adverse effect on our [Phoenix's] business***."[24]

49. On March 21, 2014, the SEC approved a cease-and-desist order ("Order") related to Phoenix and PHL Variable Insurance Company's "failure to file timely periodic reports" with the SEC, which Order "directed [Phoenix and PHL Variable Insurance Company] to cease and desist from committing or causing any violations and any future violations of" Sections 13(a) and 15(d) of the Exchange Act.[25] Also as a result of this Order, Phoenix and PHL Variable Insurance Company "each paid a civil monetary penalty in the amount of $375,000 to the United States Treasury following the entry of the Order."[26]

50. In a 2014 Form 10K, Phoenix warned in its Item 1A Risk Factors that "PHL Variable … ***will continue to not issue any new SEC-registered life insurance and annuity contracts*** until new registration statements or amendments to existing registration statements covering the offer and sale of these products have been filed

---

[24] https://www.sec.gov/Archives/edgar/data/1129633/000135448812001152/pnx_10k.htm (emphasis added).

[25] https://www.sec.gov/Archives/edgar/data/1129633/000135448814001585/pnx_10k.htm. *See also* https://www.sec.gov/rules-regulations/staff-guidance/corporation-finance-interpretations/exchange-act-sections ("While filing required documents late will not 'cure' Section 13(a) or 15(d) violations, and will not make the registrant timely for purposes of eligibility to use certain Securities Act forms, it will permit the registrant to become current in its Exchange Act reporting.").

[26] https://www.sec.gov/Archives/edgar/data/1129633/000135448814001585/pnx_10k.htm.

with and declared effective by the SEC."[27] This is especially alarming given that Phoenix "conduct[ed] the majority of [its] business through Phoenix Life and its indirect subsidiary, PHL Variable."[28]

51. Moreover, Phoenix has been known by industry insiders to be "largely dependent" on Stranger Oriented Life Insurance (STOLI) schemes,[29] in which investors "prey[] on seniors and misus[e] life insurance for their own gain[.]"[30] Industry insiders would have been aware of this fact as early as 2012, when Phoenix employees "told the company [Phoenix] that it [Phoenix] would go bankrupt if it continued to issue policies based on fake underwriting, but his warnings went unheeded."[31] Indeed, "about 80% of Phoenix's sales were investor-owned life insurance (IOLI) policies, another term for STOLI[.]"[32]

52. Critically, ***PHL Variable warned LPL and other investment advisors***

---

[27] https://www.sec.gov/Archives/edgar/data/1129633/000112963315000004/pnx-20141231x10k.htm (emphasis added).

[28] *Id.*

[29] Donna Horowitz, *Insiders Say Phoenix Sought STOLIs, Bolstering $466.9M RICO Case* (June 19, 2012), THE DEAL (emphasis added).

[30] https://insurance.ohio.gov/companies/product-regulation-and-actuarial-services/resources/stranger-originated-life-insurance-stoli; *see also* Donna Horowitz, THE LIFE SETTLEMENTS REPORT (Sep. 6, 2012), available at https://david-kroll-4824.squarespace.com/s/Sep-6-2012-Life-Settlement-Report.pdf.

[31] Donna Horowitz, *Insiders Say Phoenix Sought STOLIs, Bolstering $466.9M RICO Case* (June 19, 2012), THE DEAL (emphasis added). The Life Settlements Report is published by The Deal. The Deal serves law firms, private equity, hedge funds, and insurance firms. *See* THE DEAL, SOLUTIONS FOR YOUR INDUSTRY, https://www.thedeal.com/solutions/. As such, the Life Settlements Report is accessible to industry insiders like LPL—but not the public. "The [Life Settlements Report] provides the in-depth coverage brokers, providers, attorneys, investors and service providers need to stay current with breaking news, get ahead of competitors and keep up with regulations." THE DEAL, LIFE SETTLEMENTS REPORT, https://www.thedeal.com/solutions/life-settlements-report/.

[32] *Id.*

***<u>that it may be placed into rehabilitation as early as 2015</u>***:

> If the Company [PHL Variable Insurance Company] is unable to meet its capital needs either by itself or with assistance from Phoenix, the Company could become subject to increased regulatory oversight by its domestic insurance regulator ***<u>or to other regulatory actions including rehabilitation</u>***, any of which may materially adversely affect the Company's business, financial condition or results of operations.[33]

53. In 2016, Nassau Financial took The Phoenix Companies private.[34] Part of this transaction included "PHL Variable Insurance Company ('PHL Variable'), one of Phoenix's operating subsidiaries."[35]

54. PHL Variable repeatedly experienced solvency problems from the time Defendant removed Phoenix annuities and life insurance products from LPL's list of recommended products, through PHL Variable's eventual administrative supervision and rehabilitation-turned liquidation.

55. Industry insiders, like LPL, have been aware of these material facts surrounding Phoenix/PHL Variable's ongoing financial troubles since 2009, which facts would have been known by Defendant and not consumers like Plaintiff and Class Members. Instead of sharing these material facts and issues, Defendant chose to improperly conceal that material information from Plaintiff and Class Members.

---

[33] https://www.sec.gov/Archives/edgar/data/1031223/000119312515300293/d29133d424b3.htm (emphasis added).

[34] *See, e.g.*, Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle ("Once part of the Hartford-based Phoenix Companies, PHL became part of Nassau Financial in 2016, when Nassau, then only a year old, bought the publicly-traded Phoenix, took it private, and retired the Phoenix brand.").

[35] https://www.sec.gov/Archives/edgar/data/1129633/000157104916016107/t1601599_ex99-1.htm; *see also* https://doi.sc.gov/DocumentCenter/View/12789/PHL-Variable-Insurance-Company.

56. In 2019, "PHL entered several reinsurance deals with 'captive' and 'affiliated' reinsurers to reduce its liabilities and bolster its surplus."[36]

57. Also in 2019, Standard & Poor subsequently downgraded PHL five notches to junk status (CCC+ from BB, citing a $100 million decline in capital adequacy).

58. Moreover, at year-end 2019, PHL announced in statutory annual statements that it had in "stopped marketing and selling new business"[37] and was therefore entering run-off.

59. "In late 2021, PHL was separated from Nassau and transferred to a different Golden Gate Capital subsidiary, essentially isolating the failing business from Nassau's healthier life insurance units."[38]

60. In 2023, regulators placed PHL Variable under administrative supervision. "Rehabilitation is a court proceeding that a company's state insurance commissioner may initiate to take control of the company if it is in a hazardous financial condition."[39]

---

[36] Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/ ("It's not clear how much independent capital these reinsurers posted. Ultimately, these band-aid solutions failed.").

[37] PHL Variable Insurance Company, Management's Discussion and Analysis of the Statutory Financial Condition and Results of Operations As of and for the Year Ended Dec. 31, 2019, at 1; PHL Variable Insurance Company Statutory Financial Statements and Supplemental Schedules Dec. 31, 2019 and 2018, Notes to Statutory Financial Statements, at 6 ("In November 2019, PHL stopped marketing and selling new business.").

[38] John Hilton, *A decade in decline: PHL Variable serving as a cautionary tale*, INSURANCE NEWSNET (Jan. 22, 2026), https://insurancenewsnet.com/innarticle/a-decade-in-decline-phl-variable-serving-as-a-cautionary-tale.

[39] CT INSURANCE DEPARTMENT, *PHL Variable Insurance Company Rehabilitation*, https://portal.ct.gov/cid/phlstakeholder?language=en_US.

61. LPL and its IARs knew or should have known of these circumstances, and either did or should have investigated the stability and suitability of the Phoenix Products before advising that Plaintiffs maintain such investment products, especially given that PHL Variable, now private, was no longer required to file periodic reports with the SEC.

62. Yet LPL concealed these material facts and continued to collect trail compensation based on Phoenix life insurance policies and annuity contracts that LPL sold to Plaintiff and Class Members and continued to service.

63. Once LPL knew that PHL was experiencing solvency concerns it became duty bound to share those concerns with Plaintiff and Class Members. LPL had an ongoing and continuous duty to warn Plaintiff and Class Members about the financial condition of PHL Variable once it was no longer a suitable insurer but failed to do so at all times after 2009. In fact, rather than warn Plaintiff and Class Members about known risks, LPL actively concealed Phoenix's deterioration and financial troubles from Plaintiff and Class Members.

64. LPL knew that Plaintiff and Class Members are unsophisticated parties when it comes to the complexities of insurance, annuities, corporate structures, and insolvencies. This is precisely why Plaintiff and Class Members utilized Defendant's advisory services and trusted Defendant to provide materials facts regarding their Phoenix Products.

65. LPL continued to receive trail compensation on the Phoenix Products it serviced, which is why Plaintiff and Class Members were intentionally left in the dark as to PHL's deteriorating state. More information regarding trail compensation, and conflicts of interest associated therewith, are explained in greater detail *infra* § E.

**D. PHL Variable Insurance Co. and its Rehabilitation**

66. On March 31, 2023, Connecticut Insurance Department (the "CID") "placed [PHL Variable] under an order of administrative supervision ... having

determined that regulatory supervision was appropriate to help safeguard the financial security of" PHL Variable.[40]

67. Over a year later, on May 20, 2024, PHL Variable and its subsidiaries, Concord Re, Inc. and Palisado Re, Inc, both of which were Connecticut captive reinsurance companies, were ordered into Rehabilitation by the CID (the "PHL Rehabilitation").

68. In connection with the PHL Rehabilitation, the CID determined that "further transaction of business would be financially hazardous to its policyholders, creditors and the public[.]"[41] As the Commissioner set out, at the time the Rehabilitation commenced, Phoenix had ***negative $900 million*** in capital and surplus.[42]

69. As a result of the rehabilitation, the PHL Rehabilitator issued a Temporary Moratorium Order effective May 20, 2024, preventing or limiting policy withdrawals, surrenders and death benefit payouts.

70. "As of September 30, 2025, on a combined basis, the Companies' approximate capital and surplus remained stable at ***negative $2.2 billion***[,]"[43] and, by 2030, approximately ***$1.46 billion of policyholder liabilities will remain unpaid***.[44]

---

[40] *See* Petition For Order Of Rehabilitation And Appointment Of State Insurance Commissioner As Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024), available at https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf.

[41] May 20, 2024 Order, available at https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=27532057.

[42] *See* https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf.

[43] Rehabilitator's Third Accounting and Status Report (Nov. 20, 2025), available at https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=31401323, at 14 (emphasis added).

[44] Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-

71. PHL Variable's rehabilitation would not have come as a surprise to Defendant, who had been fully aware of financial troubles facing PHL Variable since at least 2009, when LPL removed Phoenix annuities and life insurance products from LPL's list of recommended products.

72. On New Year's Eve, December 31, 2025, PHL Variable and/or the State of Connecticut, but *not* LPL, explained that the PHL Variable rehabilitation "is not feasible" and that PHL Variable and its subsidiaries "do not have the assets that would be necessary to transfer to a buyer or reinsurer any blocks of business without causing other policyholders to receive less than what they would receive from the guaranty associations in a conventional liquidation."[45]

73. In other words, the "Rehabilitator determined that rehabilitation of PHL is not possible."[46] "The timing for the transition to a PHL liquidation proceeding is uncertain but is expected in the first half of 2027."[47]

74. Plaintiff and Class Members were immediately harmed and will remain harmed with inadequate recourse regardless of the outcome of the PHL Rehabilitation.

75. Plaintiff and Class Members are definitively unable to obtain benefits to which they are entitled—despite paying hundreds of millions of dollars in premiums in connection with these benefits, and despite Defendant knowingly and willingly concealing and omitting Phoenix/PHL Variable's deteriorating financial condition and impending insolvency so it could continue collecting trail compensation.

---

trouble-in-the-bermuda-triangle/ (citing Petition for Order Of Rehabilitation and Appointment Of State Insurance Commissioner as Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024)).

[45] https://portal.ct.gov/cid/-/media/cid/1_legal/report-of-the-rehabilitator-12-31-2025.pdf.

[46] https://portal.ct.gov/cid/phlpolicyholder?language=en_US (last accessed June 2, 2026).

[47] https://portal.ct.gov/cid/phlpolicyholder?language=en_US.

76. The Moratorium Order, in place since May 20, 2024, prevents all policyholders from withdrawing funds from Variable Annuities and Life Insurance policies with Cash Surrender Values.

77. The Moratorium Order provided an aggregate limit on death claims of no more than $300,000, "regardless of the … size" of the life insurance policy:

> *Aggregate Limit - Life Insurance Policies Covering One Individual*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $300,000 in the aggregate under one or more life insurance policies covering one individual regardless of who owns the policies or the number of beneficiaries.[48]

78. The Moratorium Order also provided an aggregate limit of $250,000 for annuities:

> *Aggregate Limit - Annuities Covering One Annuitant*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $250,000 in the aggregate under one or more annuities covering one annuitant regardless of who owns the annuities or the number of beneficiaries.

79. As of 2021, the market value of the Nietz Variable Annuity was **$1,063,037.25**, or, over $800,000 more than what Plaintiff is presently entitled to.

80. Defendant had the ability and obligation to prevent such enormous financial injury. Defendant could and should have spared Plaintiff and Class Members from the anxiety, fear, and uncertainty now facing Plaintiff, Class Members, their families, and their estates.

81. Plaintiff and Class Members will not be made whole, nor will LPL be held remotely accountable, by the outcome of the PHL Rehabilitation. Here, the Insurance Commissioner of the State of Connecticut will be empowered to collect as well as distribute the remaining assets of PHL.

---

[48] https://portal.ct.gov/cid/-/media/cid/1_legal/phl-moratoriumorder.pdf.

82. Plaintiff and Class Members are only one of many creditors the Commissioner will attempt to distribute funds to—to the extent it can. It is certain that Plaintiff and Class Members will not receive the entirety of what they are owed. Indeed, on April 13, 2026, the Rehabilitator said that Plaintiff and Class members can now only expect to receive between "34 to 57%" of what they are owed.[49]

83. But in no situation can the Commissioner seek and distribute assets of LPL to satisfy the claims of PHL Variable creditors.

84. The Connecticut state liquidation proceeding does not contain the same parties nor is it seeking to hold LPL liable for the claims asserted herein. The Connecticut state liquidation proceeding will not dispose of any claims presented in this federal case.

85. Had Plaintiff and Class Members been notified of Phoenix/PHL Variable's financial condition prior to 2024, they could have exchanged their Phoenix life insurance and annuity products for more suitable products.

86. Specifically, Plaintiff and Class Members could have performed an exchange of insurance policies or annuity contracts under 26 U.S.C. § 1035 (a "1035 Exchange"). A 1035 Exchange allows policyholders to transfer funds from a life insurance policy, endowment, or annuity to a policy of a similar type. *See* 26 U.S.C. § 1035. The benefit of filing a 1035 Exchange request is that it allows the policyholder to transfer the funds without recognizing any gain or loss.

87. Additionally, had Plaintiff and Class Members been notified of Phoenix/PHL Variable's financial troubles and the extent of risk facing their Phoenix Products prior to 2024, Plaintiff and Class Members could have simply surrendered

---

[49] PHL POLICY AND ANNUITY HOLDER INFORMATION SESSION – MEETING RECORDING (Apr. 13, 2026), at 11-12, 14, transcript available at https://portal.ct.gov/cid/-/media/cid/1_phl/phl-policy-and-annuity-holder-information-session.pdf.

their policies and purchased other suitable, less risky life insurance and annuity products.[50]

88. Finally, Plaintiff and Class Members could have withdrawn the cash value of their insurance policies and/or annuity contracts. Mr. Nietz could have withdrawn in excess of $1,000,000.00 in cash prior to May 20, 2024—and would have done so had he known PHL was at risk of regulatory action.

89. LPL has yet to issue any notice, guidance, or other communication to Plaintiff and Class Members regarding their Phoenix Products.

90. Defendant has failed Plaintiff and Class members in all of these regards. Defendant abused its position of trust and disregarded its fiduciary duties.

### E. LPL Had a Conflict of Interest

91. LPL, as an investment advisor, "provides investment advice to clients for a fee."[51] LPL had fee arrangements with respect to the Phoenix Products that were already in force, which fee arrangements were called "trail" or "trailing" commissions.

92. These fee arrangements were so profitable that LPL decided to keep Plaintiff and Class Members in the dark to ensure it could continue to collect trailer commissions, at the expense of Plaintiff and Class Members, who were never warned of the material risk facing their Phoenix Products. The powerful conflicts of interest trail commissions can create is well-documented:

> ***Specific to the annuity market***, the DOL recognized that conflicts of interest "can be more pronounced than the mutual fund market because commissions in the annuity market...are generally higher than commissions earned in connection with the

---

[50] "One of the most attractive reasons to purchase **permanent life insurance**, aside from the death benefit protection, is that it **can also be a wealth-building asset**. … Cash surrender value is the actual amount of money you will receive if you choose to terminate a permanent life insurance policy before its maturity date, or before you die." https://www.guardianlife.com/life-insurance/surrender (emphasis added).

[51] FINRA, INVESTMENT ADVISERS, https://www.finra.org/investors/investing/working-with-investment-professional/investment-advisers (last accessed May 27, 2026).

> recommendation of mutual funds." …. The DOL cited research suggesting that this commission structure "incentivizes insurance agents to steer consumers toward insurance products with higher commissions" which "***may have led consumers to purchase annuities that were not in their best interest***."

*Mkt. Synergy Grp., Inc. v. United States Dep't of Lab.*, No. 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *10 (D. Kan. Nov. 28, 2016) (emphasis added) (citing Dep't of Labor, *Regulating Advice Markets, Regulatory Impact Analysis for Final Rule and Exemptions* (Apr. 2016), at 168).[52]

93. LPL receives trail commissions *precisely because LPL is supposed to continue to service and provide investment advice* for clients like Plaintiff and Class Members who purchased the Phoenix Products through LPL.[53] For example, LPL says that "[t]rail payment from an annuity issuer for the … ***servicing of a policy"*** is "typically 1.5%, [but that number] varies depending on the type of annuity."[54] LPL also received upfront commissions for the Phoenix Products. For LPL, "upfront commission paid for new sales of annuities is typically 7%, but varies" depending on several factors.[55]

94. LPL took active steps to ensure that its trail commissions stayed intact during the same time that PHL Variable was failing and in unsound financial condition. A news article from January 2019 explains: "LPL Financial ... signed

---

[52] *Regulating Advice Markets* is available for download at https://www.dol.gov/agencies/ebsa/laws-and-regulations/rules-and-regulations/completed-rulemaking/1210-ab32-2/ria.

[53] *See, e.g.*, LPL FIRM BROCHURE A58 (MAR. 31, 2026), at 9, available at https://adviserinfo.sec.gov/firm/brochure/6413 ("If the custom advisory services apply to variable annuities or variable universal life insurance products for which the IAR receives trail compensation, such trail fees generally will be used to offset the advisory fee.").

[54] https://www.lpl.com/content/dam/lpl-www/documents/disclosures/brokerage_compensation_conflicts_of_interest.pdf, at 3 (emphasis added).

[55] *Id.* at 2.

contracts with 15 ... [variably annuity] VA providers to ensure commissions and contracts are protected going forward."[56]

**F. LPL Entered Several Consent Orders Regarding Its Advisers' Sale of Products**

95. LPL has a significant history of failing to supervise its investment advisors and broker-dealers.

96. LPL has repeatedly been punished in connection with its failure to supervise LPL employees and agents, including LPL broker-dealers and investment advisers.

97. LPL has entered into several "consent orders related to the following matters" (in addition to other consent orders not listed):

- LPL's supervision of an LPL broker-dealer/investment adviser agent's sales of structured products, resulting in a censure, an offer of restitution to impacted clients, and a fine of $125,000 (Texas, 2022).
- LPL's supervision of two LPL broker-dealer and/or investment adviser agents who pled guilty to charges of fraudulent practices with LPL customers, resulting in a cease and desist order, a fine of $350,000 and a $150,000 contribution for financial literacy and investor education initiatives, training and related materials (Connecticut, 2021).
- LPL's supervision of an LPL representative under a heightened supervision plan, resulting in a cease and desist order; a fine of $275,000; payments of restitution, disgorgement and investigative costs; and offers of payment of surrender charges in connection with variable annuity contracts for impacted customers (New Hampshire or "NH", 2020).

[56] Diana Britton, *LPL Moves to Protect Future Trail Commissions on Variable Annuities*, WEALTH MANAGEMENT (Jan. 24, 2019), available at https://www.wealthmanagement.com/ria-news/lpl-moves-to-protect-future-trail-commissions-on-variable-annuities.

- LPL's oversight of certain VA transactions, resulting in a censure, a fine of $975,000, restitution to clients and former clients of an LPL representative, disgorgement of commissions retained by LPL in connection with such representative's VA sales, and an undertaking to review such representative's brokerage and advisory activities and LPL's related policies and procedures (MA, 2017).[57]

**G. Plaintiff Kerry Nietz's Experience**

98. Plaintiff Kerry Nietz was advised by LPL investment advisors to acquire rights under and purchase, and Plaintiff Nietz did acquire rights under and purchase, a variable annuity contract offered by The Phoenix Companies, Inc.

99. Plaintiff has been a loyal LPL client and investor for over two decades.

100. Plaintiff's relationship with LPL began in or around 1997 when the Nietz Trust was created based on advice provided to Mr. Nietz by LPL.

101. Plaintiff maintained a relationship with an LPL financial advisor, Mr. Barry Hartz ("Advisor Hartz"), starting in 1997. Advisor Hartz offered advisory services through LPL Financial.

102. Between approximately 1997 and 2013, Advisor Hartz advised Plaintiff as to estate planning and retirement planning, among other investment topics.

103. Advisor Hartz set up the Nietz Trust for Plaintiff in or around 1997.

104. Advisor Hartz advised Plaintiff on financial planning for his retirement years. Advisor Hartz recommended that Plaintiff purchase a Phoenix variable annuity, and in or around 1999, relying on Advisor Hartz's advice, Plaintiff purchased the Nietz Variable Annuity.

105. In or around 2013, Advisor Hartz retired, and an LPL advisor named Nicholas Snyder ("Advisor Snyder") took over as Plaintiff's new LPL financial advisor.

---

[57] https://www.lpl.com/content/dam/edam/format/disclosure/relationship-summary/ap-gwp-r.pdf.

106. Advisor Snyder offered advisory services through LPL Financial.

107. As of 2021, the market value of Plaintiff's Phoenix variable annuity was $1,063,037.25.

108. At no point did LPL, Advisor Snyder or any LPL representative make Plaintiff aware of the material risk of his Phoenix variable annuity.

109. At no point did LPL, Advisor Snyder or any LPL representative make Plaintiff aware of the material risk surrounding Phoenix/PHL Variable.

110. Had LPL, Advisor Snyder, or its investment advisors informed Plaintiff of the material risk of his Phoenix variable annuity and/or the material risk surrounding Phoenix/PHL Variable, Plaintiff would have (1) completed a 1035 exchange for a suitable alternative investment, or (2) surrendered, or (3) withdrawn the full cash value of his Phoenix annuity which was worth more than $1,000,000.00.

111. Had Mr. Nietz cashed in his annuity in 2010 (which had a 2010 surrender value of $692,426.74) and invested the proceeds in a conservative bond fund it would have been worth more than $1,111,000 dollars today based on a 3% annual return over sixteen years, and $1,047,000 in 2024 based on a 3% annual return over fourteen years.

112. In short, Plaintiff relied on LPL and his investment advisors to keep Plaintiff apprised of any and all material facts regarding his Phoenix variable annuity and/or Phoenix/PHL Variable.

113. Plaintiff did not learn about the scope and magnitude of Phoenix's deteriorating financial condition until Plaintiff received a letter from the State of Connecticut Department of Insurance in or around May of 2024, informing Plaintiff of Rehabilitation Proceedings and the Moratorium Order that completely restricts withdrawals from his Phoenix variable annuity and limits payouts in the event of Mr. Nietz's death to $250,000.

114. Plaintiff was surprised to receive this letter. Shortly after receiving the letter, Plaintiff emailed his former LPL investment advisor, Advisor Hartz.

115. Advisor Hartz said it is a "fair question" why Plaintiff was "unaware" of

Phoenix's financial difficulties—even more so given the fact that Advisor Snyder was receiving a trail commission on the Phoenix variable annuity. Specifically, former Advisor Hartz wrote:[58]



Don't like the sound of this...

Hide message history

On Wed, Jun 19, 2024 at 12:54 PM <[redacted]> wrote:

https://www.linkedin.com/pulse/financial-deterioration-phoenix-home-life-variable-rybka-jd-cfp--wuooe/

This person seems to be of the opinion that I'll be lucky to get $250,000 out of Phoenix when all is said and done. Also, it reads like they have been in dire straights for quite a while. ☹

Kerry

Hide message history

BH Barry Hartz<[redacted]>

To: [redacted]

Wed 6/19/2024 7:07 PM

Kerry, I agree that whatever has been going on with Phoenix was years in the making. I did not happen within the past year. If Nick was receiving a trail commission on this account I think it is a fair question of why was he unaware.

Reply Forward

## CLASS ALLEGATIONS

116. Plaintiff brings this matter on behalf of himself and all similarly situated in the following class (the "Nationwide Class"):

> All persons in the United States who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from Defendant through LPL investment advisors (the "Class").

[58] Email addresses have been redacted for privacy.

117. Plaintiff also brings this matter on behalf of himself and all similarly situated in the following subclass (the "Washington Subclass")

> All persons in Washington who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from Defendant through LPL investment advisors (the "Washington Subclass").

118. The Nationwide Class and California Subclass are referred to collectively as the "Classes" throughout this Complaint.

119. Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

120. Plaintiff reserves the right to expand, limit, modify, or amend the class definitions, including the addition of one or more subclasses in connection with his motion for class certification, or at any other time, based on *inter alia*, changing circumstances and new facts obtained.

121. **Numerosity:** The members of the Classes are so numerous that joinder of all members is impractical, which, upon information and belief, number in the thousands. LPL was a major distributor of the Phoenix Products and marketed and sold the Phoenix Products through thousands of its investment advisors. While the exact number of members of each Class is unknown to Plaintiff at this time, such information can be ascertained through appropriate discovery from records maintained by Defendant and its agents.

122. **Commonality:** There are questions of law and fact common to the Classes because Class Members' claims are identical to one another and predicated on

the common contention that they were injured by having acquired rights under the Phoenix Products sold by Defendant, which Phoenix Products were purchased from Defendant through LPL investment advisors, and Defendant violated its fiduciary and professional duties, and violations of state consumer protection law, with respect to those Phoenix Products. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include, but are not limited to:

(a) Whether LPL breached its fiduciary duties by failing to properly notify Plaintiff and Class Members;

(b) Whether LPL engaged in unfair and deceptive conduct by misrepresenting, concealing, suppressing, or omitting that Phoenix's financial condition was threatened;

(c) Whether LPL abused its position of superior knowledge and sophistication to collect compensation in connection with the Phoenix Products;

(d) Whether LPL fraudulently concealed PHL's financial condition so it could benefit itself at the expense of Class Members;

(e) The proper form of equitable relief;

(d) The proper measure of monetary relief.

123. **Typicality:** The named Plaintiff's claims are typical of the Class's claims. The named Plaintiff's claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

124. **Adequate Representation:** The named Plaintiff will fairly and adequately protect the interests of the Class. The named Plaintiff has no interest antagonistic to those of the other Class Members. The named Plaintiff is committed to the vigorous prosecution of this action. Plaintiff has retained counsel who are experienced and competent in the prosecution of large class actions.

125. **Rule 23(b)(1)**: The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class Members would risk establishing incompatible standards of conduct for Defendant. Additionally, adjudications as to individual Class Members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

126. **Rule 23(b)(3)**: The prerequisites for a Rule 23(b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Classwide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class Members' claims in one action.

**COUNT I**
**Professional Negligence**
**(On Behalf of Plaintiff and the Nationwide Subclass)**

127. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

128. At all relevant times LPL held itself out to be a trusted financial and/or investment advisor acting in Plaintiff and Class Members' best interests in providing financial and/or investment advice, including advice relating to retirement planning, estate planning, risk management planning, personal wealth planning, and/or investment planning.

129. LPL owed Plaintiff and Class Members an affirmative duty of utmost good faith, and full and fair disclosure of material facts, and to act in their best interest in providing ongoing, regular advice and services. LPL was required to exercise the degree of skill and care that a reasonably prudent, skilled, and qualified investment adviser would exercise under the circumstances.

130. LPL specifically assumed this fiduciary role to Plaintiff and Class Members in connection with their Phoenix insurance policies and/or annuity contracts.

131. LPL's professional relationship with Plaintiff and Class Members was not a one-off, transactional relationship; instead, LPL maintained a long-time, trusting relationship with Plaintiff and Class Members. LPL was compensated on a continuing, fee-based arrangement, particularly with respect to the Phoenix Products.

132. During the course of Plaintiff and Class Members' relationship with LPL, LPL advised Plaintiff and Class Members with respect to retirement, estate, personal wealth, and/or investment planning, and, based on LPL's discussions with Plaintiff and Class Members as to retirement, estate, personal wealth, and/or investment planning, LPL marketed and sold Plaintiff and Class Members the Phoenix Products.

133. LPL owed Plaintiff and Class Members a duty of reasonable care arising from their pre-existing professional relationship. That duty applied before, during, and after the sale of the Phoenix Products.

134. After selling Plaintiff and Class Members the Phoenix Products, LPL continued to receive ongoing fees (i.e. trail compensation) associated with those life insurance or annuity products, which fee was used to pay LPL for its advisory services with respect to those products. Indeed, LPL continued to advise Plaintiff and Class Members with respect to their retirement, estate, personal wealth, and/or investment planning.

135. LPL owes at least the ordinary duty of care that every person owes to prevent harm where that person's actions have created a foreseeable risk of injury. LPL also owed a heightened duty of care. Plaintiff was owed a duty of care and was harmed by LPL's acts and omissions.

136. LPL breached its fiduciary duty and failed to exercise the duty of care expected of it under the circumstances surrounding the Phoenix Products.

137. LPL failed to notify Plaintiff and Class Members with respect to, *inter alia*, the fact that Plaintiff and Class Members' policies and contracts may be threatened due to Phoenix/PHL Variable's poor, deteriorating, and unsound financial

condition. LPL never made Plaintiff and Class Members aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable.

138. For more than a decade, LPL collected significant trail compensation in connection with Plaintiff and Class Members' Phoenix Products, with full knowledge that Phoenix/PHL Variable's financial outlook was poor, deteriorating, and unsound, and/or with knowledge of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable.

139. LPL continued to collect millions of dollars in trail compensation in connection with Plaintiff and Class Members' Phoenix Products, all while knowing that Phoenix/PHL Variable had a reduced ability to borrow and that declines in Phoenix/PHL's ratings would likely materially and adversely affect Phoenix/PHL Variable's financials.

140. LPL should have advised or notified Plaintiff and Class Members that their policies and contracts may be threatened due to Phoenix/PHL Variable's unsound financial condition. LPL should have made Plaintiff and Class Members aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable. This is especially true because, *inter alia*: (1) LPL holds worldwide recognition as a leading registered investment advisor and was named the No. 1 Mega RIA on *Barron's* 2025 Top RIA Ranking;[59] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised Plaintiff and Class Members with respect to retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products and continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL's outlook was

---

[59] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html.

poor, deteriorating, and unsound; and (5) LPL took active steps to preserve its trail compensation during the same time that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

141. LPL knew, or reasonably should have known, that PHL Variable was placed under an order of administrative supervision in spring of 2023, shortly before the May 2024 PHL Rehabilitation. LPL therefore knew, or reasonably should have known, that failing to notify or advise Plaintiff and Class Members of changes in Phoenix's financial condition could harm Plaintiff and Class Members. LPL therefore knew, or reasonably should have known, that falling to make Plaintiff and Class Members aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable could harm Plaintiff and Class Members.

142. LPL breached its fiduciary duty and failed to exercise the required level of care by failing to disclose the unsuitability of the PHL Products, or failing to disclose the material risk of the Phoenix Products or Phoenix/PHL Variable.

143. Had Plaintiff and Subclass Members been made aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, Plaintiff and Class Members would have (1) completed a 1035 exchange for a suitable alternative investment, or (2) surrendered, or (3) withdrawn the cash value of their Phoenix annuities and/or insurance policies.

144. As a direct and proximate result of LPL's negligence and resulting breach of its duty of professional care, Plaintiff has been damaged in an amount in accordance with proof at trial.

## <u>COUNT II</u>
### Fraudulent Concealment
### (On Behalf of Plaintiff and the Nationwide Class)

145. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

146. California has long viewed fraud as being equally blameworthy whether accomplished through affirmative misrepresentation or concealment.

147. By virtue of Defendant's fiduciary and other special relationships with Plaintiff and Class Members, Defendant was obliged to tell the full truth concerning the Phoenix Products it sold to Plaintiff and Class Members and advised Plaintiff and Class Members with respect to.

148. To fulfill these obligations, Defendant was required to keep Plaintiff and Class Members accurately and fully informed concerning the risk, valuation, and other material matters related to the Phoenix Products, so that their suitability was consistent with Defendant's representations about the annuity and other Phoenix Products as wealth management products best suited to Plaintiff and Class Members' retirement, estate, risk management, personal wealth, and/or investment planning needs.

149. In connection with the advisory, consulting, and planning services regarding the Phoenix Products, Defendant employed a scheme and common course of conduct to induce Plaintiff and Class Members into retaining the Phoenix Products, due to these annuity contracts' and insurance policies' conflict of interest payment structure, despite these products not being in Plaintiff and Class Members' best interest, and which products were, in fact, materially risky and presented an unreasonable amount of financial risk to Plaintiff and Class Members.

150. Through this common course of conduct, LPL, either itself or through its investment advisors, intentionally, or with reckless disregard, misrepresented or concealed the following material facts from Plaintiff and Class Members, among others:

(a) That Phoenix/PHL Variable's financial strength rating was downgraded from investment-grade to speculative-grade;

(b) That two major distributors of Phoenix Products (State Farm and National Life Group) suspended sales of Phoenix annuities and life insurance policies, despite previously

accounting for more than 82% of Phoenix annuity sales and State Farm alone accounted for more than 27% of Phoenix's life insurance premiums;

(c) That Phoenix/PHL Variable executed a 1-for-20 reverse stock split, which is a red flag for investors;

(d) That Phoenix/PHL Variable warned in SEC filings that it could be subject to rehabilitation or other regulatory actions;

(e) That Phoenix/PHL Variable was subsequently downgraded to junk status;

(f) That Phoenix/PHL Variable went into run-off mode and stopped marketing and selling new business;

(g) That Phoenix/PHL Variable was isolated from healthier life insurance units;

(h) That Phoenix/PHL Variable was placed under administrative supervision;

(i) The material risk of the Phoenix Products and the risk facing Phoenix/PHL Variable itself; and

(j) That Plaintiff and Class Members should have withdrawn the cash balance of their insurance policies and/or annuity contracts.

151. Defendant affirmatively hid these truths, evinced by the fact that LPL removed Phoenix annuities and life insurance products from its list of recommended products and never told Plaintiff and Class Members about the material risk facing their same Phoenix Products. Nevertheless, Defendants continued to collect millions of dollars in trail compensation and later took active steps to preserve its trail compensation from annuity products.

152. Plaintiff and Class Members continued to maintain their relationship with their LPL investment advisors who continued to provide Plaintiff and Class Members with financial advisory services, but never informed them of the material risk of the Phoenix Products and Phoenix/PHL Variable itself.

153. These misrepresentations and concealment of facts were material to the decisions of Plaintiff and Class Members to maintain the Phoenix Products that were initially sold through LPL.

154. Plaintiff and the Class Members relied upon the misrepresentations and concealment of facts (i.e., that the Phoenix Products were suitable, reasonably safe investment products as opposed to being materially risky, and that LPL collected trailer compensation despite knowing the risk facing Plaintiff and Class Members).

155. Forbearance— the decision not to exercise a right or power—is sufficient to fulfill the element of reliance necessary to sustain a cause of action for fraud or negligent misrepresentation.

156. Had Plaintiff and Class Members been aware of the aforementioned concealed and suppressed facts, they would have exchanged, surrendered, or withdrawn the cash value of the Phoenix Products. For example, had Plaintiff been aware of the material risk facing his Phoenix Variable Annuity, he would have withdrawn the cash value in full (over **$1 million** dollars in 2023), or, performed a 1035 exchange for suitable alternative annuity with a solvent and better-capitalized insurer.

157. Plaintiff and Class Members' reliance on these representations and concealment of facts was reasonable and justifiable. This is especially true because, *inter alia*: (1) LPL holds worldwide recognition as a leading registered investment advisor and was named the No. 1 Mega RIA on *Barron's* 2025 Top RIA Ranking;[60] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised Plaintiff and Class Members with respect to

---

[60] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html.

retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products.

158. Plaintiff and Class Members have suffered and continue to suffer economic and non-economic losses because of Defendant's wrongful conduct. The amount of such losses will be determined according to proof at trial. The wrongful acts of Defendant set forth in this Count were done maliciously, oppressively, and with the intent to mislead and defraud, and Plaintiff and Class Members are entitled to punitive damages to be ascertained according to proof.

## COUNT III
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class)**

159. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

160. LPL, acting in its various positions including but not limited to trusted investment or financial advisor, owed Plaintiff and Class Members a fiduciary duty by virtue of the special trust and confidence placed in it by Plaintiff and Class Members.

161. As an investment adviser, LPL owed its clients a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in their best interests, and not to act in their own interests to the detriment of their clients. *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 191–92 (1963).

162. Plaintiff placed trust and confidence and otherwise depended on LPL to perform its obligations to Plaintiff in its various positions, including but not limited to investment or financial advisor.

163. LPL's obligations are significantly enhanced because, *inter alia*: (1) LPL holds worldwide recognition as a leading registered investment advisor and was

named the No. 1 Mega RIA on *Barron's* 2025 Top RIA Ranking;[61] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised Plaintiff and Class Members with respect to retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products and continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL's outlook was poor, deteriorating, and unsound; and (5) LPL took active steps to preserve its trail compensation during the same time that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

164. LPL's conduct, as alleged above, failed to meet the heightened standards of trust, competence, and care owed in a fiduciary relationship.

165. LPL had a fiduciary duty to protect Plaintiff and Class Members and a fiduciary duty to advise them or take other action upon gaining information that their Phoenix Products may be threatened due to the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable. However, LPL failed to do so.

166. Defendant breached its fiduciary duties by failing to notify Plaintiff and Class Members for over a decade of the fact that Plaintiff and Class Members' policies and contracts may be threatened due to Phoenix/PHL Variable's poor, deteriorating, and unsound financial condition, or of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable.

167. LPL continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL

---

[61] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html

Variable's outlook was poor, deteriorating, and unsound.

168. LPL affirmatively took steps to preserve its trail compensation during this same time period that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

169. Had Plaintiff and Subclass Members been made aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, Plaintiff and Class Members would have (1) completed a 1035 exchange for a suitable alternative investment, or (2) surrendered, or (3) withdrawn the cash value of their Phoenix annuities and/or insurance policies.

170. LPL's breaches of its fiduciary duties have resulted in significant losses to Plaintiff and Class Members. These losses are continuing and increasing.

171. As a direct and proximate result of Defendant's breaches of its fiduciary duties to Plaintiff, Plaintiff has been damaged in an amount in accordance with proof at trial.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiff and the Nationwide Class)

172. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

173. Defendant received benefits from Plaintiff and Class Members and unjustly retained those benefits at their expense. For example, Plaintiff and the Class Members paid premiums for the Phoenix Products that earned Defendant millions of dollars in compensation, including both upfront and trail compensation.

174. Said compensation was conferred on Defendant by Plaintiff and Class Members under a mistake of fact due to Defendant's misrepresentations and/or omissions, and unlawfully obtained to the detriment of Plaintiff and the Class Members.

175. Defendant has been unjustly enriched in that it received and retained the benefit of funds to which it was not entitled and received in violation of its fiduciary and professional duties, and also in violation of state consumer protection law.

176. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct harmed Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

177. Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience. As a sophisticated investment advisor that had actual knowledge of Phoenix's poor, deteriorating, and unsound financial condition, and of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, Defendant was well aware that its conduct violated its duties to Plaintiff and Class Members and exposed them to tremendous financial risk.

178. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Subclass members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Subclass members for its unjust enrichment.

179. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

## COUNT V
**Violation of the Washington Consumer Protection Act**
**Wash. Rev. Code 19.86.010 *et seq*.**
**(On Behalf of Plaintiff and the Washington Subclass)**

180. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Washington Subclass.

181. The Nietz Trust is a Washington-domiciled trust that owns the Big Edge Choice f/k/a Phoenix Investor's Edge, a Flexible Premium Variable Accumulation Deferred Annuity.

182. Plaintiff is the trustee and primary annuitant of the Big Edge Choice.

183. Plaintiff, as trustee and primary annuitant of the Nietz Trust, brings this claim on behalf of the Washington Subclass against Defendant under Washington's Consumer Protection Act (the "Washington CPA"), Wash. Rev. Code § 19.86.010, *et seq*.

184. Plaintiff and Defendant are each "person[s]" under the Wash. Rev. Code § 19.86.010. Per Wash. Rev. Code § 19.86.010(1), "'Person' shall include, where applicable, natural persons, corporations, [and] trusts[.]"

185. At all relevant times, Defendant was and is engaged in "trade" or "commerce" under Wash. Rev. Code § 19.86.010(2).

186. The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Wash. Rev. Code §19.86.020. Defendant's conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) was immoral, unethical, oppressive, or unscrupulous; or (3) caused substantial injury to consumers. In short, Defendant's conduct has been deceptive because it has the capacity or tendency to deceive.

187. Under the Washington CPA, deception exists if there is an omission or practice that is likely to mislead. Plaintiffs have alleged a series of events giving rise to a pattern of unfair and deceptive practices, which affect the public's interest.

188. Defendant knew that the Phoenix Products presented an unreasonable amount of risk and knew that Phoenix was in a deteriorating financial condition. Instead of sharing these material facts and issues, Defendant chose to conceal that material information from Plaintiff and Class Members.

189. Reasonable consumers expect that the investment products for which their investment advisors continuously and regularly receive compensation for their services are not subject to looming and imminent financial threat, unless told otherwise. This is especially true given that (1) LPL holds worldwide recognition as a leading registered investment advisor and was named the No. 1 Mega RIA on *Barron's* 2025 Top RIA Ranking;[62] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised Plaintiff and Class Members with respect to retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products and continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL's outlook was poor, deteriorating, and unsound; and (5) LPL took active steps to preserve its trail compensation during the same time that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

190. Consumers like Plaintiff and the Washington Subclass Members could not have reasonably avoided economic injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

191. When an act causes substantial injury that is not outweighed by countervailing benefits to consumers or competitors, and not reasonably avoidable by the consumer, it is unfair.

192. Had Plaintiff and Subclass Members been made aware of the material

[62] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html.

risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, Plaintiff and Class Members would have (1) completed a 1035 exchange for a suitable alternative investment, or (2) surrendered, or (3) withdrawn the cash value of their Phoenix annuities and/or insurance policies.

193. As a result of Defendant's unfair and deceptive acts or practices, Plaintiff and Washington Subclass suffered were injured and suffered ascertainable loss, injury in fact, and/or actual damages in that the Phoenix Products are wholly unsuitable investment products, and Plaintiffs cannot withdraw their cash value of, surrender, or exchange their Phoenix Products for suitable alternative insurance policies and/or annuity contracts.

194. "'Assets' shall include any property, tangible or intangible, real, personal, or mixed, and wherever situate, and any other thing of value." Wash. Rev. Code § 19.86.010(3).

195. The Big Edge Choice, f/k/a Phoenix Investor's Edge, a Flexible Premium Variable Accumulation Deferred Annuity is property of the Nietz Trust.

196. These injuries are the direct and natural consequence of Defendant's misrepresentations, fraud, deceptive practices, and omissions. As a direct and proximate result of Defendant's wrongful conduct in violation of the Washington CPA, Plaintiff and members of the Washington Subclass have suffered and continue to suffer ascertainable losses.

197. Defendant is liable to Plaintiff and Subclass Members for damages in amounts to be proven at trial, including reasonable attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a) For an order certifying the Class and Subclass (the "Classes") under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Classes, and Plaintiff's Counsel as Class Counsel to represent the Classes;

b) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

c) For actual damages Plaintiff and Class Members suffered, as measured by the difference in value of their policies and contracts at the time of purchase and the value of their policies and contracts as of the present, in amounts to be determined by the Court and/or jury;

d) For equitable relief, including the imposition of a constructive trust or other equitable remedies such as restitution, suitable replacement policies or contracts, an accounting, or disgorgement of ill-gotten gains;

e) For prejudgment interest on all amounts awarded;

f) For an order awarding reasonable attorneys' fees and expenses and costs of suit;

g) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

h) Grant any other relief as the Court deems appropriate to remedy the violations.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 3, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
Max S. Roberts

Yitzchak Kopel*
Max S. Roberts (State Bar No. 363482)
Logan J. Hagerty*

1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: ykopel@bursor.com
mroberts@bursor.com
lhagerty@bursor.com

**EDWARD STONE LAW P.C.**
Edward S. Stone*
700 Canal Street, 1st Floor
Stamford, CT 06902
Telephone: (203) 504-8425
Facsimile: (203) 348-8477
E-Mail: eddie@edwardstonelaw.com

*Attorneys for Plaintiff*

**pro hac vice forthcoming*