PAMELA A. MILLER (*pro hac vice*)
(NY Bar #2912194)
LAUREN M. WAGNER (*pro hac vice*)
(NY Bar #5430640)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019-6022
Tel: 212-326-2000

BRITTANY ROGERS (CA S.B. #274432)
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Fl.
Los Angeles, CA 90071
Tel: 213-430-6000

*Counsel for Defendant*
*LPL Financial LLC*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KERRY NIETZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LPL FINANCIAL LLC,<br><br>Defendant. | No. 3:26-cv-03383-JES-DEB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LPL FINANCIAL LLC'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Judge: Hon. James E. Simmons, Jr.<br>Date: November 4, 2026<br>Time: 10:00 a.m.<br>Courtroom: 4B |

**TABLE OF CONTENTS**

                                                          **Page**

I. INTRODUCTION .................................................................................1

II. BACKGROUND ................................................................................4

    A. LPL's Business ........................................................................4

    B. Plaintiff's PHL Annuity Is Held Through a Brokerage Account Governed by the Master Account Agreement ...................................5

    C. PHL's Financial Condition Was Public Beginning in 2009 .................6

    D. Plaintiff's Claims ......................................................................8

III. LEGAL STANDARDS......................................................................9

IV. ARGUMENT ...................................................................................11

    A. Plaintiff's Claims Are Time-Barred.............................................11

    B. LPL Owed Plaintiff No Fiduciary Duty .......................................13

        1. Plaintiff Fails to Plausibly Allege a Fiduciary Duty .................13

        2. LPL Expressly Disclaimed Any Duty to Monitor....................17

    C. Plaintiff's Professional Negligence Claim Is Duplicative and Fails As a Matter of Law.............................................................17

    D. Plaintiff Cannot Plausibly Plead Fraudulent Concealment .................18

    E. Plaintiff's Unjust Enrichment Claim Fails As a Matter of Law ..........20

    F. Plaintiff Cannot Plead an Unfair or Deceptive Act for the WCPA .....................................................................................22

    G. Plaintiff's Claimed Injury Is Too Speculative to Plausibly Plead Damages or Support Article III Standing ...........................................22

V. CONCLUSION .................................................................................25

## TABLE OF AUTHORITIES

**Page**

### CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................9

*Burkhart v. Genworth Fin., Inc.*,
250 A.3d 842 (Del. Ch. 2020) ..................................................................................13

*Candelora v. Clouser*,
621 F. Supp. 335 (D. Del. 1985) ..............................................................................14

*Chertok v. Zillow, Inc.*,
2021 WL 4851816 (Del. Ch. Oct. 18, 2021), *aff'd*, 277 A.3d 1258
(Del. 2022)................................................................................................................12

*Citron v. Steego Corp.*,
1988 WL 94738 (Del. Ch. Sept. 9, 1988)..................................................................20

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................................25

*Clinton v. Acequia, Inc.*,
94 F.3d 568 (9th Cir. 1996) ......................................................................................24

*CoreTel Am., Inc. v. Oak Point Partners, LLC*,
2022 WL 2903104 (Del. Super. Ct. July 21, 2022) ..................................................21

*CoVenture - Burt Credit Opportunities GP, LLC v. Coleman*,
2023 WL 7179488 (Del. Super. Ct. Nov. 1, 2023) ...................................................25

*Doe v. San Diego Unified Sch. Dist.*,
2022 WL 16984502 (S.D. Cal. Nov. 16, 2022) ........................................................24

*Dorsey v. Jones*,
2026 WL 850417 (Del. Ch. Mar. 27, 2026)..............................................................23

*Fansler v. N. Am. Title Ins. Co.*,
2019 WL 1281432 (Del. Super. Ct. Mar. 19, 2019) .................................................10

*Forsythe v. ESC Fund Mgmt. Co. (U.S.)*,
2007 WL 2982247 (Del. Ch. Oct. 9, 2007)..............................................................15

*Gehring v. Osaic Inc.*,
2026 WL 248379 (D. Ariz. Jan. 30, 2026)...............................................................16

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Grausz v. Hershey Co.*,
   691 F. Supp. 3d 1178 (S.D. Cal. 2023) ................................................................8

*Gray v. Amazon.com, Inc.*,
   653 F. Supp. 3d 847 (W.D. Wash. 2023) ............................................................22

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
   788 A.2d 544 (Del. Ch. 2001) .............................................................................19

*Griffith v. Centex Real Est. Corp.*,
   969 P.2d 486 (Wash. Ct. App. 1998) ...................................................................22

*Hernandez v. Baird Mandalas Brockstedt & Federico, LLC*,
   315 A.3d 1183 (Del. Super. Ct. 2024), *aff'd*, 341 A.3d 473 (Del. 2025) ...............................................................................................................23

*Horizon Servs., Inc. v. Henry*,
   304 A.3d 552 (Del. 2023) ....................................................................................24

*In re E. Coast Foods, Inc.*,
   80 F.4th 901 (9th Cir. 2023) ................................................................................25

*In re JPMorgan Chase Cash Sweep Program*,
   2026 WL 396055 (S.D.N.Y. Feb. 12, 2026) .......................................................15

*In re LPL Fin. Cash Sweep Litig.*,
   789 F. Supp. 3d 961 (S.D. Cal. 2025) .................................................................15

*In re Wells Fargo Cash Sweep Litig.*,
   2025 WL 1785315 (N.D. Cal. June 27, 2025) .....................................................16

*Ins. Comm'r of the State of Conn. v. PHL Variable Ins. Co.*,
   No: X06-UWY-CV-24-6085274-S (Conn. Sup. Ct.) ......................................8, 23

*Kaufman v. C.L. McCabe & Sons*,
   603 A.2d 831 (Del. 1992) ....................................................................................12

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) .............................................................................10

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) .................................................................................4

*Kimball v. Flagstar Bank F.S.B.*,
   881 F. Supp. 2d 1209 (S.D. Cal. 2012) ...............................................................20

*Kuroda v. SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009) .............................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*,
802 F. Supp. 3d 701 (S.D.N.Y. 2025)................................................................16

*MacLaughlan v. Einheiber*,
354 A.3d 864 (Del. Ch. 2026)...........................................................................13

*Madison Ave. Inv. Partners, LLC v. Am. First Real Est. Inv. Partners, L.P.*,
806 A.2d 165 (Del. Ch. 2002)...........................................................................13

*McMahon v. New Castle Assocs.*,
532 A.2d 601 (Del. Ch. 1987)...........................................................................14

*Metro Storage Int'l LLC v. Harron*,
275 A.3d 810 (Del. Ch. 2022)...........................................................................23

*Monreal v. GMAC Mortg., LLC*,
948 F. Supp. 2d 1069 (S.D. Cal. 2013).............................................................10

*Mooney v. Pioneer Nat. Res. Co.*,
2017 WL 4857133 (Del. Super. Ct. Oct. 24, 2017)...........................................23

*Munns v. Kerry*,
782 F.3d 402 (9th Cir. 2015).............................................................................25

*Nedlloyd Lines B.V. v. Superior Ct.*,
3 Cal. 4th 459 (1992)........................................................................................11

*Nemec v. Shrader*,
991 A.2d 1120 (Del. 2010)...........................................................................18, 21

*Nguyen v. Raymond James & Assocs., Inc.*,
2022 WL 17811068 (M.D. Fla. Dec. 19, 2022)..................................................10

*Nicolet, Inc. v. Nutt*,
525 A.2d 146 (Del. 1987)..................................................................................18

*Oxford Fin., LLC v. Redwood Liquidating Co.*,
2026 WL 1770144 (Bankr. D. Del. June 18, 2026)............................................19

*Patton v. Cox*,
276 F.3d 493 (9th Cir. 2002).............................................................................10

*Paul Cap. Advisors, L.L.C. v. Holland*,
2023 WL 5551017 (Del. Ch. Aug. 29, 2023)......................................................19

*Rajaee v. Davis*,
2024 WL 2925332 (S.D. Cal. June 10, 2024).....................................................24

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

**TABLE OF AUTHORITIES**
(continued)

Page

*REX - Real Est. Exch. Inc. v. Zillow Inc.*,
2021 WL 3930694 (W.D. Wash. Sept. 2, 2021) ................................................... 10

*Schweitzer v. LCR Cap. Partners, LLC*,
2020 WL 1131716 (Del. Super. Ct. Mar. 9, 2020) ............................................. 18

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
375 U.S. 180 (1963) ............................................................................................ 16

*Sherwin-Williams Co. v. JJT, Inc.*,
2014 WL 2587483 (S.D. Cal. June 10, 2014) ..................................................... 10

*Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*,
2009 WL 2501542 (Del. Ch. Aug. 5, 2009) ........................................................ 15

*Souter v. Edgewell Pers. Care Co.*,
542 F. Supp. 3d 1083 (S.D. Cal. 2021) ................................................................. 9

*State ex rel. Jennings v. Monsanto Co.*,
299 A.3d 372 (Del. 2023) .................................................................................... 23

*Stein v. Wind Energy Holdings, Inc.*,
2022 WL 17590862 (Del. Super. Ct. Dec. 13, 2022) .......................................... 23

*Stephenson v. Capano Dev., Inc.*,
462 A.2d 1069 (Del. 1983) .................................................................................. 20

*STX Bus. Sols., LLC v. Fin.-Info.-Techs., LLC*,
2024 WL 4645104 (Del. Ch. Oct. 31, 2024), *aff'd*, 342 A.3d 399
(Del. 2025) .......................................................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) .............................................................................................. 9

*Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*,
937 A.2d 760 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) ......................... 21

*Tilden v. Cunningham*,
2018 WL 5307706 (Del. Ch. Oct. 26, 2018) ....................................................... 12

*Topham v. State St. Corp.*,
2011 WL 5843282 (Mass. Ct. App. Nov. 22, 2011) ........................................... 13

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979) .............................................................................................. 16

*Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*,
906 A.2d 168 (Del. Ch. 2006) ............................................................................. 20

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
860 A.2d 312 (Del. 2004)................................................................11, 12

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
901 A.2d 106 (Del. 2006)....................................................................14

*Weil v. Morgan Stanley DW Inc.*,
877 A.2d 1024 (Del. Ch.), *aff'd*, 894 A.2d 407 (Del. 2005)...............17

*Wohlsen Constr. Co. v. Berkel & Co. Contractors*,
2025 WL 2306140 (Del. Super. Ct. Aug. 11, 2025) ...........................18

*Zhu v. Wang*,
2026 WL 232871 (W.D. Wash. Jan. 26, 2026)...................................11

**STATUTES**

Wash. Rev. Code § 19.86.020 ...........................................................22

Wash. Rev. Code § 19.86.120 ...........................................................11

**OTHER AUTHORITIES**

CT Insurance Dep't, FAQs from PHL Policyholder Forum (Apr. 13,
2026)...................................................................................................24

CT Insurance Dep't, PHL Variable Insurance Company Rehabilitation ................24

**RULES**

Fed. R. Civ. P. 12(b)(6) .......................................................................9

Fed. R. Civ. P. 9(b).........................................................................9, 22

**REGULATIONS**

17 C.F.R. § 240.17a-14.........................................................................4

17 C.F.R. § 275.204-5 ...........................................................................4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

This case seeks to hold LPL Financial LLC ("LPL") liable for concealing publicly available facts—facts that were not concealed and that LPL had no duty to disclose.  Plaintiff Kerry Nietz alleges that in 1999 his LPL financial advisor recommended that he purchase an annuity issued by PHL Variable Insurance Company.[1]  Plaintiff's entire case hinges on his contention that LPL was allegedly required to alert Plaintiff about PHL's deteriorating financial condition starting in 2009, when PHL began a more than decade-long financial decline.  Plaintiff claims that he and putative class members have been harmed because PHL is in a rehabilitation proceeding, and they may not receive their full annuity benefits in the future.

But as Plaintiff admits, the very facts LPL "concealed" about PHL were in plain view as early as *seventeen years* before this lawsuit was filed.  Plaintiff claims that LPL acquired and hid "particularized knowledge" of PHL's continued financial decline from 2009 to 2024, but he does not identify a single fact regarding PHL's financial condition that was known only to LPL or that was not equally available to Plaintiff (or others) through another source.  Instead, his claims of "concealment" are based purely on a series of public events and documents—to which Plaintiff and LPL customers alike had equal access during that same, lengthy time period— including, among others, (i) SEC filings describing PHL's difficulties as early as 2009, (ii) publicly available ratings agency downgrades that started in 2009 and continued for years, (iii) a 2012 reverse stock split, and (iv) a public 2014 SEC cease-and-desist order.  The most recent PHL-related events Plaintiff alleges LPL should have disclosed were in 2019: additional S&P downgrades and PHL's own

---

[1] PHL Variable Insurance Company was formerly known as The Phoenix Companies, Inc., and is referred to herein as "PHL."

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

announcement that it "stopped marketing and selling new business."  In other words, the last "concealed" event was publicly known more than *six years* ago.

Not surprisingly, these allegations are fatal to the Complaint.  As a threshold matter, this timeline makes clear that Plaintiff's claims are all time-barred.  Plaintiff filed this action more than seventeen years after information about PHL's financial condition became publicly available.  Each of his causes of action is squarely time-barred because the Complaint does not allege LPL "concealed" any facts within the applicable statute of limitations periods.  Further, because Plaintiff's own allegations establish that the relevant information was readily available to him and the public as early as 2009, he cannot invoke tolling to excuse his lengthy delay in filing.  And even if the claims were timely, which they are not, it is axiomatic that Plaintiff cannot base his Complaint on the theory that LPL breached a duty or committed fraud by concealing information, while conceding that the same information was at all times available to Plaintiff.

These flaws undermine all of Plaintiff's claims, but each claim independently fails for additional reasons:

*First*, Plaintiff's breach of fiduciary duty and professional negligence claims are based on the unsupported contention that LPL was required to monitor and disclose PHL's financial condition to LPL customers who held PHL annuities.  Plaintiff bases his claims on language in LPL's "Relationship Summary" disclosure, which provides that LPL will "monitor your accounts and specific investments" only with respect to LPL's "Investment Advisory Services."  Ex. A at 2.[2]  But Plaintiff does not identify any applicable agreement establishing that he is an advisory client entitled to investment advisory services.

That omission is not coincidental: Plaintiff's own account documents show

---

[2] All "Ex." cites are to exhibits attached to the Declaration of Kris Crawford in Support of LPL's Unopposed Motion to Seal and Motion to Dismiss ("Crawford Decl.").  Unless otherwise indicated, all emphasis is added, internal quotations and citations are omitted, and pin cites are to the exhibit pagination.

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

that his annuity was part of a standard **brokerage** relationship with LPL, not an advisory one.  Courts have consistently held that a standard brokerage relationship is not fiduciary in nature where, as here, the broker has no discretion or control over the client's investments.  Accordingly, LPL discloses to all brokerage customers—including Plaintiff—that **"[w]e don't monitor brokerage account investments for you[.]"**  *Id.* ("[Y]ou make the final investment decisions for your account[.]").  That disclosure applies to Plaintiff even though he tellingly omitted it from his Complaint.  Because LPL contractually disclaimed the very duty Plaintiff alleges it owed, there can be no breach.  Plaintiff's professional negligence claim merely repackages the fiduciary-duty claim and fails for the same reason.

*Second*, Plaintiff's fraudulent concealment claim fails because PHL and third-party ratings agencies disclosed the "concealed" facts Plaintiff identifies in his Complaint, and LPL had no duty to disclose information that was publicly available to Plaintiff.  And because Plaintiff fails to identify even a single allegedly fraudulent or misleading statement by anyone at LPL, the Complaint does not meet Rule 9(b)'s heightened pleading standard, which requires specific details on the who, what, when, where, and how of the alleged fraud.

*Third*, Plaintiff's unjust enrichment claim is barred as a matter of law because his relationship with LPL is governed by an express contract.  And in any event, Plaintiff cannot show a direct relationship between his alleged financial detriment and LPL's alleged enrichment (i.e., PHL-paid trail compensation), particularly since any shortfall in his annuity benefits would stem from a court-ordered rehabilitation proceeding, not due to any action by or benefit to LPL.

*Fourth*, Plaintiff's Washington Consumer Protection Act claim fails because he cannot allege that LPL's conduct had the capacity to deceive a substantial portion of the public—an impossible showing given that the allegedly concealed information was public at all times.

*Fifth*, even setting aside the above defects, each of the claims fails because

3

Plaintiff cannot plausibly plead a concrete injury. His theory of harm rests entirely on speculation that he will someday fail to receive the full benefits of his annuity through PHL's rehabilitation proceeding. But that proceeding is ongoing and unresolved, and could still result in a full recovery. Since Plaintiff's damages are wholly speculative, he fails to plead a crucial element of each of the claims and lacks standing to bring them.

In sum, Plaintiff's position is untenable from either direction. If (as he contends) he would have exited PHL years ago had he known of its condition, then his claims accrued no later than when that information became publicly available. But if his injury has not yet materialized because the rehabilitation remains unresolved, then he cannot plead the concrete harm necessary to sustain his claims or establish Article III standing. The Complaint should be dismissed in its entirety.

## II.     BACKGROUND

### A.     LPL's Business

LPL is an independent broker-dealer and investment adviser, registered with the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). Compl. ¶ 13 & n.1.[3] LPL is required under SEC and FINRA rules to provide customers with a "Relationship Summary" that explains (among other things) the types of services LPL offers and the standard of conduct associated with each. 17 C.F.R. § 240.17a-14 (requiring broker-dealers to deliver a relationship summary to retail investors); *id.* § 275.204-5 (requiring investment advisers to deliver a relationship summary to retail investors). Plaintiff selectively quotes LPL's Relationship Summary throughout the Complaint, but that Summary explains that LPL provides both securities brokerage and investment advisory services through a network of financial professionals. *E.g.*, Compl. ¶¶ 13,

---

[3] Factual allegations are drawn from the Complaint ("Compl.," Dkt. 1) and documents incorporated by reference therein. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

29; Ex. A, at 2.  The Relationship Summary is available on the SEC and FINRA websites, and is also included as part of the respective agreements governing LPL's brokerage accounts and advisory accounts.  *See Account Agreements and Account Packets*, LPL Financial, https://www.lpl.com/disclosures/account-agreements-account-packets.html (last visited July 26, 2026); *see also* Ex. B.

As the Relationship Summary explains, LPL's brokerage and investment advisory services are distinct.  Ex. A, at 2.  **Brokerage services** involve LPL advisors taking point-in-time orders, executing securities transactions, and maintaining assets and accounts.  In providing brokerage services, LPL may recommend investments, but clients make the ultimate investment decisions.  *Id.* LPL discloses to brokerage customers that "we provide recommendations to you on specific investments," but "**[w]e don't monitor brokerage account investments** for you, unless we state otherwise in writing."  *Id.*  When LPL provides **investment advisory services**, it provides advice for a fee, and either LPL or another financial institution may be granted discretion to manage the client's investments; or the account may be nondiscretionary, in which case the client retains control.  *Id.*

### B.     Plaintiff's PHL Annuity Is Held Through a Brokerage Account Governed by the Master Account Agreement

Plaintiff Kerry Nietz claims to have a decades-long "advisory" relationship with LPL.  Compl. ¶¶ 16, 99.  He alleges that his relationship with LPL began in 1997, and that from 1997 to 2013, LPL financial advisor Barry Hartz "offered advisory services through LPL Financial" and advised him on estate and retirement planning.  *Id.* ¶¶ 100–101.  In or around 1999, Mr. Hartz allegedly recommended Plaintiff purchase the Phoenix variable annuity product then known as "Phoenix Investor's Edge" and now known as "The Big Edge Choice" (the "Annuity").  *Id.* ¶ 7.  Plaintiff alleges that after Mr. Hartz retired in 2013, Nicholas Snyder became his advisor and also "offered advisory services through LPL[.]"  *Id.* ¶¶ 105–106.

But Plaintiff's account records from the relevant period, including Plaintiff's

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

annuity application, show the Annuity was associated with a ***brokerage account*** (the "Brokerage Account"), not an advisory account.  Crawford Decl. ¶ 10; Ex. E. To open the Brokerage Account, Plaintiff filled out and signed two LPL New Account Applications and Agreements.  Ex. C (4/7/2004 app'n); Ex. D (11/22/2006 app'n).  The account applications provide that the customer has "reviewed and accept[ed] the Master Account Agreement and the Pre-Dispute Arbitration Agreement in the last section of the Master Account Agreement."  *See, e.g.*, Ex. C at 53 (4/7/2004 app'n).  The current version of the Master Account Agreement includes the terms governing LPL's standard brokerage accounts and is publicly available.  Both the Relationship Summary quoted in the Complaint and the Master Account Agreement are part of an "Account Packet," governing LPL's relationship with Plaintiff.  Ex. B.

The first page of the Master Account Agreement explicitly provides that "[u]nless otherwise agreed to in writing, neither LPL nor your [LPL] Representative will provide ongoing monitoring of your accounts for the purpose of providing investment advice," and "you understand that LPL and your Representative have ***no duty to provide ongoing monitoring of your investments for the purposes of recommending changes in investments***."  Ex. B at 11.  The agreement later reiterates that "You understand that when engaging in a brokerage relationship with us, ***LPL and your Representative do not agree to, and therefore you should not expect that we will, provide investment advice . . . for your account on an ongoing basis, or provide ongoing account monitoring***."  *Id.* at 28.

### C.    PHL's Financial Condition Was Public Beginning in 2009

Beginning in 2009, PHL's financial condition began to deteriorate, resulting in a series of public credit ratings agency downgrades.  Compl. ¶¶ 17, 42, nn.19–20 (citing The Phoenix Companies, Inc., *Form 10-Q* (Sept. 30, 2009)).  Specifically, A.M. Best Company downgraded PHL's financial strength rating from A to B++ on March 10, 2009; Standard & Poor's ("S&P") downgraded PHL's rating from BBB-

6

to BB on August 6, 2009; Moody's downgraded PHL from Baa2 to Ba1 on September 8, 2009; and all three ascribed to PHL a negative outlook. *Id.* According to Plaintiff, LPL removed PHL products from its recommendation list following the downgrades, and then "ceased selling" them. Compl. ¶¶ 20, 45.

Relying on several other public events, Plaintiff claims that PHL's financial condition continued to worsen over the following decade. In 2019, S&P downgraded PHL five additional notches to junk status (from BB to CCC+), citing a $100 million decline in capital adequacy. *Id.* ¶¶ 23, 57. After this downgrade, PHL publicly announced that it had "stopped marketing and selling new business" in November 2019, and had entered run-off. *Id.* ¶¶ 24, 58, nn.3, 37.

On March 31, 2023, the Connecticut Insurance Department ("CID") placed PHL under administrative supervision, and on May 20, 2024, the CID ordered PHL into rehabilitation in light of its financial condition. *Id.* ¶¶ 67–70 & n.41.[4] A "Temporary Moratorium Order" was issued in the proceedings, limiting policy withdrawals, surrenders, and death benefit payouts, with aggregate limits of $300,000 for life insurance policies and $250,000 for annuities. *Id.* ¶¶ 69, 77–78. On December 31, 2025, the CID found rehabilitation for PHL "not feasible," with liquidation expected in the first half of 2027. *Id.* ¶¶ 72–73.

According to the Complaint, on April 13, 2026, the Rehabilitator noted at a public information session that PHL policyholders could expect "an estimated recovery . . . [of] 34 to 57%" for claims exceeding a policyholder's guaranty association coverage limit, not for total amounts owed. Compl. ¶ 82 & n.49 (citing *PHL Policy and Annuity Holder Information Session Tr.* 11–12, 14 (Apr. 13, 2026), https://portal.ct.gov/cid/-/media/cid/1_phl/phl-policy-and-annuity-holder-information-session.pdf). But the products that the Rehabilitator listed as falling

---

[4] At n.41, the Complaint cites the docket for PHL's rehabilitation proceedings, including a public link to those materials: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?Document No=27532057.

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

within that recovery range are life insurance or universal life products, not variable annuities. *Id.* The Rehabilitator explained that recovery for certain variable annuities will instead draw on investments held in a separate account, distinct from the general account from which the 34–57% recovery applies. *Id.* at 13.

Plaintiff does not allege that his Annuity declined in value during the period he claims that LPL should have warned him to exit. To the contrary, Plaintiff alleges that the Annuity's value grew from $692,426.74 in 2010 to $1,063,037.25 by 2021, and exceeded $1,000,000 as of 2023. Compl. ¶¶ 4, 107, 111, 156.

Public filings in the CID proceedings explain that the Rehabilitator "is now focused on pursuing a transaction . . . in order to maximize the value of the Companies' assets and coverage for policyholders[.]" *See Ins. Comm'r of the State of Conn. v. PHL Variable Ins. Co.*, No: X06-UWY-CV-24-6085274-S (Conn. Sup. Ct.), Rehabilitator's First Rpt., filed Dec. 31, 2025.[5] At present, PHL remains in rehabilitation and the Rehabilitator and state guaranty associations are currently exploring whether another insurer can assume Phoenix's policies. *Id.*, Rehabilitator's Second Rpt., filed June 30, 2026.

### D.    Plaintiff's Claims

Plaintiff alleges that, at all times after 2009, LPL knew of PHL's deteriorating financial condition but concealed it from LPL's customers. Compl. ¶¶ 21, 25, 63. According to Plaintiff, had LPL disclosed PHL's deteriorating condition, he would have completed a 1035 exchange for a suitable alternative investment, surrendered or exchanged the Annuity, or withdrawn its cash value before the Temporary Moratorium Order took effect on May 20, 2024 in the CID proceedings. *Id.* ¶¶ 85–87, 110, 156. Plaintiff alleges that LPL had an incentive to conceal PHL's condition because LPL continued to collect trail compensation (i.e.,

---

[5] *See supra*, n.4. The court filings are incorporated by reference and independently judicially noticeable. *See Grausz v. Hershey Co.*, 691 F. Supp. 3d 1178, 1187 (S.D. Cal. 2023) ("[t]he [c]ourt may take judicial notice of court filings").

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

an ongoing fee from PHL) on PHL products throughout the relevant period. *Id*. ¶¶ 65, 138–139.  Notably, the Complaint is devoid of any allegations that LPL had particular knowledge separate and apart from the concededly public information Plaintiff maintains LPL should have disclosed but did not.

Plaintiff brings five claims against LPL for professional negligence (Count I), fraudulent concealment (Count II), breach of fiduciary duty (Count III), unjust enrichment (Count IV), and violations of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010 *et seq*. ("WCPA") (Count V).  Compl. ¶¶ 127–197. Plaintiff brings the first four claims on behalf of himself and a putative Nationwide Class, defined as "All persons in the United States who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the 'Phoenix Products') sold by Defendant, or purchased the Phoenix Products from Defendant through LPL investment advisors[.]" *Id.* ¶ 116.  He brings the WCPA claim on behalf of himself and a Washington Sub-Class. *Id.* ¶ 117.

## III.    LEGAL STANDARDS

Under Fed. R. Civ. P. 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In making the plausibility determination, a court must consider the complaint, documents incorporated therein, and "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  While courts must accept well-pleaded allegations as true, "[t]his presumption does not extend to conclusory allegations, unwarranted deductions of fact, or unreasonable inferences." *Souter v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083, 1089 (S.D. Cal. 2021).  Further, under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake" for claims sounding in fraud.  Fed. R. Civ. P. 9(b).[6]

---

[6] Rule 9(b) applies to Plaintiff's fraudulent concealment and professional

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

A plaintiff is required to plead the time, place, and content of alleged fraudulent statements: the "who, what, when, where, and how." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126–27 (9th Cir. 2009) (affirming dismissal of fraud-based claims "couched in general pleadings" for failure to meet Rule 9(b) standard).

The Complaint does not identify which state's law governs Plaintiff's common-law claims. Because this Court sits in diversity, California's choice-of-law rules apply. *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). The Master Account Agreement governing Plaintiff's Brokerage Account contains an express choice-of-law provision applying Delaware law. Ex. B at 28.[7] "[I]f the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' stated intention." *Sherwin-Williams Co. v. JJT, Inc.*, 2014 WL 2587483, at *2 (S.D. Cal. June 10, 2014). A contractual choice-of-law clause

---

negligence claims. *Monreal v. GMAC Mortg., LLC*, 948 F. Supp. 2d 1069, 1077–78 (S.D. Cal. 2013); *Fansler v. N. Am. Title Ins. Co.*, 2019 WL 1281432, at *5 (Del. Super. Ct. Mar. 19, 2019). Rule 9(b) also applies to WCPA claims that are "grounded in fraud." *REX - Real Est. Exch. Inc. v. Zillow Inc.*, 2021 WL 3930694, at *8 (W.D. Wash. Sept. 2, 2021); *see, e.g.*, Compl. ¶ 196 (alleging injuries under the WCPA caused by alleged "misrepresentations, fraud, deceptive practices, and omissions").

[7] The Master Account Agreement also contains an arbitration clause stating: "[A]ny claims or controversy arising between you and LPL and/or your Representative(s) . . . arising out of or relating in whole or in part to your account, transactions with or for you, [or] this agreement . . . shall be settled by arbitration." Ex. B at 26. That provision, however, includes a class-action carve-out: "No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action . . . until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court." *Id.* Because Plaintiff has initiated a putative class action, LPL does not at this time seek to compel arbitration. LPL nonetheless expressly preserves, and does not waive, its rights to seek to enforce this arbitration provision in the event class certification is denied, the class is decertified, or Plaintiff is excluded from the class. *See, e.g.*, *Nguyen v. Raymond James & Assocs., Inc.*, 2022 WL 17811068, at *6 (M.D. Fla. Dec. 19, 2022) (holding that under a similar provision, the defendant was not "waiv[ing] its right to compel arbitration by abiding by the terms of the contract").

10

"encompasses all causes of action arising from or related to that agreement, . . . including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992). Accordingly, Delaware law should apply to this dispute.

## IV.    ARGUMENT

### A.    Plaintiff's Claims Are Time-Barred

As a threshold matter, every one of Plaintiff's claims is time-barred. Plaintiff's claims for professional negligence, fraudulent concealment, breach of fiduciary duty, and unjust enrichment are each subject to a three-year limitations period. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). Plaintiff's WCPA claim is governed by a four-year statute of limitations. *Zhu v. Wang*, 2026 WL 232871, at *3 (W.D. Wash. Jan. 26, 2026) (citing RCW 19.86.120). Plaintiff filed his Complaint on June 3, 2026. To be timely, Plaintiff's common-law claims must have accrued after June 3, 2023, and his WCPA claim must have accrued after June 3, 2022. Yet Plaintiff explicitly challenges LPL's conduct going back to 2009—more than a ***decade*** before either date.

Every event that Plaintiff now claims LPL concealed or should have disclosed occurred long before June 2022 and was public knowledge at the time:

- credit rating agency downgrades of PHL in 2009 (Compl. ¶¶ 17, 42, 44);
- PHL's 2012 1-for-20 reverse stock split (*id.* ¶ 47);
- PHL's 2012 material weakness disclosure (*id.* ¶ 48);
- a 2012 report that PHL was "largely dependent" on "Stranger Oriented Life Insurance schemes" (*id.* ¶ 51);
- a 2014 SEC cease-and-desist order against Phoenix and PHL for failure to timely file periodic reports (*id.* ¶ 49);
- PHL's 2014 Form 10-K warning that PHL would not issue any new SEC-registered life insurance or annuity contracts (*id.* ¶ 50);
- PHL's 2015 warning that it could be placed into rehabilitation (*id.* ¶ 52);

11

- Phoenix's 2016 take-private deal (*id.* ¶ 53);
- S&P's 2019 downgrade of PHL to junk status (*id.* ¶ 57);
- PHL's 2019 public announcement that it had stopped marketing and selling new business, entering run-off (*id.* ¶ 58); and
- PHL's transfer from Nassau's life insurance units to a different subsidiary (*id.* ¶ 59).

Tellingly, Plaintiff does not identify a single disclosure-worthy event that occurred after June 2022 and thus alleges no conduct within either the three-year or the four-year statute of limitations period. Accordingly, none of Plaintiff's claims is timely. *See, e.g.*, *Chertok v. Zillow, Inc.*, 2021 WL 4851816, at *5–7, 13 (Del. Ch. Oct. 18, 2021), *aff'd*, 277 A.3d 1258 (Del. 2022) (dismissing time-barred breach-of-contract and unjust enrichment claims). That conclusion is the same even accepting Plaintiff's theory that he lost the opportunity to exchange, surrender, or withdraw the Annuity before the moratorium. Compl. ¶¶ 85–88, 110. The facts he says would have prompted him to act were publicly disclosed no later than 2009 and, at the latest, by 2019. *Id.* ¶¶ 17, 20, 42, 44–45, 57–58. A tort claim accrues when an injury is sustained, and the limitations period is not postponed merely because damages occur later. *See Kaufman v. C.L. McCabe & Sons*, 603 A.2d 831, 834 (Del. 1992) ("It is not required that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.").

These very same allegations also doom any argument for tolling. Delaware's discovery rule tolls a statute of limitations only where the injury is "inherently unknowable" and the plaintiff is "blamelessly ignorant" of it—and even then, only until the plaintiff learns enough to be on inquiry notice. *Wal-Mart Stores*, 860 A.2d at 319. Courts routinely reject tolling where, as here, the information at issue was publicly available. *See, e.g.*, *Tilden v. Cunningham*, 2018 WL 5307706, at *14 (Del. Ch. Oct. 26, 2018) (no tolling when plaintiff "knew of or easily could have

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

discovered the facts" relating to a corporate stock repurchase that were published in Form 10-Qs and 10-Ks).  Public financial statements and regulatory filings are routinely deemed publicly available information as a matter of law.  *See, e.g.*, *Madison Ave. Inv. Partners, LLC v. Am. First Real Est. Inv. Partners, L.P.*, 806 A.2d 165, 177 (Del. Ch. 2002) (describing 10-K and 10-Q reports and audited financial statements as "publicly available information"); *see also Topham v. State St. Corp.*, 2011 WL 5843282, at *2 (Mass. Ct. App. Nov. 22, 2011) (explaining that "in today's world it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public").

Perhaps acknowledging as much, Plaintiff alleges that he was "not familiar with" agency reports and that the relevant information was "difficult to decipher." Compl. ¶ 43.  But Delaware law does not require that public information be easily digestible before it triggers inquiry notice.  *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 860–61 (Del. Ch. 2020) (public information about an insurance company's condition triggered inquiry notice for consumer's claims "even if plaintiffs needed expert help to decipher . . . financials").  Plaintiff's claims are therefore time-barred and should be dismissed.

### B.  LPL Owed Plaintiff No Fiduciary Duty

To state a claim for breach of fiduciary duty, Plaintiff must plausibly plead that a fiduciary duty exists and that it was breached.  *MacLaughlan v. Einheiber*, 354 A.3d 864, 890, 903 (Del. Ch. 2026) (dismissing claims against company directors for failure to plead a breach).  Plaintiff contends that LPL owed fiduciary duties arising from its position as a "trusted investment or financial advisor." Compl. ¶ 160.  But the Complaint fails to allege any basis for treating LPL as a fiduciary, and the agreement governing Plaintiff's relationship with LPL expressly forecloses any such duty.  The fiduciary-duty claim should be dismissed.

#### 1.  Plaintiff Fails to Plausibly Allege a Fiduciary Duty

Because Plaintiff was a brokerage customer, there is no fiduciary relationship

13

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

between Plaintiff and either his advisor or LPL.  A fiduciary relationship only exists where a person puts "special trust in another or where a special duty exists on the part of one person to protect the interests of another."  *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006).  Ordinary commercial relationships, such as that between a broker-dealer and its customer, are not fiduciary in nature.  *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604–05 (Del. Ch. 1987).  For a nondiscretionary account, like the Brokerage Account, a broker's obligations are confined to the scope of its actual authority.  *See Wal-Mart Stores*, 901 A.2d at 113–14 (agents are fiduciaries only when "authorized to alter the legal relations between the principal and third persons").  Generally, in a brokerage relationship, duties are limited to executing the customer's transactions, which is insufficient to give rise to the duty.  *See Candelora v. Clouser*, 621 F. Supp. 335, 344 (D. Del. 1985) ("[A] stockbroker has only a limited duty to a non-discretionary cash account customer," which is "to serve the client's interest in connection with single transactions executed in the account.").

The Complaint makes the conclusory assertion that Hartz was "an investment adviser."  Compl. ¶ 161.  But courts look past such conclusory labels to the parties' actual relationship to determine whether a fiduciary relationship exists.  *See Wal-Mart Stores*, 901 A.2d at 113–14 (looking beyond plaintiff's "agent" label to the nature of the underlying relationship).  Here, the account documents and governing contract upon which Plaintiff's claims related to the Phoenix Annuity are based reflect and confirm that Plaintiff's ***actual relationship*** with LPL is a standard brokerage relationship.  Exs. C, D, E; *see also* LPL's Notice of Incorporation by Reference, filed concurrently.  The existence of a "straightforward commercial relationship arising from contract" is insufficient to create a fiduciary duty.  *See McMahon*, 532 A.2d at 604–05 (rejecting duty where "commercial relationship arising from contract" was "in all of its aspects an arms-length relationship").

And within the context of that brokerage relationship, Plaintiff does not

allege, much less show, that LPL had discretion over the PHL Annuity or the investment decisions concerning it—one of the touchstones of whether a fiduciary relationship exists. *See Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *3 (Del. Ch. Aug. 5, 2009) ("The hallmark of a fiduciary relationship is that one person has the power to exercise control over the property of another as if it were her own.").  For example, Plaintiff does not attach or cite any advisory account agreement, or any other document establishing that his relationship with LPL was in an advisory capacity.  Plaintiff never alleges that he paid LPL an ongoing advisory fee, as opposed to transaction-based brokerage commissions.  Nor does he provide any facts to suggest LPL had any authority to make decisions affecting the Annuity account as of 2009.  To the contrary, Plaintiff solely alleges that LPL facilitated the initial purchase—a simple act that does not give rise to an extra-contractual fiduciary duty.  *See Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *10 (Del. Ch. Oct. 9, 2007) (holding that "a straightforward, arm's-length commercial relationship arising from contract does not give rise to fiduciary duties").  In fact, the Complaint implicitly acknowledges that LPL had ***no*** discretionary authority because Plaintiff alone had the ability to surrender, withdraw, or exchange the Annuity.  Compl. ¶ 169.

Not surprisingly, courts that have looked at this issue have rejected efforts to hold broker-dealers liable under a fiduciary-duty theory.  *See, e.g.*, *In re LPL Fin. Cash Sweep Litig.*, 789 F. Supp. 3d 961, 986–87 (S.D. Cal. 2025) (dismissing fiduciary-duty claim against LPL because relationship with customers was "exceedingly narrow and limited . . . [and] there [was] neither any common-law fiduciary obligation, nor any special relationship of trust, confidence, or reliance"); *see also In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *10–11 (S.D.N.Y. Feb. 12, 2026) (dismissing fiduciary-duty claim because "[b]rokers do not owe general fiduciary duties to nondiscretionary clients" and complaint did not allege broker "had any discretionary authority"); *In re Wells Fargo Cash Sweep*

15

*Litig.*, 2025 WL 1785315, at \*3 (N.D. Cal. June 27, 2025) (dismissing fiduciary-duty claim by non-advisory clients who did not allege broker "had any discretionary authority"); *Gehring v. Osaic Inc.*, 2026 WL 248379, at \*9 (D. Ariz. Jan. 30, 2026) (dismissing fiduciary-duty claim because allegations did not plead "discretionary authority to make individualized investment decisions or execute transactions"); *Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 716–17 (S.D.N.Y. 2025) (dismissing fiduciary-duty claim by non-advisory customer where broker's role was limited to opening accounts, sweeping cash, and returning cash on instruction).

The Complaint's invocation of *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 191–92 (1963), for a statutory hook is misplaced. *See* Compl. ¶ 161. That case is doubly inapposite because it addressed the SEC's authority under the Investment Advisers Act (the "IAA"), not a private damages suit, and in any event, a private right of action under the IAA is confined to rescission of an investment advisory contract that violates the statute, and Plaintiff does not allege any violation. *See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). Nor does the case absolve Plaintiff from pleading that an advisory relationship existed, rather than presupposing one.

Plaintiff's reliance on LPL's receipt of trail commissions to argue there was an advisory relationship fails as well. Compl. ¶ 93. Plaintiff claims that "LPL receives trail commissions precisely because LPL is supposed to continue to service and provide investment advice for clients . . . who purchased Phoenix Products through LPL." *Id.* Trail commissions are compensation for servicing the account—not for exercising ongoing judgment—and cannot alone transform an ordinary brokerage relationship into an advisory one.

In short, Plaintiff's allegations, and the agreements on which his Complaint relies, establish a standard brokerage relationship with LPL—the type of arm's-length commercial relationship that does not give rise to fiduciary duties. *See Weil*

16

*v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1035–36, 1038 (Del. Ch.) (dismissing claim because brokers for nondiscretionary accounts owe "very limited, transactionally-specific duties"), *aff'd*, 894 A.2d 407 (Del. 2005).

### 2.   LPL Expressly Disclaimed Any Duty to Monitor

Equally fatal to Plaintiff's claims, the governing agreements expressly disclaim any duty to monitor.  While Plaintiff selectively quotes a statement from LPL's Relationship Summary disclosure that LPL will "typically monitor accounts, and specific investments within accounts, on an ongoing basis" (Compl. ¶ 29), that language applies to ***advisory services***, not brokerage services.

The contractual terms applicable to ***brokerage services*** expressly disavow such an obligation.  In fact, the Master Account Agreement identifies annuities as a paradigmatic example of a product for which LPL serves only as broker dealer of record—not even the custodian.  *See* Ex. B at 11 ("LPL acts as the broker/dealer of record on your account but is not the custodian of your assets . . . For example, this could be a mutual fund, REIT, or variable annuity sponsor.  The custodian selected by the sponsor is responsible for issuing periodic statements for your account.").  And crucially, the Master Account Agreement states explicitly that in a ***brokerage relationship***, "neither LPL nor your Representative will provide ongoing monitoring of your accounts for the purpose of providing investment advice," and the client "should not expect that [LPL] will[] provide investment advice or securities recommendations for [the] account on an ongoing basis, or provide ongoing account monitoring."  *See id.* at 11, 28.

Plaintiff's actual relationship with LPL is governed by the contractual relationship reflected in the Master Account Agreement (*see* Exs. C at 53, D at 56), and that agreement disclaims the very duties Plaintiff alleges were breached.

### C.   Plaintiff's Professional Negligence Claim Is Duplicative and Fails As a Matter of Law

Plaintiff's professional negligence claim should be dismissed as duplicative,

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

or, alternatively, because Plaintiff does not plead that LPL owed or breached a professional duty.

*First*, under Delaware's economic loss doctrine, "tort claims and breach-of-contract claims are not alternative theories of recovery for the same acts." *Wohlsen Constr. Co. v. Berkel & Co. Contractors*, 2025 WL 2306140, at *3 (Del. Super. Ct. Aug. 11, 2025). Where a dispute arises from obligations expressly addressed by contract, as it does here, it must proceed as a breach-of-contract claim, with any duplicative non-contract claims dismissed. *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (dismissing fiduciary-duty claim as duplicative). Moreover, Plaintiff's professional negligence claim rests on the same allegations as his fiduciary-duty claim, which, as established above, is foreclosed by the contractual nature of his relationship with LPL. *See supra*, 17–18; *compare* Compl. ¶¶ 127–144, *with id.* ¶¶ 159–171. This provides an independent basis to dismiss the negligence claim as duplicative. *See, e.g.*, *Schweitzer v. LCR Cap. Partners, LLC*, 2020 WL 1131716, at *8–9 (Del. Super. Ct. Mar. 9, 2020) (dismissing negligence claim where it was based on same allegations as fiduciary-duty claim).

*Second*, Plaintiff's allegations do not state a viable claim in any event. As explained above, Plaintiff identifies no agreement or undertaking requiring LPL to monitor PHL's solvency, and the governing contract expressly forecloses any such duty. *Supra*, Part B.

### D.    Plaintiff Cannot Plausibly Plead Fraudulent Concealment

To state a claim for fraudulent misrepresentation (i.e., concealment), Plaintiff must allege "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) That the defendant acted with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987). Even for an omissions-based fraud claim, a plaintiff must plead with particularity: "(1) precisely what was omitted; (2) who

18

should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Oxford Fin., LLC v. Redwood Liquidating Co.*, 2026 WL 1770144, at *9 (Bankr. D. Del. June 18, 2026) (alteration in original). Plaintiff fails to meet Rule 9(b)'s standard under either a misstatement or omissions theory of fraudulent concealment against LPL.

*No Misrepresentation.* Plaintiff alleges that LPL "misrepresented or concealed" ten categories of "material facts." Compl. ¶ 150(a)–(j). But eight of the ten categories concern PHL's own public conduct and condition and were generated by PHL or market observers, not by LPL: PHL's ratings downgrade, disclosed in PHL's own Form 10-Q; its distributors' suspension of sales; its reverse stock split, disclosed in PHL's SEC filings; its warning of potential rehabilitation; its junk-status downgrade and run-off, disclosed in PHL's financial reports filed with state insurance regulators; its isolation from healthier life-insurance units; and its administrative supervision by the CID. *Id.* ¶¶ 42, 47, 52, 57–58, 66, 150(a)–(h). As described above, LPL cannot "conceal" what a third party affirmatively published through public channels. *See Paul Cap. Advisors, L.L.C. v. Holland*, 2023 WL 5551017, at *5 (Del. Ch. Aug. 29, 2023) (dismissing common-law fraud claim against defendants where the allegedly false statements "were made only by" another party's lawyer and plaintiffs "failed to allege that the [moving defendants] made any false misrepresentations").

The remaining two categories fare no better: Plaintiff's allegation that LPL failed to disclose "material risk" about PHL is a conclusion, not a fact; and his assertion that LPL failed to disclose that Plaintiff "should have withdrawn" his funds is a recommendation, not a fact. Compl. ¶ 150(i)–(j); s*ee Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del. Ch. 2001) (predictions about future and expressions of opinion cannot give rise to common-law fraud). These conclusory statements fall far short of identifying a false statement or concealment

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

of material information. *Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1217 (S.D. Cal. 2012) ("conclusory allegations of fraud . . . are insufficient"). And because Plaintiff does not identify any specific statement—let alone who made it, when it was made, where it was made, or how it was false when made—the claim should be dismissed for failure to plead any misrepresentations at all. *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208 (Del. Ch. 2006) (dismissing fraud claim based on "unspecific, broad-brush generalities").

*No Duty to Disclose.* Liability under an omissions theory of fraud, as the Complaint purports to advance, requires a duty to disclose. *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). A defendant has no duty to disclose information that is publicly available and accessible to the plaintiff. *See Citron v. Steego Corp.*, 1988 WL 94738, at *7 (Del. Ch. Sept. 9, 1988) ("[i]t obviously is not fraud to fail to disclose" information from public sources). Courts routinely dismiss fraudulent concealment claims under similar circumstances. *See, e.g.*, *STX Bus. Sols., LLC v. Fin.-Info.-Techs., LLC*, 2024 WL 4645104, at *6 (Del. Ch. Oct. 31, 2024) (dismissing fraudulent concealment claim when plaintiffs failed to allege intentional concealment or duty to disclose), *aff'd*, 342 A.3d 399 (Del. 2025).

### E.   Plaintiff's Unjust Enrichment Claim Fails As a Matter of Law

A quasi-contractual claim of unjust enrichment is barred as a matter of law where, as here, an enforceable contract governs the subject matter of the dispute. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 890–92 (Del. Ch. 2009) (dismissing unjust enrichment claim). Because an express contract—the Master Account Agreement (Ex. B)—governs the subject matter of this dispute, *supra*, Part B, Plaintiff's "unjust enrichment" theory is foreclosed. *See, e.g.*, *Kuroda*, 971 A.2d at 890–92 (dismissing unjust enrichment claim because plaintiff's relationship with defendants was governed by express contract).

Even if Plaintiff could surmount that hurdle, Plaintiff does not plead a required element of the claim—a "direct relationship" between the plaintiff's

impoverishment and the defendant's enrichment. *CoreTel Am., Inc. v. Oak Point Partners, LLC*, 2022 WL 2903104, at \*11–12 (Del. Super. Ct. July 21, 2022). Here, Plaintiff claims that LPL was enriched because it received trail compensation on the Phoenix Products. Compl. ¶ 173. According to Plaintiff, this compensation was conferred under a mistake of fact caused by LPL's alleged misrepresentations or omissions, and was obtained in violation of LPL's fiduciary and professional duties. *Id.* ¶¶ 174–175.

Plaintiff cannot show that LPL's retention of PHL-paid trail compensation satisfied the "direct relationship" requirement. *See Nemec*, 991 A.2d at 1130 (unjust enrichment requires the "retention of money or property of another against the fundamental principles of justice or equity and good conscience"). Plaintiff does not allege that LPL received the Annuity value he allegedly will lose, that Plaintiff paid LPL trail commissions, or that LPL's compensation reduced what Plaintiff may ultimately receive from PHL. The Complaint states that the trail commissions were paid by PHL under a contract with LPL. Compl. ¶¶ 91, 93–94. Plaintiff identifies no period in which the Annuity's performance was impacted by LPL's compensation, and by Plaintiff's own concession, the Annuity's market value grew from $692,426.74 in 2010 to over $1,000,000 by 2023. *Id.* ¶¶ 4, 111, 156. Thus, the Complaint makes clear that Plaintiff's alleged shortfall (if any) will stem from a court-ordered rehabilitation moratorium imposed by the CID or the ultimate disposition in the rehabilitation—not from any "enrichment" retained by LPL. *See Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007) (unjust enrichment "requires an absence of justification for the transfer that enriches one party and impoverishes the other . . . usually entail[ing] some type of wrongdoing or mistake at the time of the transfer"), *aff'd*, 956 A.2d 32 (Del. 2008). The unjust enrichment claim should be dismissed. *CoreTel*, 2022 WL 2903104, at \*11–12 (dismissing unjust enrichment claim where plaintiff alleged only injury to an asset, not that defendant was enriched at

plaintiff's expense).

### F. Plaintiff Cannot Plead an Unfair or Deceptive Act for the WCPA

The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Plaintiff claims that LPL violated the WCPA because it "knew that the Phoenix Products presented an unreasonable amount of risk" and "chose to conceal that material information from Plaintiff and Class Members." Compl. ¶ 188. Plaintiff claims that this same conduct was "deceptive" because it had "the capacity or tendency to deceive" (*id.* ¶ 186) and constituted an actionable omission because it was "likely to mislead" (*id.* ¶ 187).

These allegations do not meet the required specificity under Rule 9(b). To show a "deceptive" act under the WCPA, a plaintiff must establish that the defendant's act or failure to act "had the capacity to deceive a substantial portion of the public." *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 858 (W.D. Wash. 2023). But nothing about Plaintiff's theory of liability under the WCPA—that is, that LPL concealed publicly available information—shows or suggests that LPL's conduct could deceive *anyone*, let alone a "substantial portion" of the public. *Id.* And under Washington law—like Delaware law (*supra*, Part D)—LPL had no duty to disclose concededly public information that was available and discoverable to Plaintiff. *See, e.g.*, *Griffith v. Centex Real Est. Corp.*, 969 P.2d 486, 492 (Wash. Ct. App. 1998) (deception-by-omission forms the basis for a WCPA violation only when a seller fails "to disclose facts material to a transaction when the facts are known to the seller but not easily discoverable by the buyer").

### G. Plaintiff's Claimed Injury Is Too Speculative to Plausibly Plead Damages or Support Article III Standing

Finally, Plaintiff fails to plead an additional crucial element of each of his common-law claims: a concrete injury caused by LPL.[8] And Plaintiff's speculative

---

[8] Harm caused by a defendant's alleged breach or wrongful conduct is a required

theory of harm undercuts his Article III standing as well. Even if the Court looks to the May 2024 moratorium as the event giving rise to injury, Plaintiff still does not allege a concrete injury because any shortfall depends on what he ultimately receives in the ongoing rehabilitation.

***Plaintiff's Alleged Damages Are Speculative.*** Plaintiff does not allege that he is currently owed, and has been denied, any specific benefit due under the Annuity. Instead, Plaintiff's theory of harm rests entirely on the fact that the Temporary Moratorium Order in the rehabilitation proceedings prohibits him from withdrawing his Annuity, and the premise that he may someday fail to receive the full benefits through the rehabilitation. Compl. ¶ 4. But the rehabilitation is ongoing and the Rehabilitator is still assessing how much can be returned to investors like Plaintiff, the putative class, and other investors who are not customers of LPL. *See Ins. Comm'r*, Rehabilitator's Second Rpt. Plaintiff could still recover the full policy amount. *See id.* Indeed, Plaintiff's own allegations confirm that the Annuity's surrender value grew from $692,426.74 in 2010 to over $1,000,000 by 2021 and he alleges no diminution in value during the very period he claims LPL should have warned him to exit. Compl. ¶¶ 107, 111. Any claimed theory of "injury" premised on rank speculation about the outcome of ongoing rehabilitation proceedings is conjectural and insufficient to plausibly allege damages to support Plaintiff's common-law claims. *See, e.g.*, *Mooney v. Pioneer Nat. Res. Co.*, 2017 WL 4857133, at *8–9 (Del. Super. Ct. Oct. 24, 2017) (dismissing fraud claim for failure to plausibly plead damages); *Stein v. Wind Energy Holdings, Inc.*, 2022 WL 17590862, at *9 (Del. Super. Ct. Dec. 13, 2022) (similar, dismissing unjust

---

element for each common-law claim. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) (fiduciary duty); *Hernandez v. Baird Mandalas Brockstedt & Federico, LLC*, 315 A.3d 1183, 1187 (Del. Super. Ct. 2024), *aff'd*, 341 A.3d 473 (Del. 2025) (professional negligence); *Dorsey v. Jones*, 2026 WL 850417, at *13 n.125 (Del. Ch. Mar. 27, 2026) (fraudulent concealment); *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023) (unjust enrichment).

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

enrichment claim because plaintiffs failed to plead that it was "reasonably conceivable that" the defendants "benefited from anything the Plaintiffs did").

Far from harming Plaintiff, the Temporary Moratorium Order was designed to protect him and other PHL policyholders.  The moratorium serves "to avoid a 'run on the bank' scenario" so that recovery can be maximized.  *See* CT Insurance Dep't, FAQs from PHL Policyholder Forum (Apr. 13, 2026), at 5–6, https://portal.ct.gov/cid/-/media/cid/1_phl/phl-forum-qa-2026april13.pdf.  The goal of the rehabilitation proceeding, as the Rehabilitator's public filings confirm, has been "to develop a rehabilitation plan that maximizes the value of assets and equitably administers the business for the benefit of all policy and annuity holders," including Plaintiff.  *See* CT Insurance Dep't, PHL Variable Insurance Company Rehabilitation, https://portal.ct.gov/cid/phlstakeholder.  Thus, Plaintiff's theory of "harm" asks the Court to treat as an actionable injury the very regulatory mechanism designed to help maximize, rather than diminish, his ultimate recovery.  And allowing Plaintiff to shift his losses onto LPL undermines the rehabilitation's goal of equitably compensating all policyholders, not just LPL customers.[9]

Finally, Plaintiff's theory of injury is foreclosed by the prohibition on double recovery: he cannot recover twice for the same alleged (speculative) shortfall.  *Horizon Servs., Inc. v. Henry*, 304 A.3d 552, 563 (Del. 2023) ("Delaware's public policy seeks to avoid allowing a plaintiff to recover twice for the same injury.").

---

[9] Should the Court decline to grant this motion, the case should be stayed pending resolution of PHL's rehabilitation proceedings.  *See, e.g.*, *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) (holding breach-of-contract claim unfit for review because the alleged breach depended on "future contingencies that may or may not occur," including whether the defendant would fail to perform by a later deadline); *Doe v. San Diego Unified Sch. Dist.*, 2022 WL 16984502, at *3 (S.D. Cal. Nov. 16, 2022) (whether a claim is ripe depends on "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration"); *see also Rajaee v. Davis*, 2024 WL 2925332, at *1 (S.D. Cal. June 10, 2024) (staying case with pending bankruptcy liquidation proceeding "to save the Parties and the Court from spending unnecessary time and judicial resources").

LPL'S MEM. P&A ISO MTD COMPL.
NO. 3:26-CV-03383-JES-DEB

Permitting Plaintiff to recover from LPL now for the same shortfall that the rehabilitation proceedings may yet redress would risk exactly that. *See CoVenture - Burt Credit Opportunities GP, LLC v. Coleman*, 2023 WL 7179488, at *10 (Del. Super. Ct. Nov. 1, 2023) (dismissing fraud claim arising from same operative facts as contract claim to avoid potential double recovery).

***No Concrete Harm to Sustain Standing.*** Such speculation about future harm also cannot satisfy Article III's standing requirement. For prospective injuries, like the one Plaintiff alleges, a complaint must plausibly allege that the harm is "certainly impending," not merely a "speculative chain of [future] possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–14 (2013); *see also Munns v. Kerry*, 782 F.3d 402, 409–11 (9th Cir. 2015) (future injury not imminent where harm depended on chain of contingent events). But there is nothing "certainly impending" about the uncertain and unknown outcome of ongoing rehabilitation proceedings, through which the Rehabilitator has confirmed that the goal is to "maximize the value of [PHL] assets" for PHL annuity holders. Accordingly, Plaintiff's "injury" here is conjectural and hypothetical, not concrete or imminent, and cannot support constitutional standing. *See, e.g.*, *In re E. Coast Foods, Inc.*, 80 F.4th 901, 910 (9th Cir. 2023) (holding that creditor lacked standing because bankruptcy plan guaranteed payment with interest and it remained possible that the creditor would be paid within the plan's initial estimated payment window).

## V.   CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in full.

Dated: August 10, 2026

O'MELVENY & MYERS LLP

*/s/ Pamela A. Miller*
Pamela A. Miller
Brittany Rogers
Lauren M. Wagner

*Counsel for Defendant*
*LPL Financial LLC*

25