**BURSOR & FISHER, P.A.**
Max S. Roberts (State Bar No. 363482)
Yitzchak Kopel (*Pro Hac Vice*)
Logan J. Hagerty (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: mroberts@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KERRY NIETZ, ALINA TYMINSKI, and MARK T. TYMINSKI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LPL FINANCIAL LLC,<br><br>Defendant. | Case No. 3:26-cv-03383-JES-DEB<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................ 1
PARTIES ........................................ 3
JURISDICTION AND VENUE ........................................ 4
FACTUAL ALLEGATIONS ........................................ 4
A. Overview ........................................ 4
B. LPL Provided Advisory Services With Respect to the Phoenix Products ........................................ 7
C. LPL Was Aware of Phoenix's Deteriorating Financial Condition ........................................ 12
D. PHL Variable Insurance Co. and its Rehabilitation ........................................ 19
E. LPL Had a Conflict of Interest ........................................ 25
F. LPL Entered Several Consent Orders Regarding Its Advisers' Sale of Products ........................................ 26
G. Plaintiff Kerry Nietz's Experience ........................................ 27
H. Plaintiffs Alina and Mark Tyminski's Experience ........................................ 32
CLASS ALLEGATIONS ........................................ 40
COUNT I ........................................ 43
COUNT II ........................................ 47
COUNT III ........................................ 50
COUNT IV ........................................ 51
PRAYER FOR RELIEF ........................................ 54
JURY TRIAL DEMANDED ........................................ 55

Plaintiffs Kerry Nietz, Alina Tyminski, and Mark Tyminski ("Plaintiffs") bring this action on behalf of themselves, and all others similarly situated, against LPL Financial LLC ("LPL" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel, based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action on behalf of all persons in the United States who acquired rights under life insurance policies or annuity contracts issued by what was formerly known as The Phoenix Companies, Inc., now known as PHL Variable Insurance Company in Rehabilitation ("Phoenix" or "PHL"), and sold by Defendant LPL or purchased through LPL investment advisors.

2. Defendant LPL, as an investment advisor, occupied and assumed a unique position of trust and confidence with Plaintiffs and Class Members regarding the brokering, sale, and servicing of the Phoenix Products (as defined herein), which were knowingly used by Plaintiffs and others similarly situated for retirement planning, estate planning, risk management planning, personal wealth planning, and/or investment planning.

3. LPL abused its position of trust and confidence. Years after selling Plaintiffs' and Class Members' insurance policies and annuity contracts and their associated benefits (the "Phoenix Products"), LPL decided to no longer recommend these products to its new clients and ceased selling them altogether.

4. Yet LPL never informed its existing customers who already held the Phoenix Products that those products were no longer suitable for their intended purposes. LPL never recommended these customers diversify their exposure away from a company they knew was failing. Instead, LPL left them with all their eggs in one basket. LPL either (1) never considered the unsuitability of the Phoenix Products to the clients who already owned them, including Plaintiffs, or (2) considered their

unsuitability and, even after learning of PHL Variable's successive downgrades and deteriorating financial condition, failed to recommend that Plaintiffs or Class Members reduce their exposure to PHL Variable.

5. Notwithstanding PHL's deteriorating financial condition, LPL continued to collect millions of dollars in trailer commissions on those very products for work it never performed. Plaintiffs and Class Members were thus unaware of the real and imminent threats facing their Phoenix Products as outlined below. By the time Plaintiff and Class Members became aware of their financial injury, it was too late.

6. In 2023, the market value of Plaintiff Nietz's variable annuity contract (the "Nietz Variable Annuity") exceeded one million dollars, and it was well past the surrender period—meaning that Plaintiff Nietz could have withdrawn the full market value of the Nietz Variable Annuity in cash. Today, PHL Variable Insurance Company is in rehabilitation, and Plaintiffs and Class Members are unable to receive the full benefits due under their policies and contracts. Neither can they exchange, surrender, or withdraw the cash value of their Phoenix Products. For example, had Mr. Nietz been made aware of the material risk facing the Nietz Variable Annuity, he could have withdrawn the cash value in full or performed a 1035 exchange for a suitable alternative retirement savings product with a solvent and better capitalized institution.

7. Plaintiff Nietz's former LPL investment advisor has conceded that Plaintiff Nietz's financial injury was "years in the making." The same, former advisor acknowledged it is a "fair question" why Plaintiff's then-current LPL advisor never informed Plaintiff Nietz about the risk facing the Nietz Variable Annuity, given that financial advisor "was receiving a trail commission" during the time that Phoenix was rapidly deteriorating and in unsound condition.

8. Accordingly, Plaintiffs bring claims against Defendant for professional negligence, breach of fiduciary duty, and unjust enrichment on behalf of themselves and a nationwide class, and Plaintiff Nietz additionally brings a claim under

Washington's Consumer Protection Act individually and on behalf of a Washington subclass

**PARTIES**

9. Plaintiff Kerry Nietz is a resident and citizen of the State of Ohio and is domiciled in Wood County, Ohio. Mr. Nietz is the Primary Annuitant of the Flexible Premium Variable Accumulation Deferred Annuity sold under a Prospectus that was filed with the Securities and Exchange Commission under a product originally known as Phoenix Investor's Edge in 1999. Upon information and belief, Phoenix Investor's Edge is now known as The Big Edge Choice ("Big Edge Choice").

10. Based on estate planning recommendations that Mr. Nietz received from LPL, the Big Edge Choice was at all times relevant to this dispute owned by a Washington domiciled trust known as the Kerry L Nietz trust 1997 dated May 15, 1997 (the "Nietz Trust").

11. Plaintiff Alina Tyminski is a resident and citizen of Connecticut and is domiciled in New Britain, Connecticut. She is a joint owner of PHL Variable Insurance Company annuity contract number 23064179 (the "Tyminski Contract") and, following the death of her husband, its sole surviving owner. She brings this action individually and as surviving joint owner of the Tyminski Contract. Mrs. Tyminski acts through her son, Plaintiff Mark T. Tyminski, as her attorney-in-fact under a durable power of attorney executed July 12, 2023 pursuant to the Connecticut Uniform Power of Attorney Act, which expressly confers authority with respect to claims and litigation and with respect to insurance and annuities. Plaintiff Mark Tyminski, along with his sister and brother who are not named parties in this case, are beneficiaries of the Tyminski Contract.

12. Defendant LPL Financial is a Limited Liability Company organized under the laws of California with its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act ("CAFA"), because there are more than 100 Class members, at least one member of the Class is a citizen of a different state than Defendant, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs.

14. The Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District.

## FACTUAL ALLEGATIONS

### A. Overview

16. Linsco/Private Ledger ("LPL") "is registered with the U.S. Securities and Exchange Commission as a broker-dealer and an investment adviser."[1] LPL has "a network of financial professionals ... who offer brokerage and investment advisory services."[2]

17. Investment advisers provide ongoing investment advice, continuously managing their customers' investment accounts.

18. LPL abandoned its fiduciary duties as an investment advisor to Plaintiffs and Class Members. For over a decade, LPL profited from Plaintiffs and Class Members' risky Phoenix insurance and annuity products, despite clear and mounting warning signs of Phoenix's deteriorating financial condition. LPL's gain—millions of dollars of trail compensation—came directly at the expense of Plaintiffs and Class Members, who now face devastating financial harm as a result.

[1] *LPL Financial LLC (LPL) Relationship Summary* (Mar. 31, 2026), available at https://brokercheck.finra.org/firm/summary/6413.

[2] *Id.*

19. LPL has been Plaintiff Nietz's investment advisor, and the Nietz Trust's investment advisor, since 1997. LPL acted as an investment advisor and fiduciary with respect to Mr. Nietz and the Nietz Trust throughout the time that Big Edge Choice was first acquired by the Nietz Trust in 1999, through May 20, 2024 when PHL Variable was placed into Rehabilitation by the Connecticut Insurance Department, and to the present day.

20. Similarly, LPL Financial and Advisor Anthony Marciano was broker-dealer and investment advisor for Tadeusz since 2002 and Alina since 2016. LPL acted as an investment advisor and fiduciary with respect to the Tyminksi's at all relevant times, and retained commissions on premiums and trailing commissions on the Tyminski Contract from 2002 until the passing of Plaintiff Alina Tyminski's husband and Plaintiff Mark Tyminski's father, Tadeusz Tyminski.

21. Beginning no later than 2009, LPL acquired particularized knowledge of financial risks associated with PHL and the Phoenix Products, and LPL was acutely aware of PHL's deteriorating financial condition that began with significant downgrades by rating agencies. These rating agencies included, for example, Moody's, Standard & Poor, and A.M. Best Company, and the downgrades materially affected PHL's financial results and reduced its ability to borrow.

22. Immediately following the ratings downgrades, both State Farm and National Life Group suspended sales of Phoenix annuities and life insurance policies. Prior to the suspension of sales of the Phoenix Products, State Farm and National Life accounted for more than 82% of Phoenix's annuity sales and State Farm alone accounted for 27% of Phoenix's life insurance premiums.

23. The impact of the loss of annuity and life insurance sales was severe, and the events of 2009 were confirmed in Phoenix's own SEC filings and observable by any broker-dealer, investment advisor risk, or compliance department.

24. At some point following the 2009 events noted above, LPL removed Phoenix from its recommended products platform and ceased selling the Phoenix

Products.

25. While Phoenix's financial condition continued to severely deteriorate after 2009, LPL never informed Plaintiffs that their retirement and estate security was at risk and subject to disruption in the event of regulatory action by the Connecticut Insurance Department.

26. In fact, LPL never did a review of PHL for Plaintiffs, never assessed whether or not Plaintiffs' annuities remained suitable for their retirement- and estate-planning objectives, and never recommended a surrender or even a partial withdrawal—even though, for instance, by 2009 there was a 0% surrender charge associated with the Nietz Variable Annuity.

27. Even when Standard & Poor subsequently downgraded PHL five notches to junk status in 2019 (CCC+ from BB, citing a $100 million decline in capital adequacy), LPL remained radio silent.

28. When PHL announced in statutory annual statements that it "stopped marketing and selling new business" as of November 2019,[3] and therefore was entering run-off, LPL remained silent and did not inform Plaintiffs and Class Members.

29. LPL failed, from 2009 through May 20, 2024, to recommend that its existing customers who owned Phoenix Products diversify their exposure. LPL deprived Mr. Nietz, Mrs. Tyminski, Mr. Tyminski, and others similarly situated from protecting their retirement and estate security.

30. To add insult to injury, LPL continues to collect trailer commissions based on the notional value of Plaintiff Nietz's Big Edge Choice Variable Annuity,

[3] PHL Variable Insurance Company, Management's Discussion and Analysis of the Statutory Financial Condition and Results of Operations As of and for the Year Ended Dec. 31, 2019, at 1; PHL Variable Insurance Company Statutory Financial Statements and Supplemental Schedules Dec. 31, 2019 and 2018, Notes to Statutory Financial Statements, at 6 ("In November 2019, PHL stopped marketing and selling new business.").

even though Mr. Nietz has not been able to withdraw anything from his annuity contract due to the Moratorium Order that has remained in place since May 20, 2024.

31. Similarly, upon information and belief, LPL and Advisor Marciano collected commissions each time the Tyminski's put more money into the Tyminski Contract, and they also earned trailer commissions from 2002 through at least year end 2025.

**B. LPL Provided Advisory Services With Respect to the Phoenix Products**

32. "LPL's advisory services are made available to clients" like Plaintiff and Class Members "primarily through individuals associated with LPL as investment adviser representatives ('IARs')."[4]

33. As relevant here, LPL and its investment advisors provided ongoing advisory services to Plaintiffs and Class Members in connection with the "Phoenix Products.

34. LPL states that, as part of its "Investment Advisory Services," it will "typically monitor accounts, and specific investments within accounts, ***on an ongoing basis*** to align with your investment goals."[5] And in its Firm Brochure, LPL says: "LPL, through its IARs, provides ***personal financial planning*** and consulting services ***tailored to the individual needs*** of the client."[6]

35. LPL advised Plaintiffs and Class Members with respect to retirement planning, estate planning, risk management planning, personal wealth planning, and/or investment planning.

---

[4] LPL FIRM BROCHURE A58 (Mar. 31, 2026), at 2, available at https://adviserinfo.sec.gov/firm/brochure/6413.

[5] LPL FINANCIAL LLC (LPL) RELATIONSHIP SUMMARY (Eff. Mar. 31, 2026), at 1, available at https://www.lpl.com/content/dam/edam/format/disclosure/relationship-summary/ap-gwp-r.pdf (emphasis added).

[6] LPL FIRM BROCHURE A58 (Mar. 31, 2026), at 3, available at https://adviserinfo.sec.gov/firm/brochure/6413 (emphasis added).

36. In the course of providing such planning, consulting, and advisory services, LPL advised Plaintiffs and Class Members regarding the Phoenix Products.

37. LPL presented the Phoenix Products to Plaintiffs and Class Members as tailored, "customized," wealth management products that were best suited for Plaintiffs and Class Members' needs.[7]

38. LPL's "Wealth Management Products" include but are not limited to "Annuities" and "Comprehensive Insurance Solutions[.]" LPL's annuity and insurance wealth management products are detailed on the LPL website (which website is designed to provide information on LPL product offerings) as follows:[8]

> **Annuities**
>
> Combine your experience with access to a wide array of annuity products that can help your clients preserve and manage their assets. You'll also gain access to robust research tools and platforms so you can analyze products, compare options, and make informed recommendations that fit your clients' long-term goals.
>
> - Deferred income annuities (DIA)
> - Fee-Based annuity solutions
> - Fixed annuities
> - Fixed index annuities
> - Registered index-linked annuities
> - Single premium immediate annuities (SPIA)
> - Variable annuities
>
> **Comprehensive Insurance Solutions**

---

[7] *See, e.g.*, LPL FINANCIAL, WEALTH MANAGEMENT PRODUCTS, available at https://www.lpl.com/join-lpl/managing-your-business/products-platforms/products.html ("At LPL Financial, we help advisors build tailored portfolios, access a wide range of nonproprietary products, and craft solutions that are customized to fit their clients' lives and goals.") (last accessed May 27, 2026).

[8] *See generally id.*

> Help your clients protect what matters most. With LPL's in-house insurance agency, you can access a wide selection of name-brand carriers and life insurance products to fit each client's unique protection and legacy goals.
>
> Available options include:
>
> Term life
> Whole life
> Universal life

39. At all relevant times, LPL knew that the Phoenix Products (i.e. Phoenix annuities[9] and life insurance) were sold to LPL customers to protect families from the early demise of a primary wage earner and to provide estate planning and wealth management strategies for their customers. LPL knew that Plaintiffs and Class Members purchased and retained these products to ensure that Plaintiffs and Class Members could protect their families and maintain their lifestyle in their retirement years.

40. According to the LPL website:

> Having enough retirement income is a top concern for many Americans nearing or in retirement. Even though they may have saved consistently throughout the working years, they may be concerned that their retirement plans will succeed. A successful retirement plan provides the ability to maintain your lifestyle for the duration of your life.[10]

41. LPL reiterates just how important the Phoenix annuity products were for Plaintiffs' and Class Members' retirement, risk management, personal wealth, and/or

---

[9] INNOVATE FINANCIAL BY LPL FINANCIAL, RETIREMENT ANNUITIES EXPLAINED: WHAT THEY ARE AND HOW THEY WORK, https://if.lpl.com/blog/retirement-annuities-explained-what-they-are-and-how-they-work ("Annuities help retirees address a specific retirement planning risk- Longevity Risk. Longevity Risk is the risk that a retiree outlives their financial assets.").

[10] *Id.*

investment planning, for example, when it says: "For those seeking income and safety, annuities may be an asset class they may want to consider."[11]

42. LPL knew that its clients, including Plaintiffs and Class Members, "count on" their LPL advisors. LPL knew that its advisers held a significant position of trust among clients like Plaintiffs and Class Members:

> *Investors count on financial advisors* for guidance they can trust. At LPL Financial, we help advisors build tailored portfolios, access a wide range of nonproprietary products, and craft solutions that are customized to fit their clients' lives and goals.[12]

43. LPL used its position of trust and confidence to sell and advise Plaintiffs and Class Members on the Phoenix Products. LPL marketed and sold the Phoenix life and annuity products through thousands of its investment advisors "in branch offices throughout the United States"[13] pursuant to a written marketing agreement with Phoenix, after LPL "entered into an agreement to acquire the retail broker-dealer operations of The Phoenix Companies Inc."[14] Phoenix described this agreement with LPL as part of an "industry trend" that "led to ***advisor groups becoming a distinct***

---

[11] *Id.*

[12] LPL FINANCIAL, WEALTH MANAGEMENT PRODUCTS, available at https://www.lpl.com/join-lpl/managing-your-business/products-platforms/products.html (emphasis added).

[13] https://www.sec.gov/Archives/edgar/data/1129633/000094937704000150/pnx_66152-ex1.htm; *see also* https://www.sec.gov/Archives/edgar/data/1129633/000094937704000490/pnx68085_10q.htm.

[14] FINANCIAL ADVISOR, LPL TO ACQUIRE PHOENIX BROKER-DEALERS (Apr. 20, 2004), https://www.fa-mag.com/news/article-2049.html (last accessed May 16, 2026); *see also* PHOENIX ACTION UNLEASHES BACKLASH, HARTFORD COURANT (July 30, 2004) (updated Sep. 3, 2021), available at https://www.courant.com/2004/07/30/phoenix-action-unleashes-backlash/.

***class of distributors***."[15] According to Todd Robinson, chairman and CEO of LPL: "We believe LPL offers these advisors an excellent platform to grow their business[] …. In addition, this move will strengthen [LPL's] ability to leverage Phoenix's life, annuity and asset management products and expertise to ***enhance our high-net-worth services***."[16]

44. This agreement was profitable for both Phoenix and LPL. "During 2005, [Phoenix] realized a gain of $1.5 million related to contingent consideration based on gross distribution concessions earned by LPL during the first year following the sale."[17] And in the span of one year following its advisors moving to LPL, Phoenix made $24.9 million *more* than it had the previous year, or, $58.7 million total. This is shown by the delta between the Second Quarter 2004 "Life and Annuity Segment Income" ($33.8 million) and Second Quarter 2005 "Life and Annuity Segment

---

15 https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/pnx80444-10k.htm (emphasis added); https://www.sec.gov/Archives/edgar/data/1129633/000094937707000109/form10k2006.pdf

16 FINANCIAL ADVISOR, LPL TO ACQUIRE PHOENIX BROKER-DEALERS (Apr. 20, 2004), https://www.fa-mag.com/news/article-2049.html (last accessed May 16, 2026) (emphasis added).

17 https://www.sec.gov/Archives/edgar/data/1129633/000119312508043638/d10k.htm; https://www.sec.gov/Archives/edgar/data/1129633/000094937705000849/pnx_74468-10q.htm

Income" ($58.7 million):[18]

SUMMARY OF SEGMENT RESULTS

Life and Annuity

| Summary (millions) | Second Quarter 2005 | Second Quarter 2004 | Change |
|---|---|---|---|
| Life Insurance Income (pre-tax) | $68.3 | $29.2 | $39.1 |
| Annuity Income (Loss) (pre-tax) | (9.6) | 4.6 | (14.2) |
| Life and Annuity Segment Income (pre-tax) | $58.7 | $33.8 | $24.9 |
| Life Insurance Sales (Annualized + Single Premium) | $34.4 | $36.5 | $(2.1) |
| Annuity Deposits | 80.4 | 137.9 | (57.5) |
| Annuity Net Deposits | $(155.1) | $(30.0) | $(125.1) |

- Life and Annuity segment income reflects year-over-year improvements in investment and mortality margins, continued strong persistency and the benefit of expense reductions, particularly those related to the second quarter 2004 sale of Phoenix's affiliated retail distribution to Linsco/Private Ledger (LPL).
- Life Insurance income included a $34.3 million pre-tax DAC benefit related primarily to the recognition of favorable mortality experience.

### C. LPL Was Aware of Phoenix's Deteriorating Financial Condition

45. As Plaintiff Nietz's former LPL advisor noted, PHL Variable's rehabilitation-turned liquidation was "years in the making"—PHL Variable did not deteriorate overnight. It certainly should not have come as a surprise to LPL and its investment advisors. LPL knew that PHL Variable was in failing financial condition for over a decade.

46. LPL stuck its head in the sand. Despite its knowledge as to the material risk facing Phoenix/PHL Variable, LPL took no action on behalf of its clients who already purchased the Phoenix Products, including Plaintiffs and Class Members.

47. In a 2009 Form 10-Q, Phoenix said: "We have recently been downgraded and had our outlook revised adversely."[19] Phoenix went on to explain:

---

18 https://www.sec.gov/Archives/edgar/data/1129633/000094937705000674/pnx72838_8-k.htm

19 https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf.

> - On September 8, 2009, Moody's Investor Services downgraded our financial strength rating of Baa2 to Ba1 and lowered our senior debt rating from Ba2 to B1. They maintained their negative outlook on all ratings.
> - On August 6, 2009, Standard & Poor's downgraded our financial strength rating of BBB- to BB and lowered our senior debt rating from B+ to B-. They maintained their negative outlook on all ratings.
> - On March 10, 2009, A.M. Best Company, Inc. downgraded our financial strength rating to B++ from A and downgraded our senior debt rating to bb+ from bbb and maintained its negative outlook.
>
> These **downgrades have materially and adversely affected new sales, persistency, our relationships with distributors and our financial results, and have reduced our ability to borrow**. Further declines in ratings would likely also materially and adversely affect our sales, persistency, our relationships with distributors and our financial results.[20]

48. For reasonable individuals like Plaintiffs and Class Members who are not familiar with and generally do not subscribe to rating agency reports, this information is not readily available, and it is difficult to decipher.

49. However, LPL, as (1) both a sophisticated advisor and broker-dealer and (2) a Phoenix insider, who had thousands of formerly-Phoenix investment advisors, knew this downgrading was highly significant and would likely impact Plaintiffs' and Class Members' Phoenix policies and/or annuity contracts. Phoenix's financial strength rating being downgraded from Baa2 to Ba1 changed PHL's rating from that of "***Investment***-Grade" to merely "***Speculative***-Grade."[21]

---

[20] https://www.sec.gov/Archives/edgar/data/1129633/000111650209001703/pdfcopy-pnx_10q.pdf (emphasis added).

[21] *See, e.g.*, Moody's Ratings System (May 2006), available at https://www.moodys.com/uploadpage/2005700000433096.pdf (emphasis added).

50. As a result of this initial downgrade, ***LPL removed Phoenix annuities and life insurance products from LPL's list of recommended products*.** LPL's decision to remove the Phoenix Products from its recommended list reflected a determination, made through LPL's own due diligence, that Phoenix was no longer an insurer whose products LPL was prepared to recommend to its clients. But LPL never recommended that Plaintiffs or Class Members diversify their asset allocations and reduce their exposure to PHL Variable when they had a duty and the opportunity to do so.

51. There were dates—in addition to the 2009 downgrades—when LPL knew, or, by the exercise of reasonable diligence should have known, of facts or circumstances which would put a reasonable investment advisor on notice that the Phoenix insurance and annuity products presented an unreasonable and material risk to its customers.

52. For example, in August 2012, Phoenix executed a 1-for-20 reverse stock split.[22] Reverse stock splits "are often done by … financially struggling companies. … [D]oing a reverse stock split can be a red flag to investors" and "investors are often right to proceed with caution."[23]

53. In 2012, Phoenix reported that it had "***identified a material weakness*** in our internal controls over financial reporting during" 2010. This should have been a major red flag to LPL because, as Phoenix explains in the same 10-K, "[e]ffective ***internal controls are necessary*** for [Phoenix] to provide timely and reliable financial reports and ***effectively prevent fraud***. …. If [Phoenix] fail[s] to maintain adequate

---

[22] *See* https://www.sec.gov/Archives/edgar/data/1129633/000135448814003889/pnx_ex991.htm

[23] Carpenter Wellington PLLC, *Reverse Stock Splits as a Strategy of Struggling Companies* (Dec. 7, 2025), available at https://carpenterwellington.com/post/reverse-stock-splits-as-a-strategy-of-struggling-companies/.

internal controls our financial statements may not accurately reflect our financial condition, which could cause [Phoenix] investors to lose confidence in our reported financial information and ***have an adverse effect on our [Phoenix's] business***."[24]

54. On March 21, 2014, the SEC approved a cease-and-desist order ("Order") related to Phoenix and PHL Variable Insurance Company's "failure to file timely periodic reports" with the SEC, which Order "directed [Phoenix and PHL Variable Insurance Company] to cease and desist from committing or causing any violations and any future violations of" Sections 13(a) and 15(d) of the Exchange Act.[25] Also as a result of this Order, Phoenix and PHL Variable Insurance Company "each paid a civil monetary penalty in the amount of $375,000 to the United States Treasury following the entry of the Order."[26]

55. In a 2014 Form 10K, Phoenix warned in its Item 1A Risk Factors that "PHL Variable … ***will continue to not issue any new SEC-registered life insurance and annuity contracts*** until new registration statements or amendments to existing registration statements covering the offer and sale of these products have been filed with and declared effective by the SEC."[27] This is especially alarming given that

---

[24] https://www.sec.gov/Archives/edgar/data/1129633/000135448812001152/pnx_10k.htm (emphasis added).

[25] https://www.sec.gov/Archives/edgar/data/1129633/000135448814001585/pnx_10k.htm. *See also* https://www.sec.gov/rules-regulations/staff-guidance/corporation-finance-interpretations/exchange-act-sections ("While filing required documents late will not 'cure' Section 13(a) or 15(d) violations, and will not make the registrant timely for purposes of eligibility to use certain Securities Act forms, it will permit the registrant to become current in its Exchange Act reporting.").

[26] https://www.sec.gov/Archives/edgar/data/1129633/000135448814001585/pnx_10k.htm.

[27] https://www.sec.gov/Archives/edgar/data/1129633/000112963315000004/pnx-20141231x10k.htm (emphasis added).

Phoenix "conduct[ed] the majority of [its] business through Phoenix Life and its indirect subsidiary, PHL Variable."[28]

56. Moreover, Phoenix has been known by industry insiders to be "largely dependent" on Stranger Originated Life Insurance (STOLI) schemes,[29] in which investors "prey[] on seniors and misus[e] life insurance for their own gain[.]"[30] Industry insiders would have been aware of this fact as early as 2012, when Phoenix employees "told the company [Phoenix] that it [Phoenix] would go bankrupt if it continued to issue policies based on fake underwriting, but his warnings went unheeded."[31] Indeed, "about 80% of Phoenix's sales were investor-owned life insurance (IOLI) policies, another term for STOLI[.]"[32]

57. Critically, ***<u>PHL Variable warned LPL and other investment advisors that it may be placed into rehabilitation as early as 2015</u>***:

> If the Company [PHL Variable Insurance Company] is unable to meet its capital needs either by itself or with assistance from

---

[28] *Id.*

[29] Donna Horowitz, *Insiders Say Phoenix Sought STOLIs, Bolstering $466.9M RICO Case* (June 19, 2012), THE DEAL (emphasis added).

[30] https://insurance.ohio.gov/companies/product-regulation-and-actuarial-services/resources/stranger-originated-life-insurance-stoli; *see also* Donna Horowitz, THE LIFE SETTLEMENTS REPORT (Sep. 6, 2012), available at https://david-kroll-4824.squarespace.com/s/Sep-6-2012-Life-Settlement-Report.pdf.

[31] Donna Horowitz, *Insiders Say Phoenix Sought STOLIs, Bolstering $466.9M RICO Case* (June 19, 2012), THE DEAL (emphasis added). The Life Settlements Report is published by The Deal. The Deal serves law firms, private equity, hedge funds, and insurance firms. *See* THE DEAL, SOLUTIONS FOR YOUR INDUSTRY, https://www.thedeal.com/solutions/. As such, the Life Settlements Report is accessible to industry insiders like LPL—but not the public. "The [Life Settlements Report] provides the in-depth coverage brokers, providers, attorneys, investors and service providers need to stay current with breaking news, get ahead of competitors and keep up with regulations." THE DEAL, LIFE SETTLEMENTS REPORT, https://www.thedeal.com/solutions/life-settlements-report/.

[32] *Id.*

> Phoenix, the Company could become subject to increased regulatory oversight by its domestic insurance regulator ***or to other regulatory actions including rehabilitation***, any of which may materially adversely affect the Company's business, financial condition or results of operations.[33]

58. In 2016, Nassau Financial took The Phoenix Companies private.[34] Part of this transaction included "PHL Variable Insurance Company ('PHL Variable'), one of Phoenix's operating subsidiaries."[35]

59. PHL Variable repeatedly experienced solvency problems from the time Defendant removed Phoenix annuities and life insurance products from LPL's list of recommended products, through PHL Variable's eventual administrative supervision and rehabilitation-that is careening towards liquidation.

60. Industry insiders, like LPL, have been aware of these material facts surrounding Phoenix/PHL Variable's ongoing financial troubles since 2009, which facts would have been known by Defendant and not consumers like Plaintiffs and Class Members. Instead of acting on that information for the benefit of Plaintiffs and Class Members who held the Phoenix Products, LPL did nothing and continued to collect trailer commissions at the expense of Plaintiffs and Class Members.

---

[33] https://www.sec.gov/Archives/edgar/data/1031223/000119312515300293/d29133d424b3.htm (emphasis added).

[34] *See, e.g.*, Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle ("Once part of the Hartford-based Phoenix Companies, PHL became part of Nassau Financial in 2016, when Nassau, then only a year old, bought the publicly-traded Phoenix, took it private, and retired the Phoenix brand.").

[35] https://www.sec.gov/Archives/edgar/data/1129633/000157104916016107/t1601599_ex99-1.htm; *see also* https://doi.sc.gov/DocumentCenter/View/12789/PHL-Variable-Insurance-Company.

61. In 2019, "PHL entered several reinsurance deals with 'captive' and 'affiliated' reinsurers to reduce its liabilities and bolster its surplus."[36]

62. Also in 2019, Standard & Poor subsequently downgraded PHL five notches to junk status (CCC+ from BB, citing a $100 million decline in capital adequacy).

63. Moreover, at year-end 2019, PHL announced in statutory annual statements that it had in "stopped marketing and selling new business"[37] and was therefore entering run-off.

64. "In late 2021, PHL was separated from Nassau and transferred to a different Golden Gate Capital subsidiary, essentially isolating the failing business from Nassau's healthier life insurance units."[38]

65. In 2023, regulators placed PHL Variable under administrative supervision. "Rehabilitation is a court proceeding that a company's state insurance commissioner may initiate to take control of the company if it is in a hazardous financial condition."[39]

---

[36] Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/ ("It's not clear how much independent capital these reinsurers posted. Ultimately, these band-aid solutions failed.").

[37] PHL Variable Insurance Company, Management's Discussion and Analysis of the Statutory Financial Condition and Results of Operations As of and for the Year Ended Dec. 31, 2019, at 1; PHL Variable Insurance Company Statutory Financial Statements and Supplemental Schedules Dec. 31, 2019 and 2018, Notes to Statutory Financial Statements, at 6 ("In November 2019, PHL stopped marketing and selling new business.").

[38] John Hilton, *A decade in decline: PHL Variable serving as a cautionary tale*, INSURANCE NEWSNET (Jan. 22, 2026), https://insurancenewsnet.com/innarticle/a-decade-in-decline-phl-variable-serving-as-a-cautionary-tale.

[39] CT INSURANCE DEPARTMENT, *PHL Variable Insurance Company Rehabilitation*, https://portal.ct.gov/cid/phlstakeholder?language=en_US.

66. LPL and its IARs knew or should have known of these circumstances, and should have advised Plaintiffs as to them, especially given that PHL Variable, now private, was no longer required to file periodic reports with the SEC that were available to the public.

67. Yet LPL took no action with respect to its existing clients' Phoenix Products, and continued to collect trail compensation based on Phoenix life insurance policies and annuity contracts that LPL sold to Plaintiff and Class Members and allegedly continued to service.

68. Once LPL knew that PHL was experiencing solvency concerns it became duty bound to share those concerns with Plaintiff and Class Members. LPL had an ongoing and continuous duty to warn Plaintiff and Class Members about the financial condition of PHL Variable once it was no longer a suitable insurer but failed to do so at all times after 2009.

69. LPL knew that Plaintiffs and Class Members are unsophisticated parties when it comes to the complexities of insurance, annuities, corporate structures, and insolvencies. This is precisely why Plaintiffs and Class Members utilized Defendant's advisory services and trusted Defendant to provide materials facts regarding their Phoenix Products.

70. LPL continued to receive trail compensation on the Phoenix Products it serviced, which gave LPL a direct financial incentive not to investigate the ongoing suitability of, nor recommend that its clients move their assets away from, PHL. More information regarding trail compensation, and conflicts of interest associated therewith, are explained in greater detail *infra* § E.

**D. PHL Variable Insurance Co. and its Rehabilitation**

71. On March 31, 2023, Connecticut Insurance Department (the "CID") "placed [PHL Variable] under an order of administrative supervision ... having

determined that regulatory supervision was appropriate to help safeguard the financial security of" PHL Variable.[40]

72. Over a year later, on May 20, 2024, PHL Variable and its subsidiaries, Concord Re, Inc. and Palisado Re, Inc, both of which were Connecticut captive reinsurance companies, were ordered into Rehabilitation by the CID (the "PHL Rehabilitation").

73. In connection with the PHL Rehabilitation, the CID determined that "further transaction of business would be financially hazardous to its policyholders, creditors and the public[.]"[41] As the Commissioner set out, at the time the Rehabilitation commenced, Phoenix had ***negative $900 million*** in capital and surplus.[42]

74. As a result of the rehabilitation, the PHL Rehabilitator issued a Temporary Moratorium Order effective May 20, 2024, preventing or limiting policy withdrawals, surrenders and death benefit payouts.

75. "As of September 30, 2025, on a combined basis, the Companies' approximate capital and surplus remained stable at ***negative $2.2 billion***[,]"[43] and, by

---

[40] *See* Petition For Order Of Rehabilitation And Appointment Of State Insurance Commissioner As Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024), available at https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf.

[41] May 20, 2024 Order, available at https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=27532057.

[42] *See* https://retirementincomejournal.com/wp-content/uploads/2024/05/DocumentInquiry-PHL.pdf.

[43] Rehabilitator's Third Accounting and Status Report (Nov. 20, 2025), available at https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=31401323, at 14 (emphasis added).

2030, approximately ***$1.46 billion of policyholder liabilities will remain unpaid***.[44]

76. PHL Variable's rehabilitation would not have come as a surprise to Defendant, who had been fully aware of financial troubles facing PHL Variable since at least 2009, when LPL removed Phoenix annuities and life insurance products from LPL's list of recommended products.

77. On New Year's Eve, December 31, 2025, PHL Variable and/or the State of Connecticut, but *not* LPL, explained that the PHL Variable rehabilitation "is not feasible" and that PHL Variable and its subsidiaries "do not have the assets that would be necessary to transfer to a buyer or reinsurer any blocks of business without causing other policyholders to receive less than what they would receive from the guaranty associations in a conventional liquidation."[45]

78. In other words, the "Rehabilitator determined that rehabilitation of PHL is not possible."[46] "The timing for the transition to a PHL liquidation proceeding is uncertain but is expected in the first half of 2027."[47]

79. Plaintiffs and Class Members were immediately harmed and will remain harmed with inadequate recourse regardless of the outcome of the PHL Rehabilitation.

80. Plaintiffs and Class Members are definitively unable to obtain benefits to which they are entitled—despite paying millions of dollars in premiums in connection with these benefits, and despite Defendant's failure, over more than a decade, to take

---

[44] Kerry Pechter, *Double Trouble in the Bermuda Triangle*, RETIREMENT INCOME JOURNAL (May 30, 2024), https://retirementincomejournal.com/article/double-trouble-in-the-bermuda-triangle/ (citing Petition for Order Of Rehabilitation and Appointment Of State Insurance Commissioner as Rehabilitator Of PHL Variable Insurance Company, Concord Re, Inc., and Palisado Re, Inc. (May 17, 2024)).

[45] https://portal.ct.gov/cid/-/media/cid/1_legal/report-of-the-rehabilitator-12-31-2025.pdf.

[46] https://portal.ct.gov/cid/phlpolicyholder?language=en_US (last accessed June 2, 2026).

[47] https://portal.ct.gov/cid/phlpolicyholder?language=en_US.

any action to fully inform them about Phoenix/PHL Variable's deteriorating financial condition and impending insolvency while it continued collecting trail compensation.

81. The Moratorium Order, in place since May 20, 2024, prevents all policyholders from withdrawing funds from Variable Annuities and Life Insurance policies with Cash Surrender Values.

82. The Moratorium Order provided an aggregate limit on death claims of no more than $300,000, "regardless of the … size" of the life insurance policy:

> *Aggregate Limit - Life Insurance Policies Covering One Individual*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $300,000 in the aggregate under one or more life insurance policies covering one individual regardless of who owns the policies or the number of beneficiaries.[48]

83. The Moratorium Order also provided an aggregate limit of $250,000 for annuities:

> *Aggregate Limit - Annuities Covering One Annuitant*. Neither the General Account nor the Non-unitized Subaccount will individually or together pay more than $250,000 in the aggregate under one or more annuities covering one annuitant regardless of who owns the annuities or the number of beneficiaries.

84. Plaintiffs' Phoenix variable annuities were allocated to the Guaranteed Interest Account ("GIA"). The GIA was an investment option under which payment amounts are guaranteed to earn a fixed rate of interest. The GIA is guaranteed by PHL Variable's general account. The general account is the "central pool" where PHL Variable, as an insurer, "places premium payments from the policies it issues and draws funds to cover its routine business operations."[49]

---

[48] https://portal.ct.gov/cid/-/media/cid/1_legal/phl-moratoriumorder.pdf.

[49] https://www.investopedia.com/terms/g/general-account.asp.

85. LPL understood that the safety of any GIA allocation is only as strong as the financial condition of the insurer standing behind it. PHL paid fees to itself (and commissions to LPL) out of funds that were supposed to be in the GIA.

86. As of 2021, the stated market value of the Nietz Variable Annuity was already **$1,063,037.25**, and available to Mr. Neitz in cash. It also could have been exchanged into a more suitable annuity with a sound financial institution where it could have continued to grow in value. Once the Rehabilitation and Moratorium Orders were issued, none of Mr. Neitz's account value whatsoever could be accessed. Since May of 2024, Mr. Neitz has had no access to his retirement annuity and nothing but uncertainty about his and his family's financial security.

87. Defendant had the ability and obligation to prevent such enormous financial injury. Defendant could and should have spared Plaintiffs and Class Members from the anxiety, fear, and uncertainty now facing Plaintiffs, Class Members, their families, and their estates.

88. Plaintiffs and Class Members will not be made whole, nor will LPL be held remotely accountable, by the outcome of the PHL Rehabilitation. Plaintiffs are not seeking to acquire any assets of the PHL estate. Instead, Plaintiffs are looking to LPL to cover all loses that were proximately caused by LPL's own misconduct.

89. It is certain that Plaintiffs and Class Members will not receive the entirety of what they are owed. Indeed, on April 13, 2026, the Rehabilitator said that Plaintiffs and Class members can now only expect to receive between "34 to 57%" of what they are owed.[50]

90. The Connecticut state Rehabilitation proceeding does not involve the same parties nor is the Rehabilitator seeking to hold LPL liable for the claims asserted

---

[50] PHL POLICY AND ANNUITY HOLDER INFORMATION SESSION – MEETING RECORDING (Apr. 13, 2026), at 11-12, 14, transcript available at https://portal.ct.gov/cid/-/media/cid/1_phl/phl-policy-and-annuity-holder-information-session.pdf.

herein. The Connecticut state liquidation proceeding will not dispose of any claims presented in this federal case. Again, Plaintiffs are not seeking to recover any assets from the PHL estate in Rehabilitation.

91. Had Plaintiffs and Class Members been notified of Phoenix/PHL Variable's financial condition at any time prior to May of 2024, they could have withdrawn their accumulated cash values or exchanged their Phoenix life insurance and/or annuity products for more suitable products.

92. Specifically, Plaintiffs and Class Members could have performed an exchange of insurance policies or annuity contracts under 26 U.S.C. § 1035 (a "1035 Exchange"). A 1035 Exchange allows policyholders to transfer funds from a life insurance policy, endowment, or annuity to a policy of a similar type. *See* 26 U.S.C. § 1035. The benefit of filing a 1035 Exchange request is that it allows the policyholder to transfer the funds without recognizing any taxable gain or loss upon transfer.

93. Additionally, had Plaintiffs and Class Members been notified of Phoenix/PHL Variable's financial troubles and the extent of risk facing their Phoenix Products prior to 2024, Plaintiffs and Class Members could have simply surrendered their policies and purchased other suitable, less risky life insurance and annuity products.[51]

94. Finally, Plaintiffs and Class Members could have withdrawn the accumulated cash values of their insurance policies and/or annuity contracts. Mr. Nietz could have withdrawn in excess of $1,000,000 in cash prior to May 20, 2024—and would have been able to take action to protect his retirement security had he known that PHL was at imminent risk of regulatory action.

---

[51] "One of the most attractive reasons to purchase **permanent life insurance**, aside from the death benefit protection, is that it **can also be a wealth-building asset**. … Cash surrender value is the actual amount of money you will receive if you choose to terminate a permanent life insurance policy before its maturity date, or before you die." https://www.guardianlife.com/life-insurance/surrender (emphasis added).

95. Defendant has failed Plaintiffs and Class members in all of these regards. Defendant abused its position of trust and disregarded its fiduciary duties.

**E. LPL Had a Conflict of Interest**

96. LPL, as an investment advisor, "provides investment advice to clients for a fee."[52] LPL had fee arrangements with respect to the Phoenix Products that were already in force, which fee arrangements were called "trail" or "trailing" commissions.

97. These fee arrangements were so profitable that LPL decided to keep Plaintiffs and Class Members in the dark to ensure it could continue to collect trailer commissions, at the expense of Plaintiff and Class Members, who were never warned of the material risk facing their Phoenix Products. The powerful conflicts of interest trail commissions can create is well-documented:

> ***Specific to the annuity market***, the DOL recognized that conflicts of interest "can be more pronounced than the mutual fund market because commissions in the annuity market...are generally higher than commissions earned in connection with the recommendation of mutual funds." …. The DOL cited research suggesting that this commission structure "incentivizes insurance agents to steer consumers toward insurance products with higher commissions" which "***may have led consumers to purchase annuities that were not in their best interest***."

*Mkt. Synergy Grp., Inc. v. United States Dep't of Lab.*, No. 16-CV-4083-DDC-KGS, 2016 WL 6948061, at *10 (D. Kan. Nov. 28, 2016) (emphasis added) (citing Dep't of Labor, *Regulating Advice Markets, Regulatory Impact Analysis for Final Rule and Exemptions* (Apr. 2016), at 168).[53]

98. LPL receives trail commissions *precisely because LPL is supposed to*

[52] FINRA, INVESTMENT ADVISERS, https://www.finra.org/investors/investing/working-with-investment-professional/investment-advisers (last accessed May 27, 2026).

[53] *Regulating Advice Markets* is available for download at https://www.dol.gov/agencies/ebsa/laws-and-regulations/rules-and-regulations/completed-rulemaking/1210-ab32-2/ria.

*continue to service and provide investment advice* for clients like Plaintiff and Class Members who purchased the Phoenix Products through LPL.[54] For example, LPL says that "[t]rail payment from an annuity issuer for the … ***servicing of a policy"*** is "typically 1.5%, [but that number] varies depending on the type of annuity."[55] LPL also received upfront commissions for the Phoenix Products. For LPL, "upfront commission paid for new sales of annuities is typically 7%, but varies" depending on several factors.[56]

99. LPL took active steps to ensure that its trail commissions stayed intact during the same time that PHL Variable was failing and in unsound financial condition. A news article from January 2019 explains: "LPL Financial ... signed contracts with 15 ... [variably annuity] VA providers to ensure commissions and contracts are protected going forward."[57]

### F. LPL Entered Several Consent Orders Regarding Its Advisers' Sale of Products

100. LPL has a significant history of failing to supervise its investment advisors and broker-dealers.

101. LPL has repeatedly been punished in connection with its failure to

---

[54] *See, e.g.*, LPL FIRM BROCHURE A58 (MAR. 31, 2026), at 9, available at https://adviserinfo.sec.gov/firm/brochure/6413 ("If the custom advisory services apply to variable annuities or variable universal life insurance products for which the IAR receives trail compensation, such trail fees generally will be used to offset the advisory fee.").

[55] https://www.lpl.com/content/dam/lpl-www/documents/disclosures/brokerage_compensation_conflicts_of_interest.pdf, at 3 (emphasis added).

[56] *Id.* at 2.

[57] Diana Britton, *LPL Moves to Protect Future Trail Commissions on Variable Annuities*, WEALTH MANAGEMENT (Jan. 24, 2019), available at https://www.wealthmanagement.com/ria-news/lpl-moves-to-protect-future-trail-commissions-on-variable-annuities.

supervise LPL employees and agents, including LPL broker-dealers and investment advisers.

102. LPL has entered into several "consent orders related to the following matters" (in addition to other consent orders not listed):

- LPL's supervision of an LPL broker-dealer/investment adviser agent's sales of structured products, resulting in a censure, an offer of restitution to impacted clients, and a fine of $125,000 (Texas, 2022).
- LPL's supervision of two LPL broker-dealer and/or investment adviser agents who pled guilty to charges of fraudulent practices with LPL customers, resulting in a cease and desist order, a fine of $350,000 and a $150,000 contribution for financial literacy and investor education initiatives, training and related materials (Connecticut, 2021).
- LPL's supervision of an LPL representative under a heightened supervision plan, resulting in a cease and desist order; a fine of $275,000; payments of restitution, disgorgement and investigative costs; and offers of payment of surrender charges in connection with variable annuity contracts for impacted customers (New Hampshire or "NH", 2020).
- LPL's oversight of certain VA transactions, resulting in a censure, a fine of $975,000, restitution to clients and former clients of an LPL representative, disgorgement of commissions retained by LPL in connection with such representative's VA sales, and an undertaking to review such representative's brokerage and advisory activities and LPL's related policies and procedures (MA, 2017).[58]

### G. Plaintiff Kerry Nietz's Experience

103. Plaintiff Kerry Nietz was advised by LPL investment advisors to acquire rights under and purchase, and Plaintiff Nietz did acquire rights under and purchase, a variable annuity contract offered by The Phoenix Companies, Inc.

[58] https://www.lpl.com/content/dam/edam/format/disclosure/relationship-summary/ap-gwp-r.pdf.

104. Plaintiff has been a loyal LPL client and investor for over two decades.

105. Plaintiff's relationship with LPL began in or around 1997 when the Nietz Trust was created based on advice provided to Mr. Nietz by LPL.

106. Plaintiff maintained a relationship with an LPL financial advisor, Mr. Barry Hartz ("Advisor Hartz"), starting in 1997. Advisor Hartz offered advisory services through LPL Financial.

107. Between approximately 1997 and 2013, Advisor Hartz advised Plaintiff as to estate planning and retirement planning, among other investment topics.

108. Advisor Hartz set up the Nietz Trust for Plaintiff in or around 1997.

109. Advisor Hartz advised Plaintiff on financial planning for his retirement years. Advisor Hartz recommended that Plaintiff purchase a Phoenix variable annuity, and in or around 1999, relying on Advisor Hartz's advice, Plaintiff purchased the Nietz Variable Annuity.

110. In or around 2003, Advisor Hartz recommended that Plaintiff reallocate the entire value of the Nietz Variable Annuity out of the Separate Account and into the GIA. Advisor Hartz understood from his discussions with Plaintiff that Plaintiff's paramount objective was a reliable, predictable source of retirement income, not market growth. Advisor Hartz explained that the GIA was a safe and secure option under which payment amounts are guaranteed to earn a fixed rate of interest. Relying on that recommendation, Plaintiff reallocated his entire contract value to the GIA.From that point forward, the value of the Nietz Variable Annuity depended solely on PHL Variable's ability to pay.

111. In or around 2013, Advisor Hartz retired, and an LPL advisor named Nicholas Snyder ("Advisor Snyder") took over as Plaintiff's new LPL financial advisor.

112. Advisor Snyder offered advisory services through LPL Financial.

113. Advisor Snyder knew that Plaintiff Nietz's objective in the Nietz Variable Annuity was a safe and secure investment. He knew that the entire value of the Nietz

Variable Annuity was allocated to the GIA, and that Plaintiff was relying on the Nietz Variable Annuity and its guaranteed interest for his retirement.

114. At no point after 2009 did LPL warn Plaintiff about the risks associated with their continued allocation to the GIA in light of PHL Variable's deteriorating financial condition. At no point did LPL recommend that Plaintiff reduce or eliminate his exposure to PHL Variable's general account. As of 2021, the market value of Plaintiff's Phoenix variable annuity was $1,063,037.25.

115. At no point did LPL, Advisor Snyder or any LPL representative make Plaintiff aware of the material risk of his Phoenix variable annuity.

116. At no point did LPL, Advisor Snyder or any LPL representative make Plaintiff aware of the material risk surrounding Phoenix/PHL Variable.

117. Had LPL, Advisor Snyder, or its investment advisors informed Plaintiff of the material risk of his Phoenix variable annuity and/or the material risk surrounding Phoenix/PHL Variable, Plaintiff would have (1) completed a 1035 exchange for a suitable alternative investment, or (2) surrendered, or (3) withdrawn the full cash value of his Phoenix annuity which was worth more than $1,000,000.

118. Had Mr. Nietz moved the value of his GIA allocation in 2010 (which had a 2010 surrender value of $692,426.74) to an annuity issued by a financially sound insurer with a 3% interest rate, it would have been worth more than $1,111,000 dollars today based on a 3% annual return over sixteen years, and $1,047,000 in 2024 based on a 3% annual return over fourteen years. In addition, had he known at any point prior to entry of the Rehabilitation Order and related Moratorium Order, Plaintiff Nietz would have been able to withdraw all of his cash without reduction or penalty.

119. In short, Plaintiff relied on LPL and his investment advisors to keep Plaintiff apprised of any and all material facts regarding his Phoenix variable annuity and/or Phoenix/PHL Variable.

120. Even after the CID placed PHL Variable under administrative supervision on March 31, 2023, LPL still did not review Plaintiff's GIA allocation or

recommend any change. For nearly fourteen more months, until the Moratorium Order took effect on May 20, 2024, Plaintiff remained free to move the value of his GIA allocation to a financially sound alternative insurer. He also could have at any time prior withdrawn 100% of the value of his annuity contract without surrender charge or fee. He would have taken action to protect his retirement, had he been fully and completely informed.

121. Plaintiff did not learn about the scope and magnitude of Phoenix's deteriorating financial condition until Plaintiff received a letter from the State of Connecticut Department of Insurance in or around May of 2024, informing Plaintiff of Rehabilitation Proceedings and the Moratorium Order that completely restricts withdrawals from his Phoenix variable annuity and limits payouts in the event of Mr. Nietz's death to $250,000.

122. Plaintiff was surprised to receive this letter. Shortly after receiving the letter, on June 19, 2024, Plaintiff emailed his former LPL investment advisor, Advisor Hartz. Plaintiff's email forwarded an online article discussing Phoenix's financial deterioration. After reading it, Plaintiff wrote that Phoenix appeared to have been "in dire straights [sic] for quite a while." That article was the first information Plaintiff received suggesting that PHL Variable was in deterioration and unsound financial condition.

///

///

///

///

///

///

///

///

///

123. Former Advisor Hartz said it is a "fair question" why Advisor Snyder was "unaware" of Phoenix's financial difficulties—even more so given the fact that Advisor Snyder was receiving a trail commission on the Phoenix variable annuity. Specifically, former Advisor Hartz wrote:[59]


Don't like the sound of this...

Hide message history

On Wed, Jun 19, 2024 at 12:54 PM <[redacted]> wrote:

https://www.linkedin.com/pulse/financial-deterioration-phoenix-home-life-variable-rybka-jd-cfp--wuooe/

This person seems to be of the opinion that I'll be lucky to get $250,000 out of Phoenix when all is said and done. Also, it reads like they have been in dire straights for quite a while. ☹

Kerry

Hide message history

BH Barry Hartz<[redacted]>
To: [redacted]
Wed 6/19/2024 7:07 PM

Kerry, I agree that whatever has been going on with Phoenix was years in the making. I did not happen within the past year. If Nick was receiving a trail commission on this account I think it is a fair question of why was he unaware.

Reply Forward

124. Former Advisor Hartz's June 19, 2024 email was the first time anyone suggested to Plaintiff that LPL, as opposed to PHL Variable, might bear responsibility for his financial harm. Plaintiff Nietz did not discover, and in the exercise of reasonable diligence could not have discovered, the facts giving rise to his claims against LPL until, at the earliest, June 19, 2024.

125. Nothing in the CID letter, or in any other communication Plaintiff Nietz and Class Members received before June 19, 2024, suggested that LPL had breached

[59] Email addresses have been redacted for privacy.

any duty owed to them or that LPL's conduct had caused or contributed to their injury. A reasonable annuity holder who learns that his or her insurer has been placed into rehabilitation would attribute the resulting harm to the insurer, not to a financial advisor he or she had trusted for years.

126. Even after June 19, 2024, Plaintiff Nietz did not know, and had no reasonable means of learning, the facts specific to LPL's conduct that underlie his claims. Plaintiff Nietz first learned these facts through his counsel's investigation. Plaintiff Neitz contacted counsel to investigate these claims in or about January 2026.

**H. Plaintiffs Alina and Mark Tyminski's Experience**

127. Tadeusz Tyminski, the deceased husband of Plaintiff Alina Tyminski and father to Plaintiff Mark Tyminski, was born in Poland in 1930, survived the Second World War as a child, and immigrated to the United States in December 1963. He worked for decades as a machine operator, first at Atlantic Machine and then at Fafnir Bearing, from which he retired. He and Alina Tyminski were married for 61 years and raised three children in New Britain, Connecticut.

128. Mr. Tyminski was, by temperament and by lifelong practice, an exceptionally conservative saver. He paid cash for nearly everything he purchased. He did not own a credit card. The only debt he carried in his life was a modest mortgage on the family's first home, purchased in 1976. He purchased the adjoining lots for cash, built the family's second home on one of them in 1991 with cash, and farmed the other.

129. Mr. Tyminski's investment strategy consisted of bank savings accounts and certificates of deposit. He did not invest in stocks or mutual funds, and he deliberately declined to do so because he feared losing his principal. His objective at all times was protecting principal or as noted by LPL on one of its investment objective reports dated April 9, 2017: "capital preservation."[60]

---

[60] The full entry by LPL for Mr. Tyminski's "Substantiation for Transaction" stated: "Client looking for capital preservation and a fixed rate inside their VA [variable annuity]. The annuity has a fixed rate and a guaranteed interest account. There is no time frame for this money in the annuity. It does not have a CD SC on deposits. Money is completely liquid."

***The Webster Bank and LPL Relationship***

130. Mr. Tyminski was a long-time customer of Webster Bank in New Britain, Connecticut. Upon information and belief, at all relevant times, Webster Bank offered brokerage, annuity, and insurance products to its retail banking customers through a program known as Webster Investment Services, operated pursuant to a networking arrangement with Defendant LPL. Under that arrangement, individuals who held themselves out as Webster financial consultants were registered representatives of LPL, maintained offices inside Webster branches, and sold products for which LPL was the broker-dealer of record.

131. In or about 2002, disappointed by the low rates then available on bank savings accounts and certificates of deposit, Mr. Tyminski was referred by Webster Bank personnel to Anthony Marciano, an LPL financial consultant with an office in the Webster branch at 450 Main Street, New Britain, Connecticut. Mr. Marciano's business card bore the Webster Bank name.

132. Upon information and belief, at all relevant times Mr. Marciano was a registered representative of LPL, and LPL was the broker-dealer and registered investment adviser responsible for the Tyminski Contract and for the supervision of Mr. Marciano's dealings with Mr. Tyminski and his wife.

***The 2002 Purchase and the Guaranteed Interest Account***

133. On or about August 20, 2002, on Mr. Marciano's recommendation, Mr.. Tyminski purchased the Tyminski Contract, a PHL Variable Insurance Company “Retirement Planner’s Edge” flexible premium deferred annuity, with Mr. Tyminski as sole owner and annuitant. The contract was non-qualified and was funded with the Tyminski’s after-tax savings.

134. Mr. Marciano presented the Tyminski Contract to Mr. Tyminski as a safe and suitable savings vehicle paying a guaranteed rate of interest of not less than three percent per year. Mr. Tyminski understood it as a form of savings account that offered a better guaranteed rate than Webster Bank. He did not understand it to be, and was

not told that it was an obligation whose value depended upon the continued solvency of PHL Variable—an insurance company he knew nothing about prior to 2002.

135. Consistent with Mr. Tyminski's instructions and risk tolerance, one hundred percent of the premium paid into the Tyminski Contract was allocated to the contract's Guaranteed Interest Account (the "GIA"). At no time was any portion of the Tyminski Contract allocated to any unitized sub-account of the PHL Variable Accumulation Account. At no time did LPL advise Mr. Tyminski to choose to allocate funds to what would have been a separate account product due to his aversion to the stock market.

136. Under the terms of the contract and PHL Variable's own prospectus, the GIA is not part of the separate account registered with the Securities and Exchange Commission. It is accounted for as part of PHL Variable's general account. Interest gets credited against the principal balance of the contract at an interest rate set by PHL Variable subject to a three percent minimum. Amounts allocated to the GIA bear no market risk but are co-mingled with PHL Variable's other general account assets and liabilities.

137. The quarterly statement for the period ending June 30, 2025 reflects no fees or charges, no withdrawals, and a paper "gain" of $5,627.46 on an opening value of $760,809.18, an annualized rate of approximately three percent. The account value, cash surrender value, and death benefit were each reported to be worth $766,436.64 as of June 30, 2025.

***Additional Premiums and the 2016 Deposit***

138. In the years that followed his initial purchase of the Tyminski Contract, Mr. Tyminski periodically added savings to the Tyminski Contract.

139. In 2016, Mr. Tyminski sold the family's first home. He deposited the proceeds of that sale, approximately $156,000, plus $94,000 from his savings account for a total deposit of $250,000 into the Tyminski Contract on or about July 22, 2016with the knowledge, participation, and assistance of Mr. Marciano and LPL.

140. At the same time that Mr. Tyminski deposited the additional $250,000 into the Tyminski Contract, he added his wife, Alina Tyminski as an additional owner. The $250,000 deposit raised the value of the Tyminski Contract above $500,000 and represented approximately 99% of the Tyminski family net worth.

141. LPL's own documents confirm that its customer was looking for capital preservation and liquidity, as shown by the image on the following page:

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///



Transaction from Sept of 2016

**Important Information Regarding the Funds Being Invested**

AOE

Account Number [redacted]

Instructions: This form is required for each investment account, certificate of deposit transfers or LPL account - equity and bond liquidations, or cash from an LPL account. Each form must be completed in its entirety and signed by the clients. A copy of this form must be kept in the clients file and must be furnished when requested. For HOS advisors submitting business, please fax this form completed and signed by the client to LPL Financial at (858) 202-8325.

**1. Account Information**

Financial Advisor Name(s): Anthony Marcaano
Date: 11/9/17
Owner Name(s): Tadeusz Tyminski + Alina Tyminski
Date of Birth / Trust Date: 6·01·1930, 2/14/44
Proposed Investment Amount: 250,000
Proposed Insurance Company Name: Phoenix
Proposed Product Name: Retirement Planners Edge

**2. Source of Funds Information**

1. The amount being funded from this source for this transaction is 250,000 –
2. These funds are originating from my/our LPL account. ◯ Yes ⊗ No

X T.T.
X A.T.

If No, please provide the following information for the institution where the funds are coming from:

Financial Institution Name: Webster Bank
Account Number: Savings <->
Account Type: [redacted]

**3. Substantiation for Transaction**

The following describes the facts upon which I/we have based the appropriateness of this transaction (e.g. performance, guaranteed death benefits, etc.). My/our description includes a discussion of the advantages and disadvantages and concludes with an evaluation of the overall net investment advantage to me/us:

Client looking for capital preservation and a fixed rate inside of their VA. The annuity has a fixed rate and a guaranteed interest account. There is no time frame for this money in the annuity. It does not have a CDSC on deposits. Money is completely liquid

**4. Owner Signature and Verification**

I /we hereby acknowledge that the applicable implications and risks of purchasing the product/policy/account named above have been discussed with me/us by my/our financial advisor.

I/we represent that I/we have determined that I/we would like to liquidate these funds with the proposed annuity contract, some of the details of which are referenced herein. I/we understand and acknowledge the accuracy of the contents of this form. Please be sure all information has been completed before signing this form.

X [signature] Owner Signature — Tadeusz Tyminski Owner Name (print) — 11/9/17 Date

X [signature] Joint Owner Signature — Alina Tyminski Joint Owner Name (print) — 11/9/17 Date

**5. Financial Advisor Acknowledgment**

In recommending the proposed transaction, I have discussed the benefits and costs with the owner(s) and considered all of the factors indicated on this form, including but not limited to, surrender charges; the commencement of a new surrender period; the potential loss of existing benefits; and any increased fees or charges. I have also considered whether the owner(s) had a variable annuity exchange within the past three years. After considering these and other factors, I determine that the transaction is suitable to meet the owner(s) stated needs.

X [signature] LPL Financial Advisor — Anthony Marcaano LPL Financial Advisor Name (print) — 11/9/17 Date

LPL Financial Advisor — LPL Financial Advisor Name (print) — Date

LPL Financial
Member FINRA/SIPC

Page 1 of 1

F439L
Revised 0714

///

142. Connecticut law protects annuity contract holders against insurer insolvency through the Connecticut Life and Health Insurance Guaranty Association only up to $500,000 in present value of annuity benefits per contract holder. Conn. Gen. Stat. § 38a-860. Neither LPL nor Mr. Marciano ever informed Mr. or Mrs. Tyminski of that limit, or that the 2016 deposit placed their savings beyond it, or that concentrating practically their entire liquid savings and net worth in a single below investment grade insurer exposed them to the very loss of principal that Mr. Tyminski had spent his life trying to avoid.

143. On information and belief, LPL and Mr. Marciano received commissions on each premium paid into the Tyminski Contract, including the 2016 deposit, and received trailing commissions every year based on the value of the Tyminski Contract for so long as it remained in force. Mr. Marciano remained the producer of record on the Tyminski Contract through at least July 2025.

***What LPL Knew and What It Failed to Do***

144. By the time of the 2016 deposit, LPL had for approximately eight years excluded Phoenix products from its recommended platform because of PHL Variable's deteriorating financial condition. PHL Variable's financial strength ratings were then below investment grade. LPL nonetheless permitted, and upon information and belief its registered representative recommended, the placement of the proceeds of the sale of Mr. Tyminski's first home and the majority of his life savings into a general account obligation of an insurer that was no longer suitable for the Tyminski's entire nest egg.

145. On January 11, 2019, Mr. Tyminski made an additional contribution of $73,000 to the Tyminski Contract. **At no point did LPL recommend that Plaintiffs diversify their exposure away from PHL Variable despite the fact that the Tyminskis were primarily concerned with "capital preservation" as noted on the LPL form identified in Paragraph 141 above.**

146. At no time after 2009 did LPL or Mr. Marciano advise Mr. or Mrs.

Tyminski of PHL Variable's financial condition, review the Tyminski Contract in light of that condition, recommend a withdrawal, surrender, or tax-free exchange under 26 U.S.C. § 1035 into a contract issued by a financially sound insurer, or recommend that additional savings be placed elsewhere. The Tyminski Contract carried no surrender charge at any relevant time, certainly not after 2016. Prior to the Moratorium Order, Mr. Tyminski could have withdrawn 100% of the assets in the GIA without any penalty or reduction whatsoever.

147. LPL continued to collect trailing commissions on the Tyminski Contract while providing no meaningful monitoring, review, or advice concerning it. The economic interest of LPL and Mr. Marciano were well served by the Tyminskis remaining in the contract. A surrender or exchange of the Tyminski Contract could have ended that easy income stream.

***The Moratorium, the Final Year, and the Death of Tadeusz Tyminski***

148. On May 20, 2024, the Connecticut Superior Court placed PHL Variable into rehabilitation and entered a Moratorium Order restricting policy withdrawals and annuity surrenders. As a result, the Tyminski's lost access to their life savings that were held in the Tyminski Contract beyond the limits set by the Moratorium Order.

149. Mr. Tyminski spent the last year of his life bedridden and under hospice care at home. During that period, he was aware that the savings he had accumulated over six decades, which he intended to leave to his three children, were not available to him or to his family, and he did not understand how that could be so. The family paid all of the expenses associated with his home health care from other resources during that period as Alina and Mark were unable to access the Tyminski Contract due to the Moratorium Order.

150. On December 31, 2025, the Rehabilitator informed the Superior Court that rehabilitation of PHL Variable was not feasible and that PHL Variable would proceed to court-supervised liquidation. Upon entry of a liquidation order, the Plaintiffs' recovery on the Tyminski Contract will be limited to guaranty association

coverage of $500,000, together with whatever additional benefits, if any, the Rehabilitator is able to arrange, unless and until the Plaintiffs recover the balance from those responsible.

151. Mr. Tyminski died on June 9, 2026. As of September 23, 2026, the account value of the Tyminski Contract was reported on his Webster Bank online portal as being $794,496.43 and interest is reportedly continuing to accrue at the rate of 3% per annum even though the Tyminski Contract is over the Guaranty Association coverage limit by close to $300,000.

152. As a consequence of the Rehabilitation converting to a Liquidation the Tyminski Contract will be reduced and the exact amount of the Tyminski's total financial loss cannot yet be calculated with certainty though a reduction in value is certain to occur following a Final Order of Liquidation by the Connecticut Superior Court.

153. The Connecticut Plaintiffs first learned that the Tyminski Contract was subject to the Moratorium Order in or around May of 2024 when Mark Tyminski opened a letter from the Connecticut Insurance Department addressed to his mother Alina Tyminski.

154. The Tyminski's first learned of LPL's prior knowledge of PHL Variable's financial condition and of LPL's removal of Phoenix products from its platform after contacting counsel some time in July of 2026. Before consulting with counsel, the Tyminski's had no reason to suspect that LPL had knowledge of PHL's declining financial condition and withheld such information from them for years.

155. Had LPL or Mr. Marciano advised the Tyminski's at any time after 2009 of PHL Variable's deteriorating financial condition, or had LPL recommended that Mr. Tyminski diversify his exposure or place the 2016 $250,000 deposit into something safer and more secure than a PHL product it had already removed from its platform, Mr. Tyminski, whose only objective was capital preservation and safety of principal, could have withdrawn or exchanged the Tyminski Contract without penalty

and placed his savings in an FDIC insured account or accounts or in another annuity contract issued by a financially sound insurer.

156. As a direct result of LPL's conduct, the Tyminski's have been deprived of access to their funds which amounted to approximately $790,000 since May of2024, face the loss of approximately $300,000 or more based on amounts that are projected to be above guaranty association coverage limits upon liquidation, have lost the use of and interest on those funds, and have incurred additional expenses related to Mr. Tyminski's home health care and hospice care that could have been paid out of the Tyminski Contract but for the Rehabilitation and Moratorium Orders entered in the PHL matter.

157. LPL, for its part, retained commissions on premiums and trailing commissions on the Tyminski Contract from 2002 until Mr. Tyminski's death in June 9, 2026, in amounts to be determined in discovery.

158. Any applicable statute of limitations has been tolled by LPL's continuing course of conduct. LPL owed Plaintiffs a continuing duty, arising from its fiduciary and advisory relationship with them and from its continuing receipt of compensation on the Tyminski Contract, to monitor the contract and to advise them of material risks to it. That duty was breached continuously from 2009 through at least May 2024, and LPL's later wrongful conduct, including but not limited to its acceptance of the 2016 deposit, the 2019 deposit and its continuing receipt of trailing commissions through Mr. Tyminski's death, relate back to the original breach.

## CLASS ALLEGATIONS

159. Plaintiffs bring this matter on behalf of themselves and all similarly situated in the following class (the "Nationwide Class"):

> All persons in the United States who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from Defendant through LPL investment advisors (the "Class").

160. Plaintiff Nietz also brings this matter on behalf of himself and all similarly situated in the following subclass (the "Washington Subclass")

> All persons in Washington who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the "Phoenix Products") sold by Defendant, or purchased the Phoenix Products from Defendant through LPL investment advisors (the "Washington Subclass").

161. The Nationwide Class and Washington Subclass are referred to collectively as the "Classes" throughout this Complaint.

162. Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

163. Plaintiffs reserve the right to expand, limit, modify, or amend the class definitions, including the addition of one or more subclasses in connection with his motion for class certification, or at any other time, based on *inter alia*, changing circumstances and new facts obtained.

164. **Numerosity:** The members of the Classes are so numerous that joinder of all members is impractical, which, upon information and belief, number in the thousands. LPL was a major distributor of the Phoenix Products and marketed and sold the Phoenix Products through thousands of its investment advisors. While the exact number of members of each Class is unknown to Plaintiffs at this time, such information can be ascertained through appropriate discovery from records maintained by Defendant and its agents.

165. **Commonality:** There are questions of law and fact common to the

Classes because Class Members' claims are identical to one another and predicated on the common contention that they were injured by having acquired rights under the Phoenix Products sold by Defendant, which Phoenix Products were purchased from Defendant through LPL investment advisors, and Defendant violated its fiduciary and professional duties, and violations of state consumer protection law, with respect to those Phoenix Products. Proceeding as a class action will generate answers to common questions that are apt to drive resolution of the litigation. Such common questions include, but are not limited to:

(a) Whether LPL breached its fiduciary duties by failing to properly notify Plaintiffs and Class Members;

(b) Whether LPL engaged in unfair and deceptive conduct by failing to disclose that Phoenix's financial condition was threatened;

(c) Whether LPL abused its position of superior knowledge and sophistication to collect compensation in connection with the Phoenix Products;

(d) The proper form of equitable relief;

(d) The proper measure of monetary relief.

166. **Typicality:** The named Plaintiffs' claims are typical of the Class's claims. The named Plaintiffs' claims arise from the same conduct, and seek to redress the same legal violations, as the Class's claims.

167. **Adequate Representation:** The named Plaintiffs will fairly and adequately protect the interests of the Class. The named Plaintiffs have no interest antagonistic to those of the other Class Members. The named Plaintiffs are committed to the vigorous prosecution of this action. Plaintiffs have retained counsel who are experienced and competent in the prosecution of large class actions.

168. **Rule 23(b)(1)**: The prerequisites for a (b)(1) class are satisfied. Prosecution of separate actions by Class Members would risk establishing

incompatible standards of conduct for Defendant. Additionally, adjudications as to individual Class Members would, as a practical matter, dispose of the interests of other members of the Class and substantially impair their ability to protect their interests.

169. **Rule 23(b)(3)**: The prerequisites for a Rule 23(b)(3) class are satisfied because common questions of law and fact predominate and are susceptible to class-wide proof. Classwide litigation of this action is also superior to individual litigation because there are no difficulties in managing this case as a class action and there is a strong need to concentrate the Class Members' claims in one action.

## COUNT I
## Professional Negligence
## (On Behalf of Plaintiffs and the Nationwide Class)

170. Plaintiffs repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

171. At all relevant times LPL held itself out to be a trusted financial and/or investment advisor acting in Plaintiffs' and Class Members' best interests in providing financial and/or investment advice, including advice relating to retirement planning, estate planning, risk management planning, personal wealth planning, and/or investment planning.

172. LPL owed Plaintiffs and Class Members an affirmative duty of utmost good faith, and full and fair disclosure of material facts, and to act in their best interest in providing ongoing, regular advice and services. LPL was required to exercise the degree of skill and care that a reasonably prudent, skilled, and qualified investment adviser would exercise under the circumstances.

173. LPL specifically assumed this fiduciary role to Plaintiffs and Class Members in connection with their Phoenix insurance policies and/or annuity contracts.

174. LPL's professional relationship with Plaintiffs and Class Members was

not a one-off, transactional relationship; instead, LPL maintained a long-time, trusting relationship with Plaintiffs and Class Members. LPL was compensated on a continuing, fee-based arrangement, particularly with respect to the Phoenix Products.

175. During the course of Plaintiffs and Class Members' relationship with LPL, LPL advised Plaintiffs and Class Members with respect to retirement, estate, personal wealth, and/or investment planning, and, based on LPL's discussions with Plaintiffs and Class Members as to retirement, estate, personal wealth, and/or investment planning, LPL marketed and sold Plaintiffs and Class Members the Phoenix Products.

176. LPL owed Plaintiffs and Class Members a duty of reasonable care arising from their pre-existing professional relationship. That duty applied before, during, and after the sale of the Phoenix Products.

177. After selling Plaintiffs and Class Members the Phoenix Products, LPL continued to receive ongoing fees (i.e. trail compensation) associated with those life insurance or annuity products, which fee was used to pay LPL for its advisory services with respect to those products. Indeed, LPL continued to advise Plaintiffs and Class Members with respect to their retirement, estate, personal wealth, and/or investment planning.

178. LPL owes at least the ordinary duty of care that every person owes to prevent harm where that person's actions have created a foreseeable risk of injury. LPL also owed a heightened duty of care. Plaintiffs were owed a duty of care and were harmed by LPL's acts and omissions.

179. LPL breached its fiduciary duty and failed to exercise the duty of care expected of it under the circumstances surrounding the Phoenix Products.

180. Among other things, after LPL itself determined that those products should no longer be recommended to new customers, either (1) failed to evaluate whether the continued concentration of Plaintiffs' retirement assets in the GIA remained consistent with Plaintiffs' known objectives of safety, and/or failed to apply

its own product-level due diligence determination to its existing clients; or, even if LPL had done so, (2) failed to recommend that Plaintiffs and Class Members reduce or eliminate their exposure to PHL Variable. And in any event LPL continued to accept asset-based trail compensation while performing none of the work that compensation was meant to support.

181. LPL failed to notify Plaintiffs and Class Members with respect to, *inter alia*, the fact that Plaintiffs' and Class Members' policies and contracts may be threatened due to Phoenix/PHL Variable's poor, deteriorating, and unsound financial condition. LPL never made Plaintiffs and Class Members aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable.

182. For more than a decade, LPL collected significant trail compensation in connection with Plaintiffs and Class Members' Phoenix Products, with full knowledge that Phoenix/PHL Variable's financial outlook was poor, deteriorating, and unsound, and/or with knowledge of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable.

183. LPL continued to collect millions of dollars in trail compensation in connection with Plaintiffs' and Class Members' Phoenix Products, all while knowing that Phoenix/PHL Variable had a reduced ability to borrow and that declines in Phoenix/PHL's ratings would likely materially and adversely affect Phoenix/PHL Variable's financials.

184. LPL should have advised or notified Plaintiffs and Class Members that their policies and contracts may be threatened due to Phoenix/PHL Variable's unsound financial condition. LPL should have made Plaintiffs and Class Members aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable. This is especially true because, *inter alia*: (1) LPL holds worldwide recognition as a leading registered investment advisor and was named the No. 1 Mega

RIA on *Barron's* 2025 Top RIA Ranking;[61] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised Plaintiffs and Class Members with respect to retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products and continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL's outlook was poor, deteriorating, and unsound; and (5) LPL took active steps to preserve its trail compensation during the same time that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

185. LPL knew, or reasonably should have known, that PHL Variable was placed under an order of administrative supervision in spring of 2023, shortly before the May 2024 PHL Rehabilitation. LPL therefore knew, or reasonably should have known, that failing to notify or advise Plaintiffs and Class Members of changes in Phoenix's financial condition could harm Plaintiffs and Class Members. LPL therefore knew, or reasonably should have known, that falling to make Plaintiffs and Class Members aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable could harm Plaintiffs and Class Members.

186. LPL breached its fiduciary duty and failed to exercise the required level of care by failing to disclose the unsuitability of the PHL Products, or failing to disclose the material risk of the Phoenix Products or Phoenix/PHL Variable.

187. Had LPL conducted the review of the Phoenix Products that the standard of care required, it should have recommended that Plaintiff and Class Members move their assets away from PHL Variable. Plaintiff and Class Members, had they been made aware of the material risk of the Phoenix Products or the material risk

[61] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html.

surrounding Phoenix/PHL Variable, would have (1) completed a 1035 exchange for a suitable alternative investment, such as an alternative annuity or other investment product issued by a financially sound institution, or (2) surrendered, or (3) withdrawn the cash value of their Phoenix annuities and/or insurance policies.

188. As a direct and proximate result of LPL's negligence and resulting breach of its duty of professional care, Plaintiff has been damaged in an amount in accordance with proof at trial.

**COUNT II**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and the Nationwide Class)**

189. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

190. LPL, acting in its various positions including but not limited to trusted investment or financial advisor, owed Plaintiffs and Class Members a fiduciary duty by virtue of the special trust and confidence placed in it by Plaintiffs and Class Members.

191. As an investment adviser, LPL owed its clients a fiduciary duty of utmost good faith, undivided loyalty, and care to make full disclosure to them of all material facts, as well as the duty to act in their best interests, and not to act in their own interests to the detriment of their clients. *Securities and Exchange Commission v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191–92 (1963).

192. Plaintiffs placed trust and confidence and otherwise depended on LPL to perform its obligations to Plaintiffs in its various positions, including but not limited to investment or financial advisor.

193. LPL's obligations are significantly enhanced because, *inter alia*: (1) LPL holds worldwide recognition as a leading registered investment advisor and was

named the No. 1 Mega RIA on *Barron's* 2025 Top RIA Ranking;[62] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised Plaintiff and Class Members with respect to retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products and continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL's outlook was poor, deteriorating, and unsound; and (5) LPL took active steps to preserve its trail compensation during the same time that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

194. LPL's conduct, as alleged above, failed to meet the heightened standards of trust, competence, and care owed in a fiduciary relationship.

195. LPL had a fiduciary duty to protect Plaintiffs and Class Members and a fiduciary duty to advise them or take other action upon gaining information that their Phoenix Products may be threatened due to the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable. However, LPL failed to do so.

196. Defendant breached its fiduciary duties by failing to notify Plaintiff and Class Members for over a decade of the fact that Plaintiffs' and Class Members' policies and contracts may be threatened due to Phoenix/PHL Variable's poor, deteriorating, and unsound financial condition, or of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable.

197. LPL continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL

---

[62] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html

Variable's outlook was poor, deteriorating, and unsound.

198. LPL affirmatively took steps to preserve its trail compensation during this same time period that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

199. The duty of loyalty requires that an adviser not subordinate its clients' interests to its own. LPL breached its duty of loyalty by placing its own interest in continued trail compensation ahead of Plaintiffs' and Class Members' interest in the safety of their investments. Any recommendation to move assets away from PHL Variable could have ended LPL's compensation stream, and LPL made no such recommendation.

200. Had LPL conducted the review of the Phoenix Products that the standard of care required, it should have recommended that Plaintiffs and Class Members move their assets away from PHL Variable. Plaintiffs and Class Members, had they been made aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, would have (1) completed a 1035 exchange for a suitable alternative investment, such as an alternative annuity or other investment product issued by a financially sound institution, or (2) surrendered, or (3) withdrawn the cash value of their Phoenix annuities and/or insurance policies.

201. LPL's breaches of its fiduciary duties have resulted in significant losses to Plaintiffs and Class Members. These losses are continuing and increasing.

202. As a direct and proximate result of Defendant's breaches of its fiduciary duties to Plaintiffs, Plaintiffs have been damaged in an amount in accordance with proof at trial.

///

///

///

///

///

**COUNT III**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class)**

203. Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and bring this claim individually and on behalf of the proposed Class.

204. Defendant received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense. For example, Plaintiffs and the Class Members paid premiums for the Phoenix Products that earned Defendant millions of dollars in compensation, including both upfront and trail compensation.

205. Said compensation was conferred on Defendant by Plaintiffs and Class Members in exchange for ongoing servicing and advice that Defendant did not provide, and Defendant retained it in breach of its fiduciary and professional duties, to the detriment of Plaintiff and Class Members. Defendant has been unjustly enriched in that it received and retained the benefit of funds to which it was not entitled and received in violation of its fiduciary and professional duties, and also in violation of state consumer protection law.

206. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct harmed Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

207. Allowing Defendant to retain the aforementioned benefits violates fundamental principles of justice, equity, and good conscience. As a sophisticated investment advisor that had actual knowledge of Phoenix's poor, deteriorating, and unsound financial condition, and of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, Defendant was well aware that its conduct violated its duties to Plaintiffs and Class Members and exposed them to

tremendous financial risk.

208. Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for its unjust enrichment.

209. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds it received and improperly retained, and such other relief as the Court may deem just and proper.

**COUNT IV**

**Violation of the Washington Consumer Protection Act**
**Wash. Rev. Code 19.86.010 *et seq*.**
**(On Behalf of Plaintiff Nietz and the Washington Subclass)**

210. Plaintiff Nietz repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Washington Subclass.

211. The Nietz Trust is a Washington-domiciled trust that owns the Big Edge Choice f/k/a Phoenix Investor's Edge, a Flexible Premium Variable Accumulation Deferred Annuity.

212. Plaintiff is the trustee and primary annuitant of the Big Edge Choice.

213. Plaintiff, as trustee and primary annuitant of the Nietz Trust, brings this claim on behalf of the Washington Subclass against Defendant under Washington's Consumer Protection Act (the "Washington CPA"), Wash. Rev. Code § 19.86.010, *et seq*.

214. Plaintiff and Defendant are each "person[s]" under the Wash. Rev. Code § 19.86.010. Per Wash. Rev. Code § 19.86.010(1), "'Person' shall include, where applicable, natural persons, corporations, [and] trusts[.]"

215. At all relevant times, Defendant was and is engaged in "trade" or "commerce" under Wash. Rev. Code § 19.86.010(2).

216. The Washington CPA broadly prohibits "[u]nfair methods of competition

and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Wash. Rev. Code §19.86.020. Defendant's conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) was immoral, unethical, oppressive, or unscrupulous; or (3) caused substantial injury to consumers. In short, Defendant's conduct has been deceptive because it has the capacity or tendency to deceive.

217. Plaintiff has alleged a series of events giving rise to a pattern of unfair and deceptive practices, which affect the public's interest.

218. Defendant knew that the Phoenix Products presented an unreasonable amount of risk and knew that Phoenix was in a deteriorating financial condition. Defendant nonetheless continued to collect compensation for servicing those products despite either (1) failing to meaningfully review whether the continued concentration of Plaintiffs' retirement assets in the GIA remained consistent with Plaintiffs' known objectives of safety, and/or failing to apply its own product-level due diligence determination to its existing clients; or, even if LPL had done such a review, (2) failing to recommend that Plaintiffs and Class Members reduce or eliminate their exposure to PHL Variable.

219. Reasonable consumers expect that the investment products for which their investment advisors continuously and regularly receive compensation for their services are not subject to looming and imminent financial threat, unless told otherwise. This is especially true given that (1) LPL holds worldwide recognition as a leading registered investment advisor and was named the No. 1 Mega RIA on *Barron's* 2025 Top RIA Ranking;[63] (2) LPL held itself out as a professional with respect to the Phoenix Products, and thousands of Phoenix-turned-LPL advisors specifically advised Class Members as to the Phoenix Products; (3) LPL advised

---

[63] https://www.lpl.com/news-media/press-releases/lpl-financial-named-number-one-mega-ria-barrons-2025-top-ria-ranking.html.

Plaintiff and Class Members with respect to retirement, estate, personal wealth, and/or investment planning; (4) LPL sold the Phoenix Products as customized, tailored products and continued to receive trail compensation with respect to these annuities and life insurance products throughout the same time period that PHL's outlook was poor, deteriorating, and unsound; and (5) LPL took active steps to preserve its trail compensation during the same time that LPL was aware of the of the material risk of the Phoenix Products and/or the material risk surrounding Phoenix/PHL Variable.

220. Consumers like Plaintiff and the Washington Subclass Members could not have reasonably avoided economic injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

221. When an act causes substantial injury that is not outweighed by countervailing benefits to consumers or competitors, and not reasonably avoidable by the consumer, it is unfair.

222. Had LPL reviewed Plaintiff Nietz's and the Washington Subclass Members' holdings of Phoenix Products, it should have recommended that Plaintiff and Subclass Members move their assets away from PHL Variable. Plaintiff and Subclass Members, had they been made aware of the material risk of the Phoenix Products or the material risk surrounding Phoenix/PHL Variable, would have (1) completed a 1035 exchange for a suitable alternative investment, such as an alternative annuity product issued by a financially sound institution, or (2) surrendered, or (3) withdrawn the cash value of their Phoenix annuities and/or insurance policies

223. As a result of Defendant's unfair and deceptive acts or practices, Plaintiff Nietz and the Subclass suffered were injured and suffered ascertainable loss, injury in fact, and/or actual damages in that the Phoenix Products are wholly unsuitable investment products, and Plaintiffs cannot withdraw their cash value of, surrender, or

exchange their Phoenix Products for suitable alternative insurance policies and/or annuity contracts.

224. "'Assets' shall include any property, tangible or intangible, real, personal, or mixed, and wherever situate, and any other thing of value." Wash. Rev. Code § 19.86.010(3).

225. The Big Edge Choice, f/k/a Phoenix Investor's Edge, a Flexible Premium Variable Accumulation Deferred Annuity is property of the Nietz Trust.

226. These injuries are the direct and natural consequence of Defendant's misrepresentations, fraud, deceptive practices, and omissions. As a direct and proximate result of Defendant's wrongful conduct in violation of the Washington CPA, Plaintiffs and members of the Subclass have suffered and continue to suffer ascertainable losses.

227. Defendant is liable to Plaintiff Nietz and Subclass Members for damages in amounts to be proven at trial, including reasonable attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a) For an order certifying the Class and Subclass (the "Classes") under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Classes, and Plaintiffs' Counsel as Class Counsel to represent the Classes;

b) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

c) For actual damages Plaintiffs and Class Members suffered, as measured by the difference in value of their policies and contracts at the time of purchase and the value of their policies and contracts as of the present, in amounts to be determined by the Court and/or jury;

d) For equitable relief, including the imposition of a constructive trust or other equitable remedies such as restitution, suitable replacement policies or contracts, an accounting, or disgorgement of ill-gotten gains;

e) For prejudgment interest on all amounts awarded;

f) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit; and

g) Grant any other relief as the Court deems appropriate to remedy the violations.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: September 24, 2026

**BURSOR & FISHER, P.A.**

By: *_/s/ Max S. Roberts_*

Max S. Roberts (State Bar No. 363482)
Yitzchak Kopel (*Pro Hac Vice*)
Logan J. Hagerty (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: mroberts@bursor.com
ykopel@bursor.com
lhagerty@bursor.com

**EDWARD STONE LAW P.C.**
Edward S. Stone (*Pro Hac Vice forthcoming*)
Lisa A. Salmons (*Pro Hac Vice forthcoming*)
700 Canal Street, 1st Floor
Stamford, CT 06902
Telephone: (203) 504-8425
Facsimile: (203) 348-8477
E-Mail: eddie@edwardstonelaw.com
lisa@edwardstonelaw.com

*Attorneys for Plaintiff*