PAMELA A. MILLER (*pro hac vice*)
(NY Bar #2912194)
LAUREN M. WAGNER (*pro hac vice*)
(NY Bar #5430640)
O'MELVENY & MYERS LLP
1301 Avenue of the Americas, 17th Fl.
New York, NY 10019-6022
Tel: 212-326-2000

BRITTANY ROGERS (CA Bar #274432)
O'MELVENY & MYERS LLP
400 S. Hope St., 19th Fl.
Los Angeles, CA 90071
Tel: 213-430-6000

*Counsel for Defendant*
*LPL Financial LLC*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

KERRY NIETZ, ALINA TYMINSKI, and MARK T. TYMINSKI, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

LPL FINANCIAL LLC,

Defendant.

No. 3:26-cv-03383-JES-DEB

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT LPL FINANCIAL LLC'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Judge: Hon. James E. Simmons, Jr.
Date: January 20, 2027
Time: 10:00 a.m.
Courtroom: 4B

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. LPL's Business ..... 2

B. Plaintiffs' PHL Annuities Are Associated with Brokerage, Non-Advisory Accounts Governed by the Master Account Agreement ..... 4

C. PHL's Public Financial Difficulties and Regulatory Proceedings ..... 6

D. Plaintiffs' Claims ..... 8

III. LEGAL STANDARD AND APPLICABLE LAW ..... 9

IV. ARGUMENT ..... 11

A. Plaintiffs' Claims Should Be Dismissed as Time-Barred ..... 11

1. The Applicable Statutes of Limitations Bar the Claims ..... 11

2. Plaintiffs Plead No Plausible Basis for Tolling ..... 13

B. Plaintiffs Fail to State a Breach of Fiduciary Duty Claim ..... 14

1. Plaintiffs Fail to Plausibly Allege Existence of a Fiduciary Duty ..... 15

2. Plaintiffs' Trail-Compensation and "Duty of Loyalty" Theories Fail to Establish a Fiduciary Duty ..... 18

3. Plaintiffs' "Insider" Theory Also Fails to Establish a Fiduciary Duty ..... 19

C. The Professional Negligence Claim Is Duplicative of the Fiduciary Duty Claim and Fails As a Matter of Law ..... 20

D. Plaintiffs' Unjust Enrichment Claim Fails As a Matter of Law ..... 21

E. The FAC Fails to State a WCPA Claim ..... 22

F. Plaintiffs' Claimed Injuries Are Too Speculative to Plausibly Plead Article III Standing and Damages for Any of Their Claims ..... 23

V. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 9

*Burkhart v. Genworth Fin., Inc.*,
250 A.3d 842 (Del. Ch. 2020) .......... 13

*Candelora v. Clouser*,
621 F. Supp. 335 (D. Del. 1985) .......... 15

*Chertok v. Zillow, Inc.*,
2021 WL 4851816 (Del. Ch. Oct. 18, 2021), *aff'd*, 277 A.3d 1258 (Del. 2022) .......... 12

*Citron v. Steego Corp.*,
1988 WL 94738 (Del. Ch. Sept. 9, 1988) .......... 14, 20

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 23

*Clinton v. Acequia, Inc.*,
94 F.3d 568 (9th Cir. 1996) .......... 25

*CoreTel Am., Inc. v. Oak Point Partners, LLC*,
2022 WL 2903104 (Del. Super. Ct. July 21, 2022) .......... 21

*CoVenture - Burt Credit Opportunities GP, LLC v. Coleman*,
2023 WL 7179488 (Del. Super. Ct. Nov. 1, 2023) .......... 24

*Forsythe v. ESC Fund Mgmt. Co. (U.S.)*,
2007 WL 2982247 (Del. Ch. Oct. 9, 2007) .......... 17

*Gehring v. Osaic Inc.*,
2026 WL 248379 (D. Ariz. Jan. 30, 2026) .......... 17

*Grausz v. Hershey Co.*,
691 F. Supp. 3d 1178 (S.D. Cal. 2023) .......... 8

*Gray v. Amazon.com, Inc.*,
653 F. Supp. 3d 847 (W.D. Wash. 2023) .......... 23

*Griffith v. Centex Real Est. Corp.*,
969 P.2d 486 (Wash. Ct. App. 1998) .......... 23

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Hernandez v. Baird Mandalas Brockstedt & Federico, LLC*, 315 A.3d 1183 (Del. Super. Ct. 2024), *aff'd*, 341 A.3d 473 (Del. 2025) .......... 23

*Horizon Servs., Inc. v. Henry*, 304 A.3d 552 (Del. 2023) .......... 24

*Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor v. INS*, 306 F.3d 842 (9th Cir. 2002) .......... 11

*In re E. Coast Foods, Inc.*, 80 F.4th 901 (9th Cir. 2023) .......... 23

*In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055 (S.D.N.Y. Feb. 12, 2026) .......... 17

*In re LPL Fin. Cash Sweep Litig.*, 789 F. Supp. 3d 961 (S.D. Cal. 2025) .......... 17

*In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315 (N.D. Cal. June 27, 2025) .......... 17

*Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del. Ch. 1993) .......... 14

*Kaufman v. C.L. McCabe & Sons*, 603 A.2d 831 (Del. 1992) .......... 12, 14

*Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) .......... 22

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .......... 3

*Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872 (Del. Ch. 2009) .......... 21

*Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701 (S.D.N.Y. 2025) .......... 17

*Lillard v. Offit Kurman, P.A.*, 2026 WL 2495395 (Del. Super. Ct. Aug. 24, 2026) .......... 19

*MacLaughlan v. Einheiber*, 354 A.3d 864 (Del. Ch. 2026) .......... 15

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Madison Ave. Inv. Partners, LLC v. Am. First Real Est. Inv. Partners, L.P.*, 806 A.2d 165 (Del. Ch. 2002) .......... 13, 20

*McMahon v. New Castle Assocs.*, 532 A.2d 601 (Del. Ch. 1987) .......... 15, 16

*Metro Storage Int'l LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022) .......... 23

*Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179 (W.D. Wash. 2010) .......... 22

*Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, 360 A.3d 215 (Del. 2026) .......... 14

*Munns v. Kerry*, 782 F.3d 402 (9th Cir. 2015) .......... 23

*Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459 (1992) .......... 10

*Nemec v. Shrader*, 991 A.2d 1120 (Del. 2010) .......... 20, 21

*Nguyen v. Raymond James & Assocs., Inc.*, 2022 WL 17811068 (M.D. Fla. Dec. 19, 2022) .......... 10

*Patton v. Cox*, 276 F.3d 493 (9th Cir. 2002) .......... 10

*Rajaee v. Davis*, 2024 WL 2925332 (S.D. Cal. June 10, 2024) .......... 25

*REX - Real Est. Exch. Inc. v. Zillow Inc.*, 2021 WL 3930694 (W.D. Wash. Sept. 2, 2021) .......... 22

*Schweitzer v. LCR Cap. Partners, LLC*, 2020 WL 1131716 (Del. Super. Ct. Mar. 9, 2020) .......... 20

*Scotto Princeton LLC v. Felsen Assocs., Inc.*, 11 Misc. 3d 378 (N.Y. Sup. Ct. 2005) .......... 19

*SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180 (1963) .......... 18

*Sherwin-Williams Co. v. JJT, Inc.*, 2014 WL 2587483 (S.D. Cal. June 10, 2014) .......... 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542 (Del. Ch. Aug. 5, 2009) .... 16

*Souter v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083 (S.D. Cal. 2021) .... 10

*State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372 (Del. 2023) .... 23

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069 (Del. 1983) .... 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007) .... 9

*Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760 (Del. Ch. 2007) .... 22

*Tilden v. Cunningham*, 2018 WL 5307706 (Del. Ch. Oct. 26, 2018) .... 13

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11 (1979) .... 18

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312 (Del. 2004) .... 11, 13

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106 (Del. 2006) .... 15, 16

*Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024 (Del. Ch.), *aff'd*, 894 A.2d 407 (Del. 2005) .... 19

*Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063 (Del. Ch. Dec. 23, 2008) .... 14

*Wohlsen Constr. Co. v. Berkel & Co. Contractors*, 2025 WL 2306140 (Del. Super. Ct. Aug. 11, 2025) .... 20

*Zhu v. Wang*, 2026 WL 232871 (W.D. Wash. Jan. 26, 2026) .... 11

**STATUTES**

Wash. Rev. Code § 19.86.020 .... 22

Wash. Rev. Code § 19.86.120 .... 11

## TABLE OF AUTHORITIES
## (continued)

**Page**

**OTHER AUTHORITIES**

*Account Agreements and Account Packets*, LPL Financial, https://www.lpl.com/disclosures/account-agreements-account-packets.html (last visited Oct. 12, 2026) ..... 3

CT Insurance Dep't, FAQs from PHL Policyholder Forum (Apr. 13, 2026) ..... 24

*Ins. Comm'r of the State of Conn. v. PHL Variable Ins. Co.*, No. X06-UWY-CV-24-6085274-S (Conn. Sup. Ct.), Rehabilitator's Third Rpt. on Status of Liquidation Planning, Sept. 30, 2026 ..... 8

*Ins. Comm'r of the State of Conn. v. PHL Variable Ins. Co.*, No. X06-UWY-CV-24-6085274-S (Conn. Sup. Ct.), Rpt. of the Rehabilitator, Dec. 31, 2025 ..... 8

*PHL Policy and Annuity Holder Information Session Tr.* ..... 8

**RULES**

Fed. R. Civ. P. 9(b) ..... 22

**REGULATIONS**

17 C.F.R. § 240.17a-14 ..... 3

17 C.F.R. § 275.204-5 ..... 3

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs seek to hold Defendant LPL Financial LLC ("LPL") liable for something it never agreed to do: monitor the financial health of a third-party insurance company that issued Plaintiffs' annuities. Plaintiffs allege that LPL financial advisors recommended annuities issued by PHL Variable Insurance Company[1]—to Plaintiff Kerry Nietz in 1999 and to the late husband and father of Plaintiffs Alina and Mark Tyminski in 2002. Plaintiffs amended their original complaint after reviewing LPL's first motion to dismiss and had every incentive to cure the deficiencies LPL identified. Plaintiffs failed to cure those deficiencies. The First Amended Complaint ("FAC," Dkt. 24) abandons the fraudulent concealment claim, but the remaining claims fail for the same reasons as before.

The FAC identifies no advisory agreement, no advisory fee, no grant of discretionary authority, and no written undertaking that imposes a duty on LPL to monitor these annuities. That omission is not an accident. The agreements that govern Plaintiffs' accounts expressly foreclose any such duty. Both annuities were held in non-advisory brokerage accounts governed by LPL's Master Account Agreement, which expressly provides that LPL has "***no duty to provide ongoing monitoring of . . . investments***." Plaintiffs cannot plead a duty that the governing agreements expressly disclaim.

And even if Plaintiffs could establish that LPL had some duty to speak, there was nothing to disclose. As the FAC acknowledges, PHL's financial decline was in plain view as early as ***seventeen years*** before this lawsuit—in PHL's own SEC filings, ratings agency downgrades beginning in 2009, a 2014 SEC cease-and-desist order, and PHL's 2015 warning that it could be placed into rehabilitation. The last pre-rehabilitation event Plaintiffs identify was made public more than ***six years***

---

[1] PHL Variable Insurance Company was formerly known as The Phoenix Companies, Inc., and is referred to herein as "PHL."

before this suit. Although the FAC attempts to label LPL a "Phoenix insider," it identifies no fact uniquely known to LPL. The same timeline also dooms every claim as time-barred. Plaintiffs' theory is that LPL's alleged breach began in 2009, and neither their new "discovery" allegations nor the Tyminskis' 2016 and 2019 deposits into the annuity revive any applicable limitations periods, which have all long passed.

Each claim fails for these and additional independent reasons.

***First***, Plaintiffs' fiduciary duty and professional negligence claims fail because they cannot establish a duty. The negligence claim simply restates Plaintiffs' legally flawed fiduciary theory under a different name.

***Second***, Plaintiffs' unjust enrichment claim is barred because express contracts govern their relationships with LPL. Moreover, Plaintiffs allege no direct link between LPL's PHL-paid trail compensation and Plaintiffs' alleged future loss, which stems from PHL's court-supervised proceedings—***not*** from LPL.

***Third***, the Washington Consumer Protection Act claim fails because Plaintiffs cannot plead, let alone with Rule 9(b)'s requisite particularity, that LPL's conduct deceived a substantial portion of the public—an impossible showing given that the allegedly concealed information was public at all times.

***Fourth***, even setting aside the above defects, each claim fails for lack of concrete injury caused by LPL. Plaintiffs' alleged harm depends on the outcome of PHL's rehabilitation proceeding, which the FAC acknowledges is ongoing and unresolved. Plaintiffs' damages are wholly speculative and Plaintiffs therefore also lack standing to bring their claims.

The FAC should be dismissed with prejudice.

## II. BACKGROUND

### A. LPL's Business

LPL is an independent broker-dealer and investment adviser, registered with the Securities and Exchange Commission ("SEC") and the Financial Industry

Regulatory Authority ("FINRA"). FAC ¶ 16 & n.1.[2] LPL is required under SEC and FINRA rules to provide customers with a "Relationship Summary" that explains (among other things) the types of services LPL offers and the standard of conduct associated with each. 17 C.F.R. § 240.17a-14 (broker-dealers must deliver a relationship summary to retail investors); *id.* § 275.204-5 (investment advisers must deliver a relationship summary to retail investors). The Relationship Summary is available on the SEC and FINRA websites, and it is also included as part of the agreements governing LPL's brokerage and advisory accounts. *See Account Agreements and Account Packets*, LPL Financial, https://www.lpl.com/disclosures/account-agreements-account-packets.html (last visited Oct. 12, 2026); *see also* Ex. A.

Plaintiffs selectively quote LPL's Relationship Summary in the FAC, but that Summary generally explains that LPL provides both securities brokerage and investment advisory services through a network of financial professionals. *E.g.*, FAC ¶¶ 16, 34; Ex. A at 2. As the Relationship Summary goes on to explain, LPL's brokerage and investment advisory services are distinct. Ex. A at 2. ***Brokerage services*** involve LPL advisors taking point-in-time orders, executing securities transactions, and maintaining assets and accounts. In providing brokerage services, LPL may recommend investments, but clients make the ultimate investment decisions. *Id.* LPL discloses to brokerage customers that "we provide recommendations to you on specific investments," but "***[w]e don't monitor brokerage account investments*** for you, unless we state otherwise in writing." *Id.* When LPL provides ***investment advisory services***, it provides advice for a fee, and either LPL or another financial institution may be granted discretion to manage the

[2] Factual allegations are drawn from the FAC and documents incorporated by reference therein. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Unless otherwise indicated, all emphasis is added, internal quotations and citations are omitted, and exhibit cites ("Ex. __") are to the Omnibus Crawford Declaration in Support of LPL's Motion to Dismiss the FAC, filed concurrently.

client's investments; or the account may be nondiscretionary, in which case the client retains control. *Id.*

### B. Plaintiffs' PHL Annuities Are Associated with Brokerage, Non-Advisory Accounts Governed by the Master Account Agreement

Plaintiff Kerry Nietz claims to have a decades-long "advisory" relationship with LPL. FAC ¶¶ 19, 104. He alleges that his relationship with LPL began in 1997, and that from 1997 to 2013, LPL financial advisor Barry Hartz "offered advisory services through LPL Financial" and advised him on estate and retirement planning. *Id.* ¶¶ 105–107. In or around 1999, Mr. Hartz allegedly recommended Mr. Nietz purchase the Phoenix variable annuity product now known as "The Big Edge Choice" (the "Nietz Annuity"), which is owned by a Washington trust, the Kerry L Nietz Trust 1997. *Id.* ¶¶ 9–10, 109. In or around 2003, Mr. Hartz allegedly recommended—and Mr. Nietz chose—a reallocation of the Nietz Annuity's entire value into the contract's fixed-rate Guaranteed Interest Account ("GIA"). *Id.* ¶¶ 84, 110. Mr. Nietz alleges that after Mr. Hartz retired in 2013, Nicholas Snyder became his LPL advisor and also "offered advisory services through LPL Financial." *Id.* ¶¶ 111–112.

Plaintiffs Alina and Mark Tyminski allege that in or about 2002, Tadeusz Tyminski ("Mr. Tyminski")—Alina's late husband and Mark's father—was referred by Webster Bank personnel to Anthony Marciano, described as "an LPL financial consultant with an office in the Webster branch" and whose "business card bore the Webster Bank name." FAC ¶ 131. According to the FAC, Webster offered annuity products to its customers through "Webster Investment Services," under a networking arrangement with LPL in which Webster financial consultants were registered representatives of LPL and sold products for which LPL was the broker-dealer of record. *Id.* ¶¶ 130, 132.

On or around August 20, 2002, allegedly on the basis of Mr. Marciano's recommendation, Mr. Tyminski purchased a PHL "Retirement Planner's Edge"

flexible premium deferred annuity (the "Tyminski Contract," and together with the Nietz Annuity, the "Annuities" or "PHL Annuities"), with Mr. Tyminski as sole owner and annuitant. FAC ¶ 133. Plaintiffs allege that one hundred percent of the premium was allocated to the Tyminski Contract's GIA. *Id.* ¶ 135. Mr. Tyminski added funds over time, including a $250,000 deposit in July 2016—when he added Alina Tyminski as an additional owner—and a $73,000 contribution in January 2019. *Id.* ¶¶ 138–140, 145. The FAC alleges that LPL and Mr. Marciano "received commissions on each premium paid into the Tyminski Contract," as well as trailing commissions. *Id.* ¶ 143.

***Plaintiffs' Accounts.*** Plaintiffs' account documents show their Annuities were associated with non-advisory Direct Business accounts with LPL:

- ***Mr. Nietz.*** Mr. Nietz's LPL account records, including his PHL annuity application, show the Nietz Annuity was associated with a non-advisory Direct Business account (the "Nietz Account"). Omnibus Crawford Decl. ¶ 10; Ex. E. To open the Nietz Account, Mr. Nietz filled out and signed two LPL New Account Applications and Agreements, each designating the account type as "Direct Business." Ex. C (4/7/2004 app'n) at 53; Ex. D (11/22/2006 app'n) at 58.
- ***The Tyminskis.*** In July 2016, when Alina Tyminski was added as a joint owner, she and Mr. Tyminski signed an LPL account application designating a Direct Business account associated with the Tyminski Contract (the "Tyminski Account"), and acknowledged that they had received and agreed to the LPL Master Account Agreement. Omnibus Crawford Decl. ¶ 11; Ex. F at 69 (7/21/2016 app'n).

A Direct Business account is a type of LPL brokerage account. Ex. B at 11. The Master Account Agreement specifies that for Direct Business account customers, "LPL acts as the broker/dealer of record" and not the custodian of assets, because the customer is "opening an account directly with a product sponsor

or issuer"—for example, a "variable annuity sponsor." *Id.*[3] The account applications provide that the customer has "reviewed and accept[ed] the Master Account Agreement[.]" *See, e.g.*, Ex. C (4/7/2004 Nietz app'n) at 53. Both the Relationship Summary—which is quoted in the FAC—and the Master Account Agreement are part of an "Account Packet" governing LPL's relationship with Plaintiffs. Ex. B; *see* FAC ¶¶ 16, 34.

The Master Account Agreement provides that "neither LPL nor your [LPL] Representative will provide ongoing monitoring of your accounts for the purpose of providing investment advice," and "you understand that LPL and your Representative have ***no duty to provide ongoing monitoring of your investments*** for the purposes of recommending changes in investments." Ex. B at 11. The Agreement later reiterates that "You understand that when engaging in a brokerage relationship with us, ***LPL and your Representative do not agree to, and therefore you should not expect that we will, provide investment advice . . . for your account on an ongoing basis, or provide ongoing account monitoring***." *Id.* at 28.

### C. <u>PHL's Public Financial Difficulties and Regulatory Proceedings</u>

Beginning in 2009, PHL's financial condition began to deteriorate, resulting in a series of public credit ratings agency downgrades. FAC ¶¶ 21, 47 nn.19–20 (citing The Phoenix Companies, Inc., *Form 10-Q*, Sept. 30, 2009). As the FAC acknowledges, these events were "confirmed in Phoenix's own SEC filings and observable by any broker-dealer, investment advisor risk, or compliance department." *Id.* ¶ 23. According to the FAC, LPL removed PHL products from its

---

[3] The Master Account Agreement defines "Brokerage" accounts as those in which "LPL acts as the broker/dealer of record and as the custodian of the assets in your account," and "Direct Business" accounts as those in which "LPL acts as the broker/dealer of record on your account ***but is not*** the custodian of your assets." Ex. B at 11. LPL therefore uses "brokerage" to refer to the non-advisory relationship reflected in either account type, as distinct from LPL's investment advisory services. *See* Ex. A at 2 (Relationship Summary distinguishing LPL's "Brokerage Services" from "Investment Advisory Services").

recommendation list "[a]s a result of this initial downgrade," and then "ceased selling" them. *Id.* ¶¶ 24, 50. Plaintiffs claim that PHL's financial condition continued to worsen over the following decade, including through a 2019 downgrade to junk status and PHL's 2019 announcement that it had entered run-off. *Id.* ¶¶ 27–28, 62–64; *see also infra* Part IV.A.1 (listing representative alleged public events and disclosures pleaded in the FAC).

On March 31, 2023, the Connecticut Insurance Department ("CID") placed PHL under administrative supervision, and on May 20, 2024, the CID ordered PHL into a rehabilitation proceeding. FAC ¶¶ 71–73 & n.41.[4] A "Temporary Moratorium Order" was issued in the proceeding, limiting PHL product policy withdrawals, surrenders, and death benefit payouts, with aggregate limits of $300,000 for life insurance policies and $250,000 for annuities. *Id.* ¶¶ 74, 82–83. On December 31, 2025, the Rehabilitator found rehabilitation for PHL "not feasible," with liquidation expected in the first half of 2027. *Id.* ¶¶ 77–78. If an insurer is liquidated, state guaranty associations—funded by the other insurers licensed in the state—pay annuity holders' covered benefits up to limits set by state law, which in Connecticut is $500,000. *See id.* ¶ 142 (citing Conn. Gen. Stat. § 38a-860). On April 13, 2026, the Rehabilitator noted at a public information session that PHL policyholders could expect "an estimated recovery . . . [of] 34 to 57%" for claims exceeding a policyholder's guaranty association coverage limit, not for total amounts owed. *Id.* ¶ 89 & n.50 (citing *PHL Policy and Annuity Holder Information Session Tr.* 11–12, 14 (Apr. 13, 2026), https://portal.ct.gov/cid/-/media/cid/1_phl/phl-policy-and-annuity-holder-information-session.pdf). Plaintiffs allege that this estimate applies to ***everything*** they are owed. *Id.* ¶ 89. Filings in the proceeding, however, reflect that it applies only to the amount above

---

[4] The FAC cites PHL's rehabilitation proceeding with a link to its public docket: https://civilinquiry.jud.ct.gov/DocumentInquiry/DocumentInquiry.aspx?DocumentNo=27532057.

guaranty-association limits, which are paid first, in full. *See PHL Policy and Annuity Holder Information Session Tr.* at 14. Plaintiffs also allege their contract values were allocated entirely to the GIA, which is supported by PHL's general account. FAC ¶¶ 84, 110, 135–136. As to such claims, guaranty-association coverage applies first; Plaintiffs acknowledge that this coverage protects the Tyminskis up to $500,000. *Id.* ¶¶ 142, 150.

Public filings in the proceeding explain that the Rehabilitator "is now focused on pursuing a transaction . . . in order to maximize the value of the Companies' assets and coverage for policyholders[.]" *See Ins. Comm'r of the State of Conn. v. PHL Variable Ins. Co.*, No. X06-UWY-CV-24-6085274-S (Conn. Sup. Ct.), Rpt. of the Rehabilitator, Dec. 31, 2025.[5] Any benefits above guaranty-association limits "would be funded by estate assets and ultimately subject to approval by the liquidation court." *Id.*, Rehabilitator's Third Rpt. on Status of Liquidation Planning at 2, Sept. 30, 2026.

**D. <u>Plaintiffs' Claims</u>**

Plaintiffs allege that, at all times after 2009, LPL knew of PHL's declining financial condition but failed to disclose it to LPL's customers. FAC ¶¶ 25, 29, 68. According to the FAC, had LPL disclosed PHL's condition, they would have completed a 1035 exchange for an alternative investment, surrendered their Annuities, or withdrawn their cash value before the Temporary Moratorium Order took effect on May 20, 2024 in the CID proceeding. *Id.* ¶¶ 91–94, 117, 155. Plaintiffs allege that LPL had an "incentive" not to disclose PHL's condition because LPL continued to collect trail compensation (*i.e.*, an ongoing fee from PHL) on PHL products throughout the relevant period. *Id.* ¶¶ 70, 182–183. Plaintiffs label LPL a "Phoenix insider" with "particularized knowledge." *See id.*

---

[5] *See supra* n.4. The court filings are incorporated by reference and independently judicially noticeable. *See Grausz v. Hershey Co.*, 691 F. Supp. 3d 1178, 1187 (S.D. Cal. 2023) ("The Court may take judicial notice of court filings.").

¶¶ 21, 49, 60. But they identify no non-public fact about PHL's financial condition that LPL possessed at any time. Additionally, the FAC has no allegation that the PHL Annuities declined in value during the period Plaintiffs claim LPL should have warned them to exit. To the contrary, Mr. Nietz alleges that the Nietz Annuity was worth $1,063,037.25 by 2021, up from a surrender value of $692,426.74 in 2010, and exceeded $1,000,000 as of 2023. FAC ¶¶ 6, 114, 118. The Tyminskis allege that their statement for the quarter ending June 30, 2025 "reflects no fees or charges, no withdrawals, and a paper 'gain,'" and that as of September 23, 2026 the Tyminski Contract's account value was $794,496.43, with interest "reportedly continuing to accrue at the rate of 3% per annum." *Id.* ¶¶ 137, 151.

Plaintiffs bring claims against LPL for professional negligence (Count I), breach of fiduciary duty (Count II), unjust enrichment (Count III), and violations of the Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010 *et seq*. ("WCPA") (Count IV). FAC ¶¶ 170–227. Plaintiffs bring the first three claims on behalf of themselves and a putative Nationwide Class of "All persons in the United States who acquired rights under life insurance policies or annuity contracts offered by The Phoenix Companies, Inc. (the 'Phoenix Products') sold by Defendant, or purchased the Phoenix Products from Defendant through LPL investment advisors[.]" *Id.* ¶ 159. Mr. Nietz brings the WCPA claim, on behalf of himself and a Washington Subclass. *Id.* ¶¶ 160, 210.

## III. LEGAL STANDARD AND APPLICABLE LAW

Under Rule 12(b)(6), a complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making the plausibility determination, a court must consider the complaint, documents incorporated therein, and "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). While courts must accept well-pleaded allegations as

true, "[t]his presumption does not extend to conclusory allegations, unwarranted deductions of fact, or unreasonable inferences." *Souter v. Edgewell Pers. Care Co.*, 542 F. Supp. 3d 1083, 1089 (S.D. Cal. 2021).

The FAC does not identify which state law governs Plaintiffs' common-law claims. Because this Court sits in diversity, California's choice-of-law rules apply. *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002). The Master Account Agreement governing Plaintiffs' relationship with LPL contains an express choice-of-law provision applying Delaware law. Ex. B at 28.[6] "[I]f the parties state their intention in an express choice-of-law clause, California courts ordinarily will enforce the parties' stated intention." *Sherwin-Williams Co. v. JJT, Inc.*, 2014 WL 2587483, at *2 (S.D. Cal. June 10, 2014). A contractual choice-of-law clause "encompasses all causes of action arising from or related to that agreement, . . . including tortious breaches of duties emanating from the agreement or the legal relationships it creates." *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 470 (1992). Accordingly, Delaware law should apply.

---

[6] The Master Account Agreement also contains an arbitration clause: "[A]ny claims or controversy arising between you and LPL and/or your Representative(s) . . . arising out of or relating in whole or in part to your account, transactions with or for you, [or] this agreement . . . shall be settled by arbitration." Ex. B at 26. That provision includes a class-action carve-out: "No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action . . . until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court." *Id.* LPL expressly preserves, and does not waive, its rights to seek to enforce this provision, and any other applicable arbitration or choice-of-law provision, as to each Plaintiff in the event class certification is denied, the class is decertified, or any Plaintiff is excluded from the class. *See, e.g.*, *Nguyen v. Raymond James & Assocs., Inc.*, 2022 WL 17811068, at *6 (M.D. Fla. Dec. 19, 2022) (under a similar provision, holding the defendant was not "waiv[ing] its right to compel arbitration by abiding by the terms of the contract").

# IV. ARGUMENT

## A. Plaintiffs' Claims Should Be Dismissed as Time-Barred

### 1. The Applicable Statutes of Limitations Bar the Claims

Plaintiffs' claims for professional negligence, breach of fiduciary duty, and unjust enrichment are subject to a three-year limitations period. *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004). Plaintiffs' WCPA claim is governed by a four-year statute of limitations. *Zhu v. Wang*, 2026 WL 232871, at *3 (W.D. Wash. Jan. 26, 2026) (citing RCW 19.86.120). Mr. Nietz filed the original Complaint on June 3, 2026 (Dkt. 1). To be timely, his common-law claims must have accrued after June 3, 2023, and his WCPA claim after June 3, 2022. The Tyminskis were not added as plaintiffs until the FAC on September 24, 2026. Dkt. 24. Unless their claims "relate back" to the original Complaint, their claims must have accrued after September 24, 2023. *See Immigrant Assistance Project of L.A. Cnty. Fed'n of Labor v. INS*, 306 F.3d 842, 856–58 (9th Cir. 2002) (claims of later-added plaintiffs would "normally be time-barred" unless they "relate back" to the original complaint).[7] Yet Plaintiffs challenge LPL's conduct dating back to 2009—more than a ***decade*** before any of these dates.

Every pre-rehabilitation event that Plaintiffs now claim LPL should have disclosed occurred no later than 2019, well before any applicable statute of limitations period, and each was public knowledge when it occurred. For example:

- credit rating agency downgrades of PHL in 2009 (FAC ¶¶ 21, 47, 49);
- PHL's 2012 material weakness disclosure (*id.* ¶ 53);
- a 2014 SEC cease-and-desist order against Phoenix and PHL for failure to timely file periodic reports (*id.* ¶ 54);

[7] The Tyminskis' claims do not "relate back" to the original Complaint, but the Court need not decide the issue: even if their claims are measured from June 3, 2026, the date of the filing of the Complaint, they are still time-barred.

- PHL's 2014 Form 10-K warning that PHL would not issue any new SEC-registered life insurance or annuity contracts (*id.* ¶ 55);
- PHL's 2015 warning that it could be placed into rehabilitation (*id.* ¶ 57);
- Phoenix's 2016 take-private deal (*id.* ¶ 58);
- S&P's 2019 downgrade of PHL to junk status (*id.* ¶ 62); and
- PHL's 2019 public announcement that it stopped marketing and selling new business, entering run-off (*id.* ¶ 63).

The only later events Plaintiffs identify are the Connecticut regulators' actions in 2023 through 2025. *Supra* Part II.C; FAC ¶¶ 65, 71–74, 77. But even if some of those events fall within a limitations window, they are public acts of the CID and the Rehabilitator, not LPL. FAC ¶¶ 121, 153. Nor can they constitute a new breach by LPL, because Plaintiffs' theory is that LPL should have warned them ***before*** the CID's Temporary Moratorium Order. *Id.* ¶¶ 91, 94, 155. Because Plaintiffs' claims rest on LPL's alleged knowledge of PHL's "deteriorating financial condition" dating to 2009, none of the claims is timely. *See, e.g.*, *Chertok v. Zillow, Inc.*, 2021 WL 4851816, at *5–7, 13 (Del. Ch. Oct. 18, 2021), *aff'd*, 277 A.3d 1258 (Del. 2022) (dismissing time-barred breach-of-contract and unjust enrichment claims).

That conclusion is the same even accepting Plaintiffs' theory that they supposedly lost the opportunity to exchange, surrender, or withdraw the Annuities before the Temporary Moratorium. FAC ¶¶ 91–94, 117, 155. Plaintiffs allege they would have acted had they been told of PHL's "deteriorating financial condition" at any time "after 2009"—facts that, as set out above, were public beginning in 2009 and, at the latest, by 2019. *E.g.*, *id.* ¶¶ 91, 155; *supra* Parts II.C, IV.A.1. A tort claim accrues when an alleged injury is sustained, and the limitations period is not postponed merely because damages occur later. *See Kaufman v. C.L. McCabe & Sons*, 603 A.2d 831, 834 (Del. 1992) (statute is not tolled just because "actual or substantial damages do not occur until a later date" after the breach).

Nor can Plaintiffs avoid the limitations bar by pointing to Mr. Tyminski's 2016 and 2019 deposits into his Annuity. FAC ¶¶ 139–140, 144–45. The FAC does not plead a claim challenging the suitability of those transactions. The acceptance of additional premiums into an existing contract is not a new breach that restarts the clock. *See infra* Part IV.A.2. And even if it were, any such claim would have accrued when each deposit was made—years before the earliest limitations date here.

**2. Plaintiffs Plead No Plausible Basis for Tolling**

Recognizing their claims are facially untimely, Plaintiffs offer three tolling theories: delayed discovery, continuing conduct, and alleged concealment. FAC ¶¶ 158, 121–122, 124, 126, 153, 154. None of these theories rescue Plaintiffs' claims.

***Discovery.*** Plaintiffs allege they could not have "discovered" their claims until consulting counsel—Mr. Nietz "in or about January 2026," the Tyminskis "some time in July of 2026." FAC ¶¶ 121–126, 153–154. But Delaware's discovery rule applies only where an injury is "inherently unknowable" and the plaintiff is "blamelessly ignorant" of it, and even then, only until the plaintiff is on inquiry notice. *Wal-Mart Stores*, 860 A.2d at 319. Delaware courts routinely reject discovery arguments where, as here, the relevant facts appeared in public SEC filings and financial statements. *See, e.g.*, *Tilden v. Cunningham*, 2018 WL 5307706, at *14 (Del. Ch. Oct. 26, 2018) (Forms 10-Q and 10-K); *Madison Ave. Inv. Partners, LLC v. Am. First Real Est. Inv. Partners, L.P.*, 806 A.2d 165, 177 (Del. Ch. 2002) (same). And it makes no difference that Plaintiffs say they did not read rating agency reports or found them "difficult to decipher." FAC ¶ 48. Public information about an insurer triggers inquiry notice "even if plaintiffs needed expert help to decipher" it. *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 860–61 (Del. Ch. 2020). Consulting a lawyer does not toll the limitations period for claims based on facts that were public for more than a decade before engaging counsel. *See*

*Kaufman*, 603 A.2d at 834–35 (no tolling even though insureds relied on defendant insurance agent's own advice, where defect was "apparent on the face of their policy").

***Continuing Conduct.*** Plaintiffs' continuing conduct theory would eliminate the statute of limitations altogether. They contend that LPL's duty "was breached continuously from 2009 through at least May 2024," so that the 2016 and 2019 deposits and LPL's continued receipt of trail compensation "relate back to the original breach." FAC ¶ 158. But later events that merely flow from an earlier alleged wrong do not restart the clock. *Kahn v. Seaboard Corp.*, 625 A.2d 269, 271 (Del. Ch. 1993) (payments under challenged contract did not extend limitations period), cited with approval in *Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, 360 A.3d 215, 236 (Del. 2026). Plaintiffs' own framing proves the point because by alleging that everything after 2009 "relate[s] back to the original breach" (FAC ¶ 158), they concede that their claims accrued in 2009.

***Concealment.*** Concealment-based tolling requires a defendant's act of concealment or misrepresentation intended to put the plaintiff off inquiry. *Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *15 (Del. Ch. Dec. 23, 2008). Plaintiffs abandoned their fraudulent concealment claim in the FAC, and there is no basis for concealment-based tolling to apply. What remains is a single conclusory assertion that LPL "withheld . . . information from them for years." FAC ¶ 154. That falls far short of the affirmative act of concealment that tolling requires, let alone the particularity Rule 9(b) demands. And LPL cannot have concealed what was already public. *Citron v. Steego Corp.*, 1988 WL 94738, at *7 (Del. Ch. Sept. 9, 1988) ("[i]t obviously is not fraud to fail to disclose" information from public sources).

### B. <u>Plaintiffs Fail to State a Breach of Fiduciary Duty Claim</u>

To state a claim for breach of fiduciary duty, Plaintiffs must plausibly plead that a fiduciary duty exists and that it was breached. *MacLaughlan v. Einheiber*,

354 A.3d 864, 890, 903 (Del. Ch. 2026). Lacking any agreement that creates such a duty, the FAC strings together four theories in an attempt to manufacture one: (1) LPL was a "investment or financial advisor" and "fiduciary" and therefore allegedly owed Plaintiffs the monitoring obligations it takes for advisory clients (*e.g.*, FAC ¶¶ 19–20); (2) LPL's receipt of trail compensation gave it an "incentive" to withhold information (*e.g.*, *id.* ¶¶ 96, 98); (3) LPL breached a "duty of loyalty" by placing "its own interest in continued trail compensation ahead of" Plaintiffs' interests and not recommending they move their assets away from PHL (*id.* ¶ 199); and (4) LPL was a "Phoenix insider" (*e.g.*, *id.* ¶¶ 43, 49–50). None of these theories establishes a fiduciary duty, and the agreements governing Plaintiffs' non-advisory accounts expressly foreclose one.

### 1. Plaintiffs Fail to Plausibly Allege Existence of a Fiduciary Duty

Because Plaintiffs were brokerage customers, there is no fiduciary relationship between Plaintiffs and LPL. A fiduciary relationship only exists where a person puts "special trust in another or where a special duty exists on the part of one person to protect the interests of another." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006). Ordinary commercial relationships, such as that between a broker-dealer and its customer, are not fiduciary in nature. *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604–05 (Del. Ch. 1987). For nondiscretionary "Direct Business" accounts, like the Nietz and Tyminski Accounts here (*supra* Part II.B), a broker's obligations are confined to the scope of its actual authority. *See Wal-Mart Stores*, 901 A.2d at 113–14 (agents are fiduciaries only when "authorized to alter the legal relations between the principal and third persons"). Generally, in a brokerage relationship, duties are limited to executing the customer's transactions, which is insufficient to give rise to a fiduciary duty. *See Candelora v. Clouser*, 621 F. Supp. 335, 344 (D. Del. 1985) (stockbroker's duty in a non-discretionary account is "to serve the client's interest in connection

with single transactions executed in the account").

Plaintiffs make the conclusory allegation that LPL supposedly acted "[a]s an investment adviser" and "fiduciary." FAC ¶ 191. But courts regularly look past conclusory labels to the parties' ***actual*** relationship to determine whether a fiduciary relationship exists. *See Wal-Mart Stores*, 901 A.2d at 113–14 (looking beyond plaintiff's "agent" label to the nature of the underlying relationship). Here, the account documents and governing contracts upon which Plaintiffs' Annuity-related claims are based confirm that Plaintiffs' actual relationships with LPL are standard brokerage relationships. Exs. C–G; *see also* LPL's Notice of Incorporation by Reference, filed concurrently. Without more, courts regularly hold that a "straightforward commercial relationship arising from contract" is insufficient to create a fiduciary duty. *See McMahon*, 532 A.2d at 604–05 (rejecting duty where "commercial relationship arising from contract" was "in all of its aspects an arms-length relationship").

And within the context of that brokerage relationship, Plaintiffs do not allege, much less show, that LPL had discretion over the PHL Annuities or the investment decisions concerning them—one of the touchstones of whether a fiduciary relationship exists. *See Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, 2009 WL 2501542, at *3 (Del. Ch. Aug. 5, 2009) ("The hallmark of a fiduciary relationship is that one person has the power to exercise control over the property of another as if it were her own."). LPL did not even hold the property at issue: in the Direct Business accounts Plaintiffs selected, LPL "is not the custodian of [the customer's] assets." *Supra* Part II.B. Plaintiffs allege no advisory agreement or written undertaking to monitor either Annuity, and they never allege that Plaintiffs paid LPL an ongoing advisory fee. Nor do they provide any facts to suggest LPL had any authority to make decisions affecting their Annuities. To the contrary, they allege that LPL facilitated or recommended the initial purchases—an act that does not give rise to an extra-contractual fiduciary duty. *See Forsythe v. ESC Fund*

*Mgmt. Co. (U.S.)*, 2007 WL 2982247, at *10 (Del. Ch. Oct. 9, 2007) (holding that "a straightforward, arm's-length commercial relationship arising from contract does not give rise to fiduciary duties"). And Plaintiffs' own allegations reflect that the decisions were theirs to make: they allege that they would have surrendered, withdrawn, or exchanged the Annuities had they been told of PHL's condition, effectively conceding that LPL had ***no*** discretionary authority. *See, e.g.*, FAC ¶ 120 (alleging Mr. Nietz "remained free to move" his PHL allocation and "could have [withdrawn the value of his annuity] at any time").

Not surprisingly, courts that have looked at this issue have rejected efforts to hold broker-dealers—as LPL is here to Plaintiffs—liable under a fiduciary-duty theory. *See, e.g.*, *In re LPL Fin. Cash Sweep Litig.*, 789 F. Supp. 3d 961, 986–87 (S.D. Cal. 2025) (dismissing fiduciary-duty claim against LPL because relationship with customers was "exceedingly narrow and limited . . . [and] there [was] neither any common-law fiduciary obligation, nor any special relationship of trust, confidence, or reliance"); *In re JPMorgan Chase Cash Sweep Program*, 2026 WL 396055, at *10–11 (S.D.N.Y. Feb. 12, 2026) (dismissing fiduciary-duty claim because "[b]rokers do not owe general fiduciary duties to nondiscretionary clients" and complaint did not allege broker "had any discretionary authority"); *In re Wells Fargo Cash Sweep Litig.*, 2025 WL 1785315, at *3 (N.D. Cal. June 27, 2025) (dismissing fiduciary-duty claim by non-advisory clients who did not allege broker "had any discretionary authority"); *Gehring v. Osaic Inc.*, 2026 WL 248379, at *9 (D. Ariz. Jan. 30, 2026) (dismissing fiduciary-duty claim because allegations did not plead "discretionary authority to make individualized investment decisions or execute transactions"); *Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 716–17 (S.D.N.Y. 2025) (dismissing fiduciary-duty claim by non-advisory customer where broker's role was limited to opening accounts, sweeping cash, and returning cash on instruction).

Plaintiffs' invocation of *SEC v. Capital Gains Research Bureau, Inc.*, 375

U.S. 180, 191–92 (1963), for a statutory hook is misplaced. *See* FAC ¶ 191. That case is inapposite because it addressed the SEC's authority under the Investment Advisers Act (the "IAA"), not a private damages suit, and in any event, a private right of action under the IAA is confined to rescission of an investment advisory contract that violates the statute, and Plaintiffs do not allege any violation. *See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 24 (1979). Nor does the case absolve Plaintiffs from pleading that an advisory relationship existed, rather than presupposing one.

Equally fatal, LPL expressly disclaimed the very duty Plaintiffs seek to impose. The Master Account Agreement governing Plaintiffs' non-advisory Direct Business accounts provides that LPL has "***no duty to provide ongoing monitoring of . . . investments***." And LPL's Relationship Summary tells every brokerage customer the same thing in plain terms: "[w]e don't monitor brokerage account investments for you." *Supra* Parts II.A–B; Ex. B at 11; Ex. A at 2.

### 2. Plaintiffs' Trail-Compensation and "Duty of Loyalty" Theories Fail to Establish a Fiduciary Duty

Plaintiffs' trail-compensation and "duty of loyalty" allegations fare no better.

***Trail Compensation.*** Trail compensation is an ongoing payment that LPL receives from the company that issues an investment product, such as a mutual fund or annuity, while the customer continues to hold that product. *See* Ex. B at 9, 36. The issuer pays trails out of the product's own assets under its distribution arrangement with LPL, generally as a small annual percentage of the amount invested, and for annuities the payment compensates LPL for the "promotion, sale and servicing of a policy." *Id.* at 36. Plaintiffs allege that trail compensation "was used to pay LPL for its advisory services." FAC ¶¶ 96, 98, 174, 177. But trails are distribution compensation paid by the issuer—not a fee for exercising ongoing judgment over Plaintiffs' accounts, and they cannot transform an ordinary brokerage relationship into a fiduciary one. *See* Ex. B at 9 (trail payments are

"ongoing distribution charges (e.g., 12b-1 fees or trail payments)"); *Scotto Princeton LLC v. Felsen Assocs., Inc.*, 11 Misc. 3d 378, 382 (N.Y. Sup. Ct. 2005) (dismissing fiduciary duty claim where "[t]he only compensation [defendant] received was the commissions earned on the placement or renewal of insurance policies"); *Weil v. Morgan Stanley DW Inc.*, 877 A.2d 1024, 1035–36, 1038 (Del. Ch.) (brokers for nondiscretionary accounts owe "very limited, transactionally-specific duties"), *aff'd*, 894 A.2d 407 (Del. 2005). Plaintiffs' own source confirms that trails offset an advisory fee only "***[i]f*** the custom advisory services apply to variable annuities" (FAC ¶ 98 n.54), and Plaintiffs do not allege contracting for those services or paying any advisory fee.

***"Duty of Loyalty."*** Relabeling this theory as a "duty of loyalty" fails for the same reasons. A duty of loyalty is a fiduciary duty, and cannot exist without a fiduciary relationship. *See Lillard v. Offit Kurman, P.A.*, 2026 WL 2495395, at *8 (Del. Super. Ct. Aug. 24, 2026) (allegation that defendant attorney "must act in the client's best interest, demonstrating trust, loyalty and transparency" was insufficient to plead fiduciary duty). Nor is it plausible to accuse LPL of being disloyal by not giving advice it never agreed to give. *Supra* Part IV.B.1. If ordinary issuer-paid compensation sufficed, every broker selling a commissioned product would face a fiduciary claim whenever it did not tell a customer to sell. *See Weil*, 877 A.2d at 1036 (rejecting theory that broker breached "vague fiduciary duty of loyalty" by profiting from customer relationships).

### 3. Plaintiffs' "Insider" Theory Also Fails to Establish a Fiduciary Duty

Plaintiffs' "insider" theory—that LPL's supposed knowledge as a Phoenix "insider" made it "duty bound" to warn Plaintiffs—depends on LPL having known something Plaintiffs could not. FAC ¶ 68. Plaintiffs' own allegations contradict that. Every fact the FAC cites was public. *See supra* Part IV.A.1. Without a non-public fact, there is no actionable omission (*Stephenson v. Capano Dev., Inc.*,

462 A.2d 1069, 1074 (Del. 1983)), and no duty to disclose (*Citron*, 1988 WL 94738, at *7 ("[i]t obviously is not fraud to fail to disclose" information from public sources)). *See Madison Ave.*, 806 A.2d at 177 (10-K and 10-Q reports and audited financial statements are "publicly available information"). Plaintiffs' principal "insider" allegation proves the point. They allege that LPL stopped recommending PHL products "[a]s a result of" the public 2009 downgrade (FAC ¶ 50)—a public rating action available to every investor, including Plaintiffs. The fact that LPL made an internal decision based on public information does not turn that information into a secret, and the governing agreements expressly disclaim any duty to translate such product-level decisions into ongoing advice for brokerage customers.

### C. The Professional Negligence Claim Is Duplicative of the Fiduciary Duty Claim and Fails As a Matter of Law

Plaintiffs' negligence claim should be dismissed as duplicative and because Plaintiffs do not plausibly plead that LPL owed or breached a professional duty.

Under the economic loss doctrine, tort and breach-of-contract claims are not "alternative theories of recovery for the same acts." *Wohlsen Constr. Co. v. Berkel & Co. Contractors*, 2025 WL 2306140, at *3 (Del. Super. Ct. Aug. 11, 2025). Where a dispute arises from obligations expressly addressed by contract, as here, it must proceed as a breach-of-contract claim, with any duplicative non-contract claims dismissed. *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (dismissing fiduciary-duty claim as duplicative); *compare* FAC ¶¶ 173, 179, 186–187 (professional negligence claim alleges LPL "assumed this fiduciary role" and "breached its fiduciary duty"), *with id.* ¶¶ 195–196, 200 (fiduciary duty claim alleging the same); *see, e.g.*, *Schweitzer v. LCR Cap. Partners, LLC*, 2020 WL 1131716, at *8–9 (Del. Super. Ct. Mar. 9, 2020) (dismissing negligence claim where it was based on same allegations as fiduciary-duty claim).

Plaintiffs' allegations do not state a viable claim in any event. As explained

above, the Master Account Agreement expressly disclaims the ongoing monitoring duty underlying Plaintiffs' fiduciary and negligence claims, and their other theories attempting to manufacture a fiduciary duty where none exists also fail as a matter of law. *Supra* Parts IV.B.1–3.

**D. <u>Plaintiffs' Unjust Enrichment Claim Fails As a Matter of Law</u>**

A quasi-contractual claim of unjust enrichment is barred where, as here, an enforceable contract governs the subject matter of the dispute. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 890–92 (Del. Ch. 2009) (dismissing unjust enrichment claim because plaintiff's relationship with defendants was governed by express contract). The Master Account Agreement governs Plaintiffs' relationships with LPL, so the claim fails at the threshold. Ex. B; *supra* Part IV.B.1.

Even if Plaintiffs could surmount that hurdle, they do not plead the required "direct relationship" between their alleged impoverishment and LPL's alleged enrichment. *CoreTel Am., Inc. v. Oak Point Partners, LLC*, 2022 WL 2903104, at *11–12 (Del. Super. Ct. July 21, 2022). Plaintiffs allege their premiums earned LPL upfront and trail compensation "in exchange for ongoing servicing and advice that Defendant did not provide." FAC ¶¶ 204–205. But they concede that trail payments come "from an annuity issuer" (*id.* ¶ 98), and their allegation that "PHL paid fees to itself (and commissions to LPL) out of funds that were supposed to be in the GIA" (*id.* ¶ 85), describes only payments by PHL from its own general account. *Id.* ¶ 84. Plaintiffs' contract values went to and remained with PHL; they were never diverted to LPL, which "is not the custodian" of customers' Direct Business account assets. Ex. B at 11. LPL's retention of issuer-paid compensation is not the "retention of money or property of another" that unjust enrichment requires. *Nemec*, 991 A.2d at 1130. And whatever loss Plaintiffs may suffer will stem from the Temporary Moratorium in the CID rehabilitation proceeding—***not*** from anything LPL retained. *See CoreTel*, 2022 WL 2903104, at *11–12 (dismissing unjust enrichment claim where plaintiff alleged injury to an asset, not

enrichment at plaintiff's expense); *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 796 n.161 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) (unjust enrichment "requires an absence of justification for the transfer that enriches one party and impoverishes the other"), *aff'd*, 956 A.2d 32 (Del. 2008).

**E. <u>The FAC Fails to State a WCPA Claim</u>**

The WCPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Here, Mr. Nietz's theory is that LPL knew of PHL's deteriorating financial condition but withheld that information while continuing to collect compensation, and that his injuries are the "consequence of Defendant's misrepresentations, fraud, deceptive practices, and omissions." FAC ¶¶ 216, 218, 220, 226. Because the claim sounds in fraud, it must satisfy Rule 9(b). *See REX - Real Est. Exch. Inc. v. Zillow Inc.*, 2021 WL 3930694, at *8 (W.D. Wash. Sept. 2, 2021). It fails both that standard and on the merits, and thus must be dismissed.

A plaintiff alleging fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Yet Mr. Nietz identifies no affirmative misstatement by LPL—much less who made it, when or where it was made, or how it was misleading. Nor does he identify with any particularity what LPL supposedly knew, when, and failed to disclose. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126–27 (9th Cir. 2009) (affirming dismissal of fraud-based claims "couched in general pleadings" for failure to satisfy Rule 9(b)). His assertions that LPL failed to disclose the "material risk" of the Phoenix Products, and should have told customers to "move their assets away from PHL Variable" (*e.g.*, FAC ¶¶ 181, 187, 222) are unsubstantiated conclusions the Court need not accept. *See, e.g.*, *Minnick v. Clearwire US, LLC*, 683 F. Supp. 2d 1179, 1188 (W.D. Wash. 2010) (dismissing WCPA false advertising claim based on "repetitive, conclusory statements" and failure to identify relied-upon statements).

A "deceptive" act under the WCPA is one that "had the capacity to deceive a

substantial portion of the public." *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 858 (W.D. Wash. 2023). Failing to repeat publicly available information could not deceive ***anyone***, let alone a "substantial portion" of the public. *See supra* Part IV.A.1; FAC ¶¶ 23, 218, 220; *Griffith v. Centex Real Est. Corp.*, 969 P.2d 486, 492 (Wash. Ct. App. 1998) (omission violates WCPA only where facts are "known to the seller but not easily discoverable by the buyer").

### F. Plaintiffs' Claimed Injuries Are Too Speculative to Plausibly Plead Article III Standing and Damages for Any of Their Claims

Finally, Plaintiffs lack Article III standing because they fail to plead a concrete injury caused by LPL. That same defect means they also fail to plead a crucial element of their common-law claims.[8]

A prospective future injury—as alleged here—must be "certainly impending," not merely a "speculative chain of [future] possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–14 (2013); *see also Munns v. Kerry*, 782 F.3d 402, 409–11 (9th Cir. 2015). There is nothing "certainly impending" about the outcome of ongoing proceedings in which guaranty-association coverage is paid first and in full and in which the Rehabilitator remains focused on "maximiz[ing] the value of the Companies' assets and coverage for policyholders." *Supra* Part II.C; *see In re E. Coast Foods, Inc.*, 80 F.4th 901, 910 (9th Cir. 2023) (no standing where creditor might still be paid in full under bankruptcy plan).

In the FAC, Plaintiffs now assert that it is "certain" they will not receive the entirety of what they are owed, and that "a reduction in value is certain to occur." FAC ¶¶ 89, 152. But the Tyminskis concede that their loss "cannot yet be

---

[8] Harm caused by a defendant's alleged breach or wrongful conduct is a required element for each common-law claim. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) (fiduciary duty); *Hernandez v. Baird Mandalas Brockstedt & Federico, LLC*, 315 A.3d 1183, 1187 (Del. Super. Ct. 2024), *aff'd*, 341 A.3d 473 (Del. 2025) (professional negligence); *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023) (unjust enrichment).

calculated with certainty," and that their recovery will include "guaranty association coverage of $500,000, together with whatever additional benefits, if any, the Rehabilitator is able to arrange." *Id.* ¶¶ 150, 152. Plaintiffs also concede that the timing of any liquidation "is uncertain," that interest continues to accrue, and that no specific benefit has been denied—only that withdrawals are restricted and they may someday not be paid in full. *Id.* ¶¶ 6, 78–80, 152; *supra* Part II.C. And they do not allege any diminution in value during the period they claim LPL should have warned them to exit. By Plaintiffs' own telling, then, whether any shortfall exists, and its amount, depends on the outcome of the ongoing Rehabilitation proceeding. Labeling that future "loss" as "certain" does not make it concrete.

Any present restriction on Plaintiffs' funds, moreover, is the product of the CID's Temporary Moratorium Order, not of any conduct by LPL. That includes the alleged loss of access to funds since May 2024 to pay for Mr. Tyminski's home health and hospice care. FAC ¶ 156. LPL does not minimize the hardship those circumstances present. But the Temporary Moratorium was imposed by the regulator "to avoid a 'run on the bank' scenario" and protect policyholders' recovery. *See* CT Insurance Dep't, FAQs from PHL Policyholder Forum (Apr. 13, 2026), at 5–6, https://portal.ct.gov/cid/-/media/cid/1_phl/phl-forum-qa-2026april13.pdf; *supra* Part II.C. Allowing Plaintiffs to shift that loss to LPL would also risk double recovery for a shortfall that guaranty-association coverage and PHL's proceedings may redress. *Horizon Servs., Inc. v. Henry*, 304 A.3d 552, 563 (Del. 2023) (Delaware policy "seeks to avoid allowing a plaintiff to recover twice for the same injury"); *see* FAC ¶¶ 142, 150; *CoVenture - Burt Credit Opportunities GP, LLC v. Coleman*, 2023 WL 7179488, at *10 (Del. Super. Ct. Nov. 1, 2023) (dismissing fraud claim arising from same facts as contract claim to avoid double recovery).[9]

---

[9] Should the Court decline to grant this motion, the case should be stayed pending resolution of PHL's rehabilitation proceeding. *See, e.g.*, *Clinton v. Acequia, Inc.*,

## V. **CONCLUSION**

Plaintiffs amended their pleading with the benefit of LPL's first motion to dismiss, which identified these same defects, and which the FAC does not cure. Because further amendment would be futile, the FAC should be dismissed in full without leave to amend.

Dated: November 6, 2026

O'MELVENY & MYERS LLP

*/s/ Pamela A. Miller*
Pamela A. Miller
Brittany Rogers
Lauren M. Wagner

*Counsel for Defendant*
*LPL Financial LLC*

---

94 F.3d 568, 572 (9th Cir. 1996) (claim dependent on "future contingencies that may or may not occur" unfit for review); *Rajaee v. Davis*, 2024 WL 2925332, at *1 (S.D. Cal. June 10, 2024) (staying case pending liquidation proceeding).